**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF NEW JERSEY,
  25 Market Street, 8th Floor
  Trenton, NJ 08625

STATE OF MARYLAND,
  200 Saint Paul Place
  Baltimore, MD 21202

STATE OF DELAWARE,
  820 North French Street
  Wilmington, DE 19801

STATE OF COLORADO,
  1300 Broadway
  Denver, CO 80203

DISTRICT OF COLUMBIA,
  400 6th Street NW
  Washington, DC 20001

STATE OF HAWAI'I,
  425 Queen Street
  Honolulu, HI 96813

STATE OF ILLINOIS,
  115 South LaSalle Street, 35th Floor
  Chicago, IL 60603

STATE OF MAINE,
  6 State House Station
  August, ME 04333

COMMONWEALTH OF MASSACHUSETTS,
  1 Ashburton Place
  Boston, MA 02108

PEOPLE OF THE STATE OF MICHIGAN,
  3030 West Grand Boulevard, Suite 9-600
  Detroit, MI 48202

STATE OF MINNESOTA,
  445 Minnesota Street, Suite 600
  St. Paul, MN 55101

Civ. No.-_____

STATE OF NEVADA,
   555 East Washington Avenue
   Las Vegas, NV 89101

STATE OF OREGON,
   100 Southwest Market Street
   Portland, OR 9720

STATE OF RHODE ISLAND,
   150 South Main Street
   Providence, RI 02903

STATE OF VERMONT,
   109 State Street
   Montpelier, VT 05609

STATE OF WASHINGTON,
   2425 Bristol Court SW, Second Floor
   P.O. Box 40117
   Olympia, WA 98504
                                *Plaintiffs*,

   v.

PAMELA J. BONDI, in her official capacity as
Attorney General of the United States,
   950 Pennsylvania Avenue, NW
   Washington, DC 20540

UNITED STATES DEPARTMENT OF
JUSTICE,
   950 Pennsylvania Avenue, NW
   Washington, DC 20540

DANIEL DRISCOLL, in his official capacity as
Acting Director of the Bureau of Alcohol,
Tobacco, Firearms and Explosives,
   99 New York Avenue, NE
   Washington, DC 20226

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES,
   99 New York Avenue, NE
   Washington, DC 20226

KEVIN MAXWELL, in his personal and
professional capacity as Manager and Owner of
Rare Breed Triggers, LLC,
    1095 Torren PT
    Geneva, FL 32732

LAWRENCE DEMONICO, in his personal and
professional capacity as President of Rare Breed
Firearms, LLC,
    6124 Osecola Trail
    Austin, TX 78738

RARE BREED TRIGGERS, LLC,
    3523 45th Street South, Suite 100
    Fargo, ND 58104

RARE BREED FIREARMS, LLC,
    15511 W Highway 71, Suite 110444
    Austin, TX 78738

NATIONAL ASSOCIATION OF GUN
RIGHTS, INC.,
    P.O. Box 1776
    Weatherford, Texas 76086

TEXAS GUN RIGHTS, INC.,
    P.O. Box 1776
    Weatherford, TX 76086

PATRICK CAREY,
    5016 Knight Drive
    Zachary, LA 70791

JAMES WHEELER,
    3128 Feathercrest Ln
    Crandall, TX 75114

TRAVIS SPEEGLE,
    3415 Pebble Bar Drive
    Katy, TX 77450

                *Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Gun violence is a national scourge. In the past five years, nearly 100,000 Americans were murdered with a gun. During that time, the nation witnessed more than 3,000 mass shootings. In 2024 alone, more than 5,000 children were shot with a firearm, and more than 1,400 of them died as a result.

2.    This epidemic of gun violence has been fueled in recent years by the growing use of machinegun conversion devices (MCDs), which are used to turn semi-automatic firearms into fully automatic machineguns that can unleash massive carnage in mere seconds. One such MCD— the forced reset trigger, or FRT—has become especially popular, including among individuals who are prohibited from possessing any firearms under federal law. At least 100,000 FRTs have been sold throughout the country and have made their way into every State, even those that independently ban such devices under their state laws.

3.    In response to this growing threat and consistent with its longstanding regulation of similar devices, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") correctly classified FRTs as prohibited machineguns under federal law, undertook robust enforcement efforts that succeeded in enjoining distributors from selling the deadly devices, and conducted extensive retrieval operations, seizing nearly 12,000 FRTs from the field.

4.    But now, the federal government has suddenly reversed course. Despite declaring in recent years that FRTs pose a serious public safety risk, ATF has not only promised to abandon enforcing federal law against the distribution and possession of FRTs: it has decided to distribute thousands of these dangerous devices into communities around the country.

5.    ATF has cloaked this policy in a settlement agreement (the "Settlement Agreement" or "Agreement," attached as Exhibit A) resolving various lawsuits—including a successful

enforcement action in which a federal court ruled that FRTs are machineguns under federal law and entered a preliminary injunction against their principal distributor. ATF is now walking away from that case entirely. As part of the Agreement, ATF is also reversing course in a case where it appealed an injunction requiring it to return FRTs recovered from certain parties to that suit. If that were not enough, ATF has elected to go well beyond what the court order in that case requires, returning FRTs not just to the parties in that litigation, but to *anyone anywhere*, so long as it is practicable to do so.

6.      This reckless decision will not only endanger the public—putting people nationwide at greater risk of deadly violence—but is contrary to federal law. ATF's longstanding position is that federal firearms laws proscribe the distribution and possession of devices like the FRT because they convert firearms into machineguns that can fire hundreds of uninterrupted rounds of ammunition with a single pull of the trigger. Even now, ATF has not renounced that view. Instead, bowing to political pressure, it has decided to simply ignore it.

7.      If facilitating the violation of federal law were not enough, ATF's actions will also—in its own words—"aid and abet violations of state law." That is because numerous States independently prohibit the distribution and possession of FRTs, but individuals or entities in these States are not excluded from receiving the return of seized FRTs under the Agreement.

8.      Plaintiffs—the States of New Jersey, Maryland, Delaware, Colorado, District of Columbia, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, Oregon, Rhode Island, Vermont, and Washington (collectively, "Plaintiff States")—bring this action to urgently address the irreparable harms that would result from ATF's patently unlawful actions. If ATF's action is allowed to stand, Plaintiff States will suffer dramatic and irreversible harms. Thousands of weapons their own laws prohibit will be directly distributed within their borders, and they will

have to expend substantial resources to enforce those laws to confiscate these very same illegal items. Nor would the harms stop there: redistributing MCDs within Plaintiff States would both undermine public safety and generate significant added law-enforcement and healthcare costs. The harms would be irreversible, as once ATF returns these thousands of MCDs, it will be difficult, if not impossible, to retrieve them.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction under 28 U.S.C. § 1331. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704.

10.      An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02, and 5 U.S.C. §§ 702, 705 and 706.

11.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States government, officers sued in their official capacities, and others who are parties to the Agreement. Plaintiff the State of Maryland is a resident of this judicial district, and a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred and will continue to occur within the District of Maryland.

**PARTIES**

A.      **Plaintiffs**

12.      Plaintiff the State of New Jersey is a sovereign state of the United States and is represented by and through its Attorney General, Matthew J. Platkin. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

13.      Plaintiff the State of Maryland, represented by and through its Attorney General Anthony Brown, is a sovereign state of the United States. As the State's chief legal officer, the

6

Attorney General is authorized to act in federal court on behalf of the State on matters of public concern.

14.     Plaintiff the State of Delaware is a sovereign state of the United States. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

15.     Plaintiff the State of Colorado is a sovereign state of the United States. Colorado is represented by Attorney General Philip J. Weiser, who is the State's Chief Law Officer.

16.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb.

17.     Plaintiff the State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, who is the chief legal officer of Hawai'i and authorized by Haw. Rev. Stat. § 28-1 to pursue this action.

18.     Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

19.     Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

20.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

21.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

22.     Plaintiff the State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

23.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state of the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

24.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

25.     Plaintiff the State of Rhode Island is a sovereign state of the United States. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

26.     Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

27.     Plaintiff the State of Washington, represented by and through its Attorney General Nicholas W. Brown, is a sovereign state of the United States. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

**B.      Defendants**

28.     Defendant Pamela J. Bondi is the Attorney General of the United States. In her official capacity, she oversees the United States Department of Justice, including the ATF. She is a party by and through whom the United States entered into the Agreement. The Attorney General is sued in her official capacity.

29.     Defendant the United States Department of Justice ("DOJ") is a federal agency within the executive branch of the United States government that is responsible for enforcing federal firearms laws and in which ATF is housed. Defendant DOJ is responsible for implementing the provisions of the Agreement on behalf of the United States.

30.     Defendant Daniel P. Driscoll is the Acting Director of ATF. He is a party by and through whom the United States entered into the Agreement. Acting Director Driscoll is sued in his official capacity.

31.     Defendant ATF is a law enforcement agency within DOJ that is responsible for the enforcement of federal firearms laws. Defendant ATF is responsible for implementing the provisions of the Agreement on behalf of the United States.

32.     The Defendants identified in ¶¶ 28-31 above are collectively referred to herein as the Government Defendants.

33.     Defendant Kevin Maxwell is the Manager and Owner of Rare Breed Triggers, LLC. He is sued in his personal and official capacity. Defendant Maxwell is a necessary party as the

Settlement Agreement that he entered into with other Defendants may be affected by the requested relief, and this may impede his interests under that Agreement.

34.     Defendant Lawrence DeMonico is the President of Rare Breed Firearms, LLC. He is sued in his personal and official capacity. Defendant DeMonico is a necessary party as the Settlement Agreement that he entered into with other Defendants may be affected by the requested relief, and this may impede his interests under that Agreement.

35.     Defendant Rare Breed Triggers, LLC, is a company that is organized in North Dakota as Rare Breed Triggers, LLC. Rare Breed Triggers, LLC is a necessary party as the Settlement Agreement that it entered into with other Defendants may be affected by the requested relief, and this may impede its interests under that Agreement.

36.     Defendant Rare Breed Firearms, LLC, is a sister company of Rare Breed Trigger, LLC, and is incorporated in Texas. Rare Breed Firearms, LLC is a necessary party as the Settlement Agreement that it entered into with other Defendants may be affected by the requested relief, and this may impede its interests under that Agreement.

37.     The Defendants identified in ¶¶ 33-36 are collectively referred to herein as the RBT Defendants.

38.     Defendant National Association for Gun Rights, Inc., ("NAGR") is a Virginia corporation with its headquarters in Loveland, Colorado. NAGR is a necessary party as the Settlement Agreement that it entered into with other Defendants may be affected by the requested relief, and this may impede its interests under that Agreement.

39.     Defendant Texas Gun Rights, Inc. ("TGR") is a 501(c)(4) organization headquartered in Texas. TGR is a necessary party as the Settlement Agreement that it entered into

with other Defendants may be affected by the requested relief, and this may impede its interests under that Agreement.

40.    Defendant Patrick Carey is sued in his personal capacity. Defendant Carey is a necessary party as the Settlement Agreement that he entered into with other Defendants may be affected by the requested relief, and this may impede his interests under that Agreement.

41.    Defendant James Wheeler is sued in his personal capacity. Defendant Wheeler is a necessary party as the Settlement Agreement that he entered into with other Defendants may be affected by the requested relief, and this may impede his interests under that Agreement.

42.    Defendant Travis Speegle is sued in his personal capacity. Defendant Speegle is a necessary party as the Settlement Agreement that he entered into with other Defendants may be affected by the requested relief, and this may impede his interests under that Agreement.

43.    The Defendants identified in ¶¶ 38-42 are collectively referred to herein as the NAGR Defendants.

## ALLEGATIONS

### A.    The Harms And Costs Of Gun Violence

44.    Gun violence creates a cascading set of harms to the public, the heaviest of which are felt by its victims and their families. In 2023, for example, there were nearly 47,000 gun related fatalities nationwide, including 430 in New Jersey, 737 in Maryland, 124 in Delaware, 1,019 in Colorado, 225 in the District of Columbia, 73 in Hawai'i, 1,691 in Illinois, 200 in Maine, 270 in Massachusetts, 1,384 in Michigan, 525 in Minnesota, 616 in Nevada, 642 in Oregon, 58 in Rhode Island, 83 in Vermont, and 1,053 in Washington.[1]

---

[1] U.S. Dep't of Health & Hum. Servs., Ctrs. for Disease Control & Prevention, *WISQARS Fatal and Nonfatal Injury Reports*, CDC WISQARS, https://tinyurl.com/yc36tz6j (last visited June 8, 2025) (Nationwide); *Id.*,

45.     Firearm violence remained the leading cause of death among American youth for the third year in a row in 2023, with pediatric firearm fatality and injury rates surging more than 50% since 2019.[2]

46.     People who survive a firearm related injury often experience lifelong effects. These include chronic mental health problems from conditions such as post-traumatic stress disorder and physical disabilities from injury to the brain or spinal cord.[3] Family members of those who are affected by firearm related injuries also experience lifelong negative effects, including an increase in trauma-related disorders, mood disorders, and substance abuse disorders.[4]

47.     Gun violence also affects communities. As gun violence rises, community members bear the financial burden, as the response to gun violence strains the resources of law enforcement and healthcare providers. A single fatal shooting in Newark, New Jersey can cost taxpayers $2,188,700 and a non-fatal shooting incident can cost $1,007,077.[5] In Maryland, the costs are even higher. Each fatal shooting in Baltimore can cost taxpayers $2,427,333 and each non-fatal shooting can cost taxpayers $1,509,434.[6]

---

https://tinyurl.com/2t6u33v6 (New Jersey); *Id.*, https://tinyurl.com/m84eya3b (Maryland); *Id.*, https://tinyurl.com/yc2p8hrv (Delaware); *Id.*, https://tinyurl.com/29tc59yh (Colorado); *Id.*, https://tinyurl.com/4xynpxz2 (District of Columbia); *Id.*, https://tinyurl.com/6x2ne8a7 (Hawai'i); *Id.*, https://tinyurl.com/5ctv8tkw (Illinois); *Id.*, https://tinyurl.com/yc6fr6fn (Maine); *Id.*, https://tinyurl.com/2pnycdt8 (Massachusetts); *Id.*, https://tinyurl.com/4s4auz56 (Michigan); *Id.*, https://tinyurl.com/ywrj7sa4 (Minnesota); *Id.*, https://tinyurl.com/34p43x4e (Nevada); *Id.*, https://tinyurl.com/muebjvak (Oregon); *Id.*, https://tinyurl.com/ydpurak7 (Rhode Island); *Id.*, https://tinyurl.com/34dakzxa (Vermont); *Id.*, https://tinyurl.com/2vdt94kc (Washington).

[2] Amanda Hernández, *Youth Gun Deaths in the US Have Surged 50% Since 2019*, N.J. Monitor (Mar. 21, 2025, 6:25 AM), https://tinyurl.com/y2pudjku.

[3] *Fast Facts: Firearm Injury and Death*, Ctrs. for Disease Control & Prevention (July 5, 2024), https://tinyurl.com/2bzztfv6.

[4] Zurui Song et al., *Firearm Injuries in Children and Adolescents: Health and Economic Consequences Among Survivors and Family Members*, 42 Health Affs. 1541, 1544-49 (2023).

[5] Nat'l Inst. for Crim. Just. Reform, *Cost of Violence – Newark, NJ*, Cost of Violence, https://tinyurl.com/dt46wsv9 (last visited June 5, 2025).

[6] Nat'l Inst. for Crim. Just. Reform, *Cost of Violence – Baltimore, MD*, Cost of Violence, https://tinyurl.com/msb45rru (last visited June 5, 2025).

**B.     Federal Regulation Of Machineguns**

48.    Congress enacted the National Firearms Act ("NFA") in 1934 to regulate a series of especially dangerous weapons, particularly machineguns and sawed-off firearms, through a tax on the manufacture, importation, sale, or other disposal of these type of firearms. The definition of "firearms" under the NFA includes, in relevant part, "a machinegun." 26 U.S.C. § 5845(a).

49.    The NFA defined a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The NFA has included that definition of "machinegun" since its original passage in 1934, when Congress sought to curb widespread gang violence enabled by such weapons. *See* H.R. Rep. No. 73-1780, at 1 (1934) (explaining that "[t]he gangster as a law violator must be deprived of his most dangerous weapon, the machine gun" and "while there is justification for permitting the citizen to keep a pistol or revolver for his own protection …, there is no reason why anyone except a law officer should have a machinegun.").

50.    Congress enacted the Gun Control Act of 1968 ("GCA") after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do not adequately enable the States to control this traffic within their own borders." Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225 (1968). The GCA expanded the statutory definition of machinegun to include "the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." Gun Control Act of 1968, Pub. L. 90-618, § 5845(b), 82 Stat. 1213, 1231 (codified at 26 U.S.C. §5845(b)).

13

51.     In the Firearm Owners' Protection Act, enacted in 1986, Congress further expanded the statutory definition of machinegun to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." Pub. L. 99-308, §109(a), 100 Stat. 449, 460 (1986) (codified at 26 U.S.C. §5845(b)); *see* 26 U.S.C. §5845(b)).

52.     Additionally, the Firearm Owners' Protection Act prohibited the private sale or possession of any "machinegun" manufactured thereafter. Pub. L. 99-308, §102, 100 Stat. 449, 453 (1986); *see* 18 U.S.C. §§921(a)(24), 922(o); 26 U.S.C. §5845(b).

## C.     The Threat Posed by Machinegun Conversion Devices And Forced Reset Triggers

53.     Machinegun conversion devices (MCDs) are devices that are used to convert a semi-automatic firearm, which requires a shooter to release and pull the trigger for each shot they fire, into a machinegun that fires automatically. Firearms equipped with MCDs often exceed the rate of fire of many machineguns, firing up to 20 bullets per second. The use of MCDs decreases firing accuracy and increases the likelihood of multiple victims. For example, in one incident in New Jersey, a shooter fired 28 rounds from an MCD-equipped firearm in just over one second, seriously injuring three people.

54.     In recent years there has been a dramatic proliferation of machinegun conversion devices (MCDs). Between 2017 and 2021, ATF recovered 5,454 MCDs—a 570 percent increase over the prior five-year period.[7] In 2023 alone, ATF recovered a total of 4,542 MCDs, nearly 83 percent of the amount recovered between 2017 and 2021.[8]

---

[7] ATF, National Firearms Commerce & Trafficking Assessment: Crime Guns, Part VII, at 4 (2023), https://tinyurl.com/3u3jfudb.
[8] *Firearms Trace Data - 2023*, ATF (Dec. 9, 2024), https://tinyurl.com/52dw3fyr (click Firearm Types Recovered and Traced in the United States and Territories (xcl)).

55.     The increase in MCDs has corresponded to increasing incidents of machinegun fire. Between 2019 and 2021, such incidents "exploded by about 1,400%."[9]

56.     MCDs have also been used increasingly in violent crimes. ATF reported a "dramatic increase in the use of [MCDs] in violent crimes" from 2018 to 2023.[10] That includes an approximately 400% increase from 2022 to 2023 in firearm traces involving an MCD in which the trace was also associated with a crime of violence—including homicides, assaults, and the murder of a police officer.

57.     MCDs have been associated with several criminal incidents in Plaintiff States. For instance, New Jersey has identified at least 26 criminal cases where MCDs have been recovered. In another recent incident in Maryland, an MCD-equipped firearm was recovered (along with an AK-47) after a mass shooting that left one person dead and nine injured in Baltimore County.[11] ATF reports show that state and local law enforcement frequently encounter MCD-equipped firearms as part of criminal investigations. In 2023 alone, ATF ran traces on approximately 1,000 MCDs recovered in Plaintiff States.[12]

58.     The "forced reset trigger," or "FRT," is a type of MCD that is designed to replace the standard trigger assembly on an AR-15-type rifle. FRTs include those marketed and sold as the FRT-15, as well as under the Wide Open Trigger ("WOT") label. Although designed for an AR-15-type rifle, other firearms can be configured or modified to allow installation of FRTs. For

---

[9] Scott Glover & Curt Devine, *A Device that Can Turn a Semi-Automatic Weapon into a Machinegun in Moments Is Wreaking Havoc on American Streets*, CNN (Aug. 30, 2022), https://tinyurl.com/5n7t5v5m.
[10] ATF, F.Y. 2024 Congressional Budget Submission 14 (2023), https://tinyurl.com/myswym87.
[11] Christian Olaniran & Tara Lynch, *Man Arrested with AK-47, Stolen Vehicle During Investigation into Towson Mass Shooting, Police Say*, CBS News (Dec. 23, 2024, 11:12 PM), https://tinyurl.com/47bemc26.
[12] *Firearms Trace Data - 2023*, supra note 8.

example, the RBT Defendants have stated that the FRT-15 they manufacture is compatible with some AR-9mm firearms.

59.    The purpose of an FRT is to allow a shooter to achieve rapid, continuous fire by pulling the FRT trigger once and maintaining continuous rearward pressure. A firearm equipped with an FRT enables the firearm to shoot 800 to 900 rounds per minute, regardless of the shooter's skill, training, or stamina.

60.    In a typical AR-type semi-automatic firearm, the shooter must pull and release the trigger to fire each shot. Specifically, when the shooter pulls the trigger, it releases the hammer, which strikes the firing pin, initiating the release of a bullet. Upon the bullet's release, the recoil from the shot forces a part known as the bolt carrier backwards. The rearward movement of the bolt carrier assembly extracts and then ejects a cartridge case, and depresses—or cocks—the hammer, which is held in place by a part known as the disconnector. The disconnector interrupts the weapon's operating cycle, forcing the shooter to release the trigger to reset it, and then to pull it again to fire the next round.

61.    In an FRT trigger assembly, the hammer is modified, and the disconnector is removed and replaced with a larger trigger that features a lobe-like sear surface, as well as a locking bar. Because an FRT has no disconnector, it eliminates the need for the shooter to release their pull of the trigger to fire an additional shot. In a typical AR-type firearm, the forward movement of the bolt carrier assembly following a shot loads a subsequent cartridge without releasing the hammer because the disconnector holds the hammer in place. In an FRT-equipped firearm, however, the bolt carrier's forward movement automatically releases the hammer by striking the locking bar. Thus, the shooter needs to do only one thing—maintain rearward pressure on the trigger—and rounds will continuously fly out of an FRT-equipped firearm.

62.     The functionality of an FRT-equipped firearm is similar to a machinegun like the military-standard M16. Those machineguns either remove the disconnector entirely or, more typically, remove it from the firing sequence when set to automatic mode. On an M16, the firing sequence starts similarly to the one on an unmodified AR-15. But once the backwards-moving bolt carrier depresses the hammer, it is engaged by a part known as the sear, which holds the hammer into place until the forwards-moving bolt carrier displaces it. That allows the hammer to return to the firing pin, so that the gun will continue to fire so long as the shooter applies pressure to the trigger. In that way, both FRTs and other machineguns allow a shooter's single application of force to the trigger to fire shots continuously until the gun's magazine is empty.

63.     Because of their design, law enforcement encountering a firearm equipped with an FRT may not be cognizant of that fact. Installing an FRT involves removing the original trigger assembly, and replacing it with an FRT. This makes FRTs far less conspicuous and not as easily identifiable as other after-market MCDs such as auto-sears (also known as "switches"). Whereas auto-sears are after-market add-ons that stick out from the back of a firearm and are thus generally apparent to law enforcement, FRTs require familiarity and inspection of the trigger assembly, and may require disassembly or test-firing to be identified. As a result, the number of FRT-equipped firearms recovered by law enforcement is likely underreported, and their recovery would not ordinarily be captured during the firearms tracing process.

64.     Nonetheless, FRTs have been linked to several criminal incidents. From January 2021 through July 25, 2024, the ATF Firearms and Ammunition Technology Division conducted approximately eighty criminal examinations of FRTs as a part of criminal cases. ATF classified a total of 143 FRTs as a part of those cases. As of August 2024, ATF was continuing to recover FRTs in connection with criminal investigations, including investigations into the illicit

distribution of narcotics, firearms trafficking, the possession of firearms by prohibited individuals, and the distribution of firearms to such individuals.

65.    In one incident in 2023, ATF recovered an AR-type firearm equipped with an FRT during the execution of a federal search warrant as part of an investigation into an armed narcotics trafficker. ATF found that the firearm had been involved in seven separate shootings, including a drive-by shooting targeting a home and a shooting directed at an unmarked police vehicle.

**D.    ATF's Longstanding View That FRTs and Similar Devices are "Machineguns"**

66.    Title 28 Section 599A(b)(1) of the U.S. Code provides ATF with the authority to investigate violations of federal firearms law at the direction of the Attorney General. Under the corresponding federal regulation at 28 C.F.R. § 0.130, the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, including under the GCA, *see* 18 U.S.C. §§ 921-34, and the NFA, *see* 26 U.S.C. §§ 5801-72.

67.    ATF's implementing regulations state that the term "automatically" used in the NFA definition of a machinegun means "functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." 27 C.F.R. § 479.11. The regulations also state that a "single function of the trigger means a single pull of the trigger and analogous motions." *Id.* (internal quotations omitted).

68.    In 2006, ATF issued Ruling 2006-2, which interpreted the phrase "single function of the trigger" in 26 U.S.C. § 5845(b) to mean "single pull of the trigger."[13] Under Ruling 2006-2, any device that "fire[s] repeatedly" when "the shooter maintains finger pressure against the stock" (*e.g.*, because an internal coiled spring pushes the trigger forward) is deemed a

---

[13] ATF Ruling 2006-2, at 2 (Dec. 13, 2006).

machinegun.[14] A device that "initiate[s] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted" is a machinegun.[15]

69.    Since the 1970s, ATF has consistently classified devices functionally similar to FRTs as machineguns. ATF first classified as a machinegun a trigger device operating on these principles in 1975. It subsequently classified as machineguns devices materially similar to the FRT-15 and WOT in 1994, 2004, 2005, 2006, and 2017. In total, ATF has classified approximately 17 distinct devices similar to the FRT as machineguns.

70.    In 2021, ATF issued two reports classifying both the FRT-15 and the WOT as "machineguns." As part of its testing, ATF applied both plastic zip ties and a metal cable seal to the trigger of an FRT to apply continuous pressure: it observed that the weapon it tested fired repeatedly, with no need to disengage between shots. On March 22, 2022, ATF issued an open letter to federal firearms licensees stating that it had determined that certain FRTs were indeed machineguns under federal law and intended to "take appropriate remedial action with respect to sellers and possessors of these devices." ATF encouraged possessors of these devices "to contact ATF for further guidance on how they may divest possession."

71.    ATF proceeded to take several steps to seize and recover FRTs in the field. ATF prioritized its retrievals based on public safety concerns. For example, ATF focused on whether the purchaser's criminal history requires heightened review, or the person has received multiple devices indicative of further re-selling or trafficking.

72.    As of August 2024, ATF had identified at least 11,884 FRT-15s and WOTs in its possession, including FRTs sold by the RBT Defendants, Big Daddy Unlimited ("BDU"), Wide

---

[14] *Id.*
[15] *Id.* at 3.

Open Enterprises ("WOE") (the maker of the WOT), and resellers. The FRTs in ATF's possession as of August 2024 included but were not limited to: (i) FRTs that were seized pursuant to search warrants, other judicial process, or warrant exceptions as part of a criminal investigation into the possession or distribution of the devices by a manufacturer or distributor; (ii) FRTs that were subject to national retrieval efforts from possessors in connection with one of several criminal investigations; and (iii) FRTs that were seized pursuant to search warrants or judicial process as part of an investigation into other criminal conduct (*e.g.*, firearms trafficking, narcotics trafficking, felon-in-possession), where the subject of the investigation was also in possession of one or more of the devices. These FRTs were retrieved from many States, including from Plaintiff States. For example, at least 23 FRTs shipped to individuals in New Jersey have been recovered by law enforcement authorities.

73.    ATF estimates that each individual retrieval of an FRT requires a combined expenditure of 16 to 24 man-hours, split between intelligence professionals engaged in analysis and Special Agents engaged in the retrieval and associated investigatory work. ATF agents have expended thousands of hours on these retrieval efforts nationally.

74.    In January 2023, ATF brought an enforcement action in New York against the RBT Defendants. Compl., *United States v Rare Breed Triggers, LLC* (*RBT*), 690 F. Supp. 3d 41 (E.D.N.Y. 2023) (No. 1:23-cv-00369). The district court issued a preliminary injunction against the company's continued distribution of FRTs after it found the federal government likely to succeed on the merits of its claim that FRTs are prohibited under federal law. *RBT*, 690 F. Supp. 3d 51 at 88. Defendants appealed, and the matter was fully briefed and argued before the U.S. Court of Appeals for the Second Circuit by December 2024. *See* Dkt., No. 23-7276 (2d Cir.).

20

75.    In February 2023, the United States filed a civil forfeiture action in the District of Utah. *See* Compl., *United States v. Misc. Firearms and Related Parts and Equip. Listed in Exhibit A* (*Misc. Firearms*), No. 1:23-cv-17 (D. Utah Feb. 13, 2025). That action sought the forfeiture of approximately 1,000 FRTs and various FRT component parts that had been seized from Defendant Demonico and certain subcontractors of the RBT Defendants. *Id.*

76.    In August 2023, the NAGR Defendants filed a lawsuit in the Northern District of Texas challenging ATF's classifications of the FRT-15 and WOT as machineguns. Compl., *Nat'l Ass'n for Gun Rts., Inc. v. Bondi* (*NAGR*), 741 F. Supp. 3d 568 (N.D. Tex. 2024) (No. 4:23-cv-830). In July 2024, the district court granted plaintiffs' motion for summary judgment and issued a Final Judgment that vacated and set aside the challenged classifications, enjoined the United States from implementing or enforcing ATF's "expanded definition of 'machinegun'" against the plaintiffs to the suit, enjoined the United States from pursuing criminal enforcement actions against the RBT Defendants, and ordered the United States to return any FRTs "seized pursuant to their unlawful classification" to all parties in that litigation within 30 days. Final Judgment, *NAGR*, 741 F. Supp. 3d 568 (No. 4:23-cv-830), ECF No. 101. The district court subsequently extended the return deadline to February 22, 2025. Order, *NAGR*, 741 F. Supp. 3d 568 (No. 4:23-cv-830), ECF No. 112. The United States appealed the *NAGR* decision, and the matter was fully briefed and argued to the U.S. Court of Appeals for the Fifth Circuit by December 2024. *See* Dkt., *NAGR v. Bondi*, No. 24-10707 (5th Cir.).

77.    Shortly before the district court's February 22 deadline for returns to the parties, the United States advised the district court that it was taking steps to comply, but would not return "FRT-15s and WOTs in states where possession of FRT-15s and WOTs is illegal under state law." Notice of Compliance at 5-6, *NAGR*, 741 F. Supp. 3d 568 (No. 4:23-cv-830), ECF No. 126. The

United States also stated that it would not return FRTs to persons prohibited from possessing a firearm under 18 U.S.C. § 922(g) and that it would run background checks for those seeking return of an FRT. *Id.* at 5.

78.     Three days after the February 22 return deadline passed, the NAGR Defendants submitted a Notice of Non-Compliance asserting that the United States had not yet returned the FRTs and arguing that FRTs should be returned to all plaintiffs and their members regardless of the State in which they resided because the federal government could not "be trusted with interpreting state law." Pls.' Notice of Non-Compliance at 4, *NAGR*, 741 F. Supp. 3d 568 (No. 4:23-cv-830), ECF No. 127.

79.     The United States responded to the NAGR Defendants' submission that the district court's order did not require it to "aid and abet violations of state law." Response at 2-3, *NAGR*, 741 F. Supp. 3d 568 (No. 4:23-cv-830), ECF No. 128.

**E.     The Government Defendants' Decision to Redistribute All Recovered FRTs**

80.     On February 7, 2025, President Trump issued an Executive Order titled "Protecting Second Amendment Rights," which directed Defendant Bondi to review, among other things, all rules ATF promulgated between 2021 and 2025, and all positions taken by the federal government in lawsuits related to firearms. Exec. Order. No. 14,206, 90 Fed. Reg. 9503 (Feb. 7, 2025).

81.     In late April 2025, following a change in ATF leadership and apparently in accordance with the President's Executive Order, the federal government filed motions in the *RBT* and *NAGR* appeals and in the Utah forfeiture action seeking to put them on hold pending settlement discussions. *See* Motion, *United States v. RBT*, No. 23-7276 (2d Cir. Apr. 22, 2025), ECF No. 80; Unopposed Motion, *NAGR v. Bondi*, No. 24-10707 (5th Cir. Apr. 22, 2025), ECF No. 125; Motion, *Misc. Firearms*, No. 1:23-cv-17 (D. Utah Apr. 23, 2025), ECF No. 44.

82.     On May 16, 2025, Defendants entered into the Agreement, which resolved all three of the above actions. The Agreement states that the Government Defendants will not enforce any statute or agency interpretation under which an FRT is "contended to be" a machinegun provided that the FRTs are not designed for use in handguns. Ex. A at ¶ 11. The Agreement purports that it will bind the Government Defendants perpetually and universally.

83.     The Agreement also commits the federal government "to return FRTs" "to the extent practicable" that any federal agency "has seized or taken as a result of a voluntary surrender" in response to any request received by September 30, 2025 (the "Redistribution Policy"). *Id*. at ¶ 3. This Redistribution Policy is not limited to the parties to the NAGR, Eastern District of New York, or District of Utah lawsuits that are the subject of the Agreement. Instead, it requires the Government Defendants to return FRTs to any entity or individual from whom they were seized. The Agreement includes no carve outs on its face that would exclude returns to individuals or entities located in States that bar the possession of FRTs or FRT-equipped firearms. Nor does the Agreement include a carve out excluding returns to individuals who are barred from possessing firearms by federal law pursuant to 18 U.S.C § 922(g), such as convicted felons.

84.     Pursuant to the Agreement, the parties proceeded to seek dismissal of all pending litigation. On May 16, 2025, the federal government filed a motion to voluntarily dismiss the *NAGR* appeal in the Fifth Circuit, which was granted on May 19, 2025. Mot. to Dismiss Appeal, *NAGR v. Bondi*, No. 24-10707 (5th Cir. May 16, 2025), ECF No. 135. The federal government filed a stipulation of dismissal with prejudice in the *RBT* case in district court on May 16, 2025, *see* Stipulation of Dismissal, *RBT*, 690 F. Supp. 3d 51 (No. 1:23-cv-00369), ECF No. 149. Three days later, RBT moved to dismiss their Second Circuit appeal, *see* Motion, *U.S. v. RBT*, No. 23-7276 (2d. Cir. May 19, 2025), ECF No. 83, which was granted on May 21, 2025, *see* Motion Order,

No. 23-7276 (2d. Cir.), ECF No. 85. And on May 16, 2025, the parties likewise filed a stipulation of dismissal of the Utah forfeiture action. Stipulation of Dismissal, *Misc. Firearms*, No. 1:23-cv-17 (D. Utah.). The Utah action was terminated on May 19, 2025.

**F.     The Harms Imposed on the Plaintiff States by the Redistribution Policy**

85.     The Government Defendants' redistribution of FRTs—a number that totals at least 11,884—will impose serious sovereign and fiscal injuries on the Plaintiff States.

86.     At least 14 of the Plaintiff States have state laws that independently prohibit FRTs or FRT-equipped firearms: Colorado (Colo. Rev. Stat. §§ 18-12-101(1)(g.7), 18-12-102); Delaware (Del. Code Ann. tit. 11, § 1444(a)(6)(b)); District of Columbia (D.C. Code §§ 7-2501.01(10), 22-4501(4), 22-4514(a)); Hawai'i (Haw. Rev. Stat. § 134-8.5); Illinois (720 Ill. Comp. Stat. 5/24-1(a)(7), (a)(14)); Maryland (Md. Code , Crim. Law §§ 4-301(m)(1), 4-305.1); Massachusetts (Mass. Gen. Laws Ann. ch. 140, § 121, ch. 269, § 10(c)); Michigan (Mich. Comp. Laws §§ 750.224(1)(a), 750.224e(1)); Minnesota (Minn. Stat. 609.67); New Jersey (N.J. Stat. Ann. § 2C:39-1(i)); Nevada (Nev. Rev. Stat. § 202.274); Oregon (Or. Rev. Stat. §§ 166.210(7), 166.272); Rhode Island (R.I. Gen. Laws § 11-47-8(d)); and Washington (Wash. Rev. Code. §§ 9.41.010(31), 9.41.190.

87.     Despite these state laws, FRTs have been sold throughout the country, including in Plaintiff States. ATF has estimated that RBT has distributed at least a combined 100,000 FRT-15s across the country, including to almost every Plaintiff State. Further, a large portion of RBT's customer base are dealers to whom RBT sold the FRT-15s for the purpose of resale. ATF found that RBT distributed FRTs to third-party sellers that in turn distributed FRTs into every State. Plaintiff State of New Jersey has acquired records showing that in 2021 and 2022 alone, Rare

Breed Triggers LLC made 364 deliveries through a commercial shipping service to addresses in New Jersey.

88.     Many of these FRTs were recovered from individuals and entities in Plaintiff States. If the Government Defendants proceed with executing the Redistribution Policy, the number of FRTs and FRT-equipped firearms in Plaintiff States will increase, resulting from direct returns to individuals residing in Plaintiff States, sales of FRTs returned to distributors and resellers that then sell the FRTs into Plaintiff States, and returns to individuals in other States who either bring their FRTs into Plaintiff States or transfer the FRTs in their possession to individuals residing in Plaintiff States. Indeed, firearms and related devices that are prohibited in Plaintiff States are still regularly recovered there, especially when such devices are lawful in other States, in part due to the activities and presence of significant interstate firearms trafficking networks.

89.     ATF has specifically confirmed that more than 60 FRTs were previously shipped to individuals who are prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g). Because this was based on ATF's review of a limited number of sales by RBT and other sellers, and because of the secondary market and other third-party sellers, this is likely a small fraction of the total number of FRTs shipped to such individuals. Because the Redistribution Policy does not include a carve out for individuals who are prohibited from possessing firearms under § 922(g) or similar state laws, States would have to incur additional law enforcement costs to enforce their state-law equivalents of 18 U.S.C. § 922(g) against prohibited possessors who receive FRTs as a result of the Redistribution Policy.

90.     Because the distribution of FRTs into many Plaintiff States will violate state laws, *see supra* ¶ 86, those States will incur greater law enforcement costs from having to enforce their prohibitions on the sale, distribution, and possession of FRTs or FRT-equipped firearms. This

includes the substantial cost of retrieving FRTs or FRT-equipped firearms that are distributed or possessed in violation of state law. As noted above, *supra* at ¶ 73, ATF's own evidence indicates that each FRT retrieval takes approximately 16 to 24 hours of law enforcement time.

91.     As ATF has concluded, the continued availability of FRTs puts the public at risk. Criminal acts carried out with machineguns, including MCD-equipped firearms, are more deadly and dangerous, leading to a greater number of casualties and necessitating a greater commitment of law enforcement and health care resources to respond to such events.

92.     It is substantially likely that the Redistribution Policy will lead to the increased use of FRTs, including in criminal incidents. Criminal incidents involving the use of FRT-equipped firearms are substantially likely to impose additional law enforcement costs on Plaintiff States because they typically increase the number of victims and involve a greater number of witnesses. Plaintiff States must respond to such incidents with greater resources to investigate the criminal incident, including more senior and specially trained personnel to process the scene, more evidence analysis, and more forensic investigation by medical examiners.

93.     Criminal incidents involving FRT-equipped firearms are also substantially likely to impose increased health care costs on Plaintiff States. Higher-casualty events impose substantial burdens on state-owned or operated health care facilities that treat shooting victims, both because they increase the number of casualties who must be treated and because firearms with an accelerated rate of fire tend to cause more severe injuries that involve more medical complications.

94.     Further, higher-casualty shootings require a commitment of more emergency medical response personnel, as emergency departments are not routinely staffed to handle the influx of patients that need care when high-casualty events occur. As a result, any less emergent patients who were already at the hospital will either have to wait longer for care or will be diverted

to hospitals that are able to take them in, placing a strain on other local hospitals in the process. On the other hand, if a mass shooting event occurs in a rural area where hospitals are not equipped to provide the type of care required, there will be increased mortality rates as critical patients overwhelm hospital resources and are forced to wait until they can be transported to a larger hospital.

95.     Plaintiff States will be forced to absorb these increased health care costs. Plaintiff State New Jersey, for example, has a state-owned hospital that would be affected by such projected cost increases. *See* N.J. Stat. Ann. 18A:64G-6.1a. In 2024, Plaintiff State Maryland expended $60.3M treating 3,549 patients with firearm related injuries in its state, a cost that will increase if the Redistribution Policy takes effect.

## CAUSES OF ACTION

### COUNT ONE
### 18 U.S.C. ¶ 922—Ultra Vires
### Against Government Defendants

96.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

97.     Title 18, Section 922(o)(1) of the U.S. Code provides that it shall be unlawful for any individual or entity to "possess a machinegun," which is defined at 26 U.S.C. § 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" and "include[s] the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

98.    The Redistribution Policy contravenes 18 U.S.C. § 922(o) by giving possession of "machineguns" to individuals and entities throughout the United States, and is therefore *ultra vires*.

99.    The Redistribution Policy will cause Plaintiff States irreparable injuries. The requested declaratory and injunctive relief is substantially likely to redress these injuries.

### COUNT TWO
### Violation of APA § 706(2)(A), (C)—Contrary to Law
### Against Government Defendants

100.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

101.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

102.    The Redistribution Policy is a final agency action that is subject to judicial review.

103.    Under the APA, a court must set aside final agency action that is "not in accordance with the law," 5 U.S.C. § 706(2)(A), or which is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *Id.* § 706(2)(C).

104.    An administrative agency's power to act is "prescribed entirely by statue." *United States v. Cortez*, 930 F.3d 350, 357 (4th Cir. 2019), *as amended* (July 19, 2019). That is, an administrative agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). Any actions that overstep the authority Congress has granted are *ultra vires* and contrary to law. *See PFLAG, Inc. v. Trump*, --- F. Supp. 3d ----, No. 25-cv-337, 2025 WL 685124, at * 16 (D. Md. Mar. 4, 2025).

105.    The Redistribution Policy is not in accordance with the law and oversteps the limits Congress has prescribed.

106.    It is illegal to possess or transfer a machinegun under federal law. 18 U.S.C. § 922(o); *see also* 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b).

107.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Redistribution Policy violates the APA.

108.    Plaintiff States are entitled to a preliminary and permanent injunction preventing Defendants from implementing the Redistribution Policy.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

a.    Declare that the Redistribution Policy is *ultra vires*;

b.    Declare that the Redistribution Policy is agency action that is contrary to the laws of the United States and is therefore unlawful under 5 U.S.C. § 706(2)(A) and (C);

c.    Preliminarily and permanently enjoin the Government Defendants from implementing or enforcing the Redistribution Policy beyond that specifically required by another judicial order by returning any FRTs to any individual or entity located in Plaintiff States or to any distributor, dealer, seller, or other entity that sells, resells, or otherwise distributes FRTs into Plaintiff States, either directly or indirectly;

d.    Vacate and set aside the Redistribution Policy pursuant to 5 U.S.C. § 706(2);

e.    Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

f.    Award such other relief as this Court may deem just and proper.

Dated:  June 9, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy (D. Md. Bar No. 28391)
  *Deputy Solicitor General*
Jeremy M. Feigenbaum*
  *Solicitor General*
Nathaniel Rubin*
  *Special Assistant to the Solicitor General*
Christopher Ioannou*
Max Lesser*
Marie Cepeda Mekosh*
Amanda McElfresh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 376-3377
Shankar.Duraiswamy@njoag.gov

*Counsel for the State of New Jersey*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

/s/ *Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Kate Aaronson*
  *Deputy Attorney General*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar. No. 31472)
Keith M. Jamieson (D. Md. Bar. No. 31543)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD  21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson*
  *Solicitor General*
Peter J. Baumann*
  *Senior Assistant Attorney General*
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov
Peter.Baumann@coag.gov

*Counsel for the State of Colorado*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ Eliza H. Simon
Eliza H. Simon (D.Md Bar No. 19648)
  *Senior Counsel to the Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C., 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

*/s/ Michael M. Tresnowski*
Michael M. Tresnowski*
  *Assistant Attorney General*
Cara Hendrickson*
  *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(312) 814-3000
Michael.Tresnowski@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks*
  *Chief State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
Katherine.dirks@mass.gov

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

*/s/ Vivian A. Mikhail*
Vivian A. Mikhail*
  *Deputy Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333
Tel.:  207-626-8800
Fax:  207-287-3120
vivian.mikhail@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

*/s/ Adam R. de Bear*
Adam R. de Bear*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI  48933
(517) 335-7573
debeara@michigan.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

*/s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (971) 673-1880
Fax: (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

*/s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

*\* Pro hac vice application forthcoming*

*Counsel for the People of the State of Michigan*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Stephen N. Provazza*
Stephen N. Provazza*
  *Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
(401) 274-4400
SProvazza@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

*/s/ Andrew R. W. Hughes*
Andrew R.W. Hughes*
William McGinty*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*