**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF NEW JERSEY, et al.,

　　　　　　　　　　*Plaintiffs*,

　v.

PAMELA J. BONDI, et al.,

　　　　　　　　　　*Defendants*.

No. 1:25-cv-1807-PX

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

     A.     Machinegun Conversion Devices and Forced Reset Triggers .................................2

     B.     FRT Litigation ........................................................................................................6

     C.     The United States's Decision To Return All Recovered FRTs ..............................8

ARGUMENT ................................................................................................................10

     I.     PLAINTIFFS HAVE STANDING TO BRING SUIT .........................................10

     II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .......................16

     III.     THE EQUITIES COMPEL PRELIMINARY RELIEF .........................................25

CONCLUSION ................................................................................................................29

## INTRODUCTION

This case concerns an unprecedented effort by the federal government to violate federal firearms laws through a settlement agreement. The National Firearms Act (NFA) broadly defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger," and the statute encompasses parts designed to convert a weapon into a machinegun. 26 U.S.C. §5845(b). For years, the Bureau of Alcohol Tobacco, Firearms and Explosives (ATF) recognized that "forced reset triggers" (FRTs)—including, as relevant, the FRT-15 and Wide Open Trigger (WOT)—fit that statute perfectly: they replace the standard trigger on a firearm such that the shooter "need only pull the FRT-15 trigger once and maintain rearward pressure" to achieve continuous fire, and thus shoot at a rate faster even than the M16 military rifle in automatic mode. *United States v. Rare Breed Triggers*, 690 F. Supp. 3d 51, 65 (E.D.N.Y. 2023) *(RBT)*. Because federal law requires that such awesome automatic firepower does not fall into civilian hands, ATF took multiple actions to prevent that result: it classified FRTs as machineguns; sued the primary distributor of FRTs; and seized thousands of FRTs. One district court agreed at the preliminary stage that ATF was likely correct that FRTs are machineguns and enjoined the sale of these devices. And although another district court disagreed, ATF had filed and briefed an appeal.

All that changed on May 13, 2025, when ATF entered into a settlement agreement that—for the first time—reverses course on FRTs. ATF agreed to drop its pending enforcement actions and its pending appeal, but it did not stop there. The agency agreed to never again enforce the NFA against FRTs, a promise that claims to be perpetual (as it purports to bind future administrations) and universal (as it prohibits enforcement against all, not merely the parties to the agreement). But even the agency's promise to never again enforce the NFA against FRTs was not

enough: as relevant for these purposes, the agency agreed to return the FRTs it had previously recovered—numbering at least 11,884—including promising to return the FRTs even to individuals who were not parties to the relevant litigations.

The Plaintiff States bring this action to forestall the irreparable harms that would otherwise immediately follow from ATF's patent violations of federal law. The federal government intends to distribute *thousands* of machinegun conversion devices to persons across the country and to do so notwithstanding the NFA's clear text, and in many cases notwithstanding state laws that prohibit possessing the devices the agency seeks to return. But agencies have no power to violate the federal laws that govern them, even if they attempt to bury their lawbreaking in a purported settlement. And if ATF's action is allowed to stand, Plaintiff States will suffer dramatic and irreversible harms. By returning thousands of FRTs to individuals residing in Plaintiff States and to distributors who would otherwise sell FRTs into Plaintiff States, ATF would force Plaintiff States either to accept within their borders machineguns that many of their own laws prohibit, or to expend substantial resources to enforce those state laws by seizing these very same illegal items. Nor would the state harms stop there: redistributing machinegun conversion devices within Plaintiff States would undermine public safety and generate significant law enforcement and healthcare costs. To protect the status quo from the federal government's imminent violation of the NFA, this Court should swiftly enjoin the federal government from facilitating the return of FRTs into Plaintiff States.

## **BACKGROUND**

### A.     **Machinegun Conversion Devices and Forced Reset Triggers.**

Federal law has long regulated and prohibited "the carrying of 'dangerous and unusual weapons.' " *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). As part of that tradition, in 1934, the NFA imposed a series of statutory controls on "machineguns," defined as "any weapon

which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Congress later broadened the definition of machinegun to include "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.*; *see* Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213, 1215–23, 1231 (1968); Pub. L. 99-308, § 109, 100 Stat. 451, 460 (1986). And in 1986, Congress prohibited the sale or possession of any "machinegun" manufactured thereafter, keeping them out of civilian hands. § 102, 100 Stat. at 453; *see* 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b).

In recent years, however, there has been a dramatic proliferation of machinegun conversion devices (MCDs), which enable an individual with a semiautomatic firearm to fire automatically— oftentimes even exceeding the rate of fire of many machineguns. Ex. 1 at ¶ 8 (declaration of Eric Barlow) (NJ). The extraordinary rate of fire of an MCD-equipped firearm—reaching up to 20 bullets *per second*—decreases firing accuracy and increases the likelihood of multiple victims. *Id.* at ¶ 9. For example, in one incident in New Jersey, a shooter fired 28 rounds from an MCD-equipped firearm in just over one second, seriously injuring three people. *Id.* at ¶ 10. ATF itself has seen a "significant rise" in MCDs, recovering 5,454 MCDs between 2017 and 2021—a 570 percent increase over the prior five-year period. *Id.* at ¶ 11. Incidents of machinegun fire also "exploded by about 1,400% from 2019 through [2021]," with ATF reporting a "dramatic increase in the use of [MCDs] in violent crimes" from 2018 to 2023. *Id.* at ¶¶ 11–12. That includes an "approximately 400% increase" from 2022 to 2023 "in firearm traces involving an MCD in which the trace was also associated with a crime of violence," including homicides, assaults, and the

murder of a police officer. *Id.* at ¶¶12–13; *see also* Ex. 2 at ¶42 (declaration of ATF Special Agent Craig Saier). And Plaintiff States have likewise seen a significant footprint for MCDs, frequently requesting ATF's aid in tracing MCD-equipped weapons. Ex. 1 (NJ) at ¶11 (noting almost 1,000 MCDs traced from recoveries in Plaintiff States in 2023 alone).

Recently, a new MCD has emerged: the FRT. FRTs replace the standard trigger on an AR-15-type rifle so that the shooter "need only pull the FRT-15 trigger once and maintain rearward pressure" to achieve rapid, continuous fire. *RBT*, 690 F. Supp. 3d at 65; *see* Ex. 1 (NJ) at ¶14 (acknowledging that other guns can be also configured or modified to allow installation of FRTs). A firearm with an FRT can fire faster than an M16 military rifle in automatic mode, allowing even a novice shooter to fire multiple rounds in under a second, *see* Ex. 2 at ¶32; *RBT*, 690 F. Supp. 3d at 65 ("In a cycle of fire, the FRT-15, like a standard machinegun, fires each shot in one-tenth to one-fourteenth of a second. This functionality enables even a novice shooter using an FRT-15 to fire multiple rounds of ammunition in a fraction of a second."). As a result, shootings involving firearms equipped with FRTs increase the number of victims and injuries. Ex. 3 at ¶¶8–11 (declaration of Dr. Dennis Quinlan Jr.) (NJ); Ex. 22 at ¶¶8–13 (declaration of Jenifer Pauliukonis, MPH) (MD); Ex. 24 at ¶¶8–12 (declaration of Dr. Sarah Lyon-Callo) (MI); Ex. 25 at ¶¶6–11 (declaration of Dr. Mackenzie Cook) (OR); Ex. 28 at ¶¶11–18 (declaration of Frederick P. Rivara, MD, MPH) (WA).

As ATF witnesses have themselves repeatedly and consistently acknowledged in previous litigations, FRTs "pose a significant public safety risk." Ex. 4 at ¶20 (declaration of Matthew P. Varisco); *see also* Ex. 2 at ¶¶32-43. Many FRTs "have been distributed to convicted felons and have been recovered in connection with serious criminal conduct." Ex. 4 at ¶20; *see also* Ex. 2 at ¶36. In one case, a firearm recovered with an attached FRT was involved in seven separate

shootings.  Ex. 2 at ¶34.  Strikingly, ATF conducted 71 criminal examinations of FRTs from January 2021 through October 2023 as part of cases involving a range of criminal conduct, including gang investigations and firearms- and narcotics-trafficking.  Ex. 2 at ¶35.  And as of July 2024, ATF has classified a total of 143 FRTs as part of criminal cases.  Ex. 4 at ¶21.

FRTs are spreading even in States that have prohibited them.  At the state level, FRTs and/or FRT-equipped firearms are prohibited in at least 14 of the Plaintiff States.[1]  Despite the difficulty of tracking FRTs—which typically will not make visible modifications to a firearm, *see* Ex. 2 at ¶33 (ATF recognizing that other "law enforcement agencies may not be well-informed to ascertain whether a recovered AR-type firearm has been retrofitted with a drop-in trigger device such as the FRT-15 or WOT," and therefore recoveries are "likely underreported")—there is still significant evidence that FRTs have proliferated across the Nation. ATF estimates that one manufacturer—Rare Breed Triggers (RBT)—sold 100,000 FRTs across the United States in two years, *see RBT*, 690 F. Supp. 3d at 58; Ex. 5 at 2 (declaration of Melissa Rodriguez), shipping packages to at least 47 States and U.S. territories, including to the Plaintiff States.  *See* Ex. 2 at ¶18; Ex. 1 (NJ) at ¶¶17–19 (discussing known deliveries into New Jersey); Ex. 6 at ¶¶6–7 (declaration of Special Agent Cheryl Harrell) (noting shipment of at least 560 FRT-15s into Massachusetts).  Not only that, but "RBT distributed FRT-15s to third-party sellers who distributed FRT-15s to every State."  Ex. 2 at ¶18.  And given the prevalence of interstate trafficking in

---

[1] The relevant States and provisions are as follows: Colorado (Colo. Rev. Stat. §§ 18-12-101(1)(g.7), 18-12-102); Delaware (Del. Code Ann. tit. 11, § 1444(a)(6)(b)); District of Columbia (D.C. Code §§ 7-2501.01(10), 22-4501(4), 22-4514(a)); Hawaiʻi (Haw. Rev. Stat. § 134-8.5); Illinois (720 Ill. Comp. Stat. 5/24-1(a)(7), (a)(14)); Maryland (Md. Code , Crim. Law §§ 4-301(m)(1), 4-305.1); Massachusetts (Mass. Gen. Laws Ann. ch. 140, § 121, ch. 269, § 10(c)); Michigan (Mich. Comp. Laws §§ 750.224(1)(a), 750.224e(1)); Minnesota (Minn. Stat. 609.67); New Jersey (N.J. Stat. Ann. § 2C:39-1(i)); Nevada (Nev. Rev. Stat. § 202.274); Oregon (Or. Rev. Stat. §§ 166.210(7), 166.272); Rhode Island (R.I. Gen. Laws § 11-47-8(d)); Washington (Wash. Rev. Code. §§ 9.41.010(31), 9.41.190).

firearms and firearm parts, FRTs travel beyond the original State to which they are shipped. Indeed, "[i]nterstate trafficking of firearms and related devices, even when banned under [state] law, is a common problem that law enforcement . . . routinely confronts." Ex. 21 at ¶12 (declaration of Brendan F. Kelly) (IL); Ex. 20 at ¶12 (declaration of Stan Hilkey) (CO); Ex. 23 at ¶23 (declaration of Rosemary Chappell) (MD); Ex. 26 at ¶8 (declaration of Edward Troiano) (RI); Ex. 27 at ¶13 (declaration of Patricia Cole-Tindall) (WA).

**B.    FRT Litigation.**

In 2021, ATF issued two reports classifying the FRT-15 and WOT—two commercially available FRT devices—as "machineguns" under federal law. *See* Ex. 14 (ATF Report on FRT-15); Ex. 15 (ATF Report on WOT). This determination was consistent with ATF's longstanding approach to other devices that employ the same mechanical principles as the FRT-15 and WOT. Indeed, on seven separate occasions between 1975 and 2018, ATF classified analogous devices as machineguns. *See* Ex. 2 at ¶12 ("ATF has consistently classified devices functionally similar to the FRT-15 and WOT as 'machineguns' going back to the 1970s."); Ex. 7 (November 14, 1975 ATF Evaluation); Ex. 8 (April 4, 1994 ATF Evaluation); Ex. 9 (September 16, 2004 ATF Evaluation); Ex. 10 (May 2, 2005 ATF Evaluation); Ex. 11 (April 27, 2006 ATF Evaluation); Ex. 12 (July 21, 2017 ATF Evaluation); Ex. 17 (August 28, 2018 ATF Evaluation).

In response to the growing threat posed by FRTs, ATF initiated robust enforcement efforts, recovering 11,884 FRTs in the field, from both distributors and individuals. Ex. 4 at ¶6. Many of these FRTs were themselves recovered in connection with criminal investigations into activities such as firearms- and narcotics-trafficking. *Id.* ATF also brought an enforcement action in January 2023 against RBT—the principal FRT manufacturer and distributor—along with its affiliate and their executives. *See* Compl., *RBT*, 690 F. Supp. 3d 51 (No. 23-369), ECF No. 1. The Eastern District of New York issued a preliminary injunction against the company's continued distribution

of FRTs after it found the federal government likely to succeed on the merits of its claim that FRTs are prohibited under federal law. *RBT*, 690 F. Supp. 3d at 88, 122–23. Defendants appealed, and the matter was fully briefed and argued by December 2024. *See* Dkt., No. 23-7276 (2d Cir.).

In July 2024, the Northern District of Texas came to the opposite conclusion in a challenge brought by the members of two firearms-related organizations and by three individuals who owned and/or sold FRTs. *See Nat'l Ass'n for Gun Rts. v. Bondi*, 741 F. Supp. 3d 568 (N.D. Tex. 2024) *(NAGR)*. That district court concluded instead that FRTs do not qualify as machineguns, vacated and declared unlawful ATF's contrary classifications, enjoined ATF from taking enforcement action regarding FRTs against a swath of both individual possessors and distributors, and ordered ATF to return any FRTs it had recovered from the three individuals and the two organizations' members by February 22, 2025. *Id.* at 607–08, 612–17; *see also* Final Judgment, *NAGR*, No. 23-830, ECF No. 101; Order, ECF No. 112. The United States appealed the decision, and the matter was fully briefed and argued by December 2024. *See* Dkt., No. 24-10707 (5th Cir.).

Anticipating that the United States might cease its efforts to defend the ATF classifications in light of the change in presidential administration, several Plaintiff States moved to intervene in the Fifth Circuit on January 16, 2025. *See* Mot., *NAGR v. Bondi*, No. 24-10707 (5th Cir.), ECF No. 83. The panel denied the motion without explanation, but allowed the States to participate as amici. *See* Court Order, *NAGR v. Bondi*, No. 24-10707 (5th Cir.), ECF No. 89. The States sought reconsideration, reasoning that an amicus brief would not protect their interests if the United States dropped the appeal, but submitted an amicus brief in the alternative. *See* Mot., *NAGR v. Bondi*, No. 24-10707 (5th Cir.), ECF No. 98. A divided Fifth Circuit panel denied reconsideration without written opinion. *See* Order, *NAGR v. Bondi*, No. 24-10707 (5th Cir.), ECF No. 109.

7

Shortly before the district court's February 22 deadline for returns to the parties, the United States advised the district court that it was taking steps to comply, but would not return "FRT-15s and WOTs in states where possession of FRT-15s and WOTs is illegal under state law." Notice of Compliance at 5-6, *NAGR*, No. 23-830, ECF No. 126. Three days after the return deadline had passed, the challengers submitted a Notice of Non-Compliance asserting that the United States had not yet returned the FRTs at issue in the litigation, and arguing that FRTs should be returned to all plaintiffs and their members regardless of the State in which they resided because the federal government could not "be trusted with interpreting state law." Pls.' Notice of Non-Compliance at 4, *NAGR*, No. 23-830, ECF No. 127. The United States responded that the district court's order could not require federal agencies to "aid and abet violations of state law." Resp. to Pls.' Notice of Noncompliance at 2–3, *NAGR*, No. 23-830, ECF No. 128.

### C.    The United States's Decision To Return All Recovered FRTs.

On February 7, 2025, President Trump issued an Executive Order titled "Protecting Second Amendment Rights," which directed Defendant Bondi to review, among other things, all rules promulgated by ATF between 2021 and 2025, all classifications of firearms, and all positions taken by the federal government in lawsuits related to firearms. Exec. Order No. 14,206, 90 Fed. Reg. 9503 (Feb. 7, 2025). In late April, following a change in agency leadership and apparently in accordance with the President's Executive Order, the federal government filed motions in *RBT* and *NAGR* seeking to put the appeals on hold pending settlement discussions. *See* Mot., *United States v. RBT*, No. 23-7276 (2d Cir. Apr. 22, 2025), ECF No. 80; Unopposed Mot., *NAGR v. Bondi*, No. 24-10707 (5th Cir. Apr. 22, 2025), ECF No. 125. On May 16, the federal government moved to voluntarily dismiss the appeal in the Fifth Circuit. Mot. to Dismiss Appeal, *NAGR v. Bondi*, No. 24-10707 (5th Cir. May 16, 2025), ECF No. 135. Given ATF's reversal, the States filed a renewed Motion to Intervene on May 18, but the Fifth Circuit granted the United States's motion

8

to dismiss the appeal without ruling on intervention.  *See* No. 24-10707, ECF Nos. 139 and 140. The federal government also filed a stipulation of dismissal with prejudice in its New York action against RBT, *see* Stipulation of Dismissal, *RBT*, 690 F. Supp. 3d 51 (No. 23-369), ECF No. 149, and the Second Circuit appeal was dismissed, *see* Mot. Order, No. 23-7276 (2d Cir.), ECF No. 84.

These dismissals followed ATF's decision to sign a sweeping settlement agreement that reverses its prior position.  *See* Ex. 13 (May 13, 2025 Settlement Agreement); Press Release, U.S. DOJ, Department of Justice Announces Settlement of Litigation Between the Federal Government & Rare Breed Triggers, (May 16, 2025), https://tinyurl.com/329dr6m2.  The May 13th Agreement purports to obligate the United States not to enforce any statute or agency interpretation under which an FRT is "contended to be" a machinegun—a promise that claims to be both perpetual (as it purports to bind future administrations) and universal (as it prohibits enforcement against all, not merely the parties to the agreement).  Ex. 13 at 5–6.  And the federal government has committed, via the Agreement, "to return FRTs" "to the extent practicable" that any federal agency "has seized or taken as a result of a voluntary surrender," in response to any request that the federal government receives by September 30, 2025.  *Id.* at 3–4.  The Agreement is not limited to the parties to those litigations or to FRTs seized in connection with any then-pending litigation.  And the Agreement included no carve outs for situations in which the ATF's redistributions would be to individuals who reside in States that bar the possession of FRTs and FRT-equipped firearms or to companies that continue to sell these FRTs in violation of state law, *see supra* at 5 n.1.[2]

---

[2] Public reporting suggests this settlement was mandated over the express objections of the ATF. *See* Perry Stein, *ATF's pro-gun lawyer opposed Trump administration's latest move on guns,* Wash. Post (May 22, 2025), *available at* https://tinyurl.com/2s4zfuy4.

On June 9, Plaintiff States filed their Complaint challenging the Settlement Agreement and its redistribution policy.  See ECF No. 1.  That same day, ATF updated its redistribution policy on its website, *see* Ex. 29 (ATF Website on Returns as of June 9, 2025), to state:

> Some states independently prohibit the possession of forced reset triggers or trigger activating devices.  If you live in a jurisdiction in which the possession of a forced reset trigger is prohibited by law, ATF will work with you to return the device in a place where it may be lawfully possessed, or upon request, will transfer the device to a third party who may lawfully receive it.

ATF did not identify the jurisdictions in which it believes that FRT possession is prohibited.  The June 9 Announcement further provides that no later than June 30, 2025, ATF will notify "owners of eligible FRTs by mail" and "provid[e] instructions as to how to retrieve their device(s)."  *Id.*

With redistributions set to begin imminently, this motion for preliminary relief follows.

## ARGUMENT

To obtain a preliminary injunction, movants must establish "(1) that [they are] likely to succeed on the merits; (2) that [they are] likely to suffer irreparable harm if preliminary relief isn't granted; (3) that the balance of equities favors [them]; and (4) that an injunction is in the public interest."  *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023).  All four factors overwhelmingly support granting a preliminary injunction.

## I. PLAINTIFF STATES HAVE STANDING.

As a threshold matter, Plaintiff States have a "personal stake" in this dispute sufficient to satisfy Article III.  *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)); *accord Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 789 (4th Cir. 2004).  For standing, a plaintiff must show (1) "an injury in fact," *i.e.*, "a concrete and imminent harm to a legally protected interest," that is (2) "fairly traceable to the challenged conduct" and (3) "likely to be redressed by the lawsuit."  *Nebraska*, 600 U.S. at 489;

*accord Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). States may sue to seek redress for sovereign and pocketbook injuries alike. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (sovereign injuries); *Nebraska*, 600 U.S. at 489–90 (fiscal injuries). The federal government's planned redistribution of *thousands* of FRTs that it had previously seized—to all who submit a request by September—will concretely impose both kinds of harms.

Begin with the sovereign injuries. States have an established sovereign interest in making and enforcing a legal code, *Alfred Snapp*, 458 U.S. at 601, and as relevant here, ensuring that those within their borders follow the civil and criminal laws that they have established. *See, e.g.*, *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing that a "violation of [a government's] laws" constitutes an "injury to its sovereignty"); *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (acknowledging that a "sovereign state" has a "concrete interest . . . in maintaining compliance with its laws"); *Harper v. Pub. Serv. Comm'n*, 396 F.3d 348, 354 (4th Cir. 2005) ("Interests like . . . criminal law lie at the heart of state sovereignty . . . ."). That is why States can sue or prosecute private parties when they violate their civil and criminal statutes— since the violation of the sovereign's own laws is itself an offense to the sovereign. *See Stevens*, 529 U.S. at 771 (confirming that "the injury to [a government's] sovereignty arising from violation of its laws . . . suffices to support a criminal lawsuit by the Government"). And that is why some federal courts have held that even the federal government's mere "encouraging" of private parties to "disregard" state law reflects "an adequate injury to the State's sovereign interests." *Daily Wire, LLC v. U.S. Dep't of State*, 733 F. Supp. 3d 566, 577–79 (E.D. Tex. 2024).

The ATF's planned redistribution of FRTs goes well beyond mere encouragement and imminently threatens the States' sovereign interests. Although ATF said three months ago that returns of FRTs to States that prohibit them would "aid and abet" the recipients' "violations of

11

state law," Resp. to Pls.' Notice of Noncompliance at 2-3, *NAGR*, No. 23-830, ECF No. 128,[3]

ATF's subsequent decision to redistribute the FRTs as memorialized in the Settlement Agreement

did not include any carve outs as to Plaintiff States on its face, *see* Ex. 13 at 3–4, and ATF's June

9 Announcement confirms the breadth of the agency's imminent redistribution.  While the June 9

Announcement indicates that ATF would not physically return FRTs to "a jurisdiction in which

the possession of a forced reset trigger is prohibited by law" (without clarifying which States ATF

believes so qualify), it nevertheless issued a *deliberate and targeted invitation* to residents of such

jurisdictions that ATF will affirmatively "work with you to return the device in a place where it

may be lawfully possessed"—even though those individuals will presumably return home to

Plaintiff States with that unlawful item without ATF ensuring otherwise.  Ex. 29.  Further, ATF

evidently plans to redistribute FRTs to distributors that sell FRTs into Plaintiff States, as neither

the Settlement Agreement nor the June 9 Announcement includes any such carve outs.  *See RBT*,

690 F. Supp. 3d at 58 (discussing history of FRT distributors selling throughout the United States);

Ex. 2 at ¶18 (stating that distributor RBT had directly shipped suspected FRTs to almost all states

and had sold FRTs to third-party sellers who distributed them into "every State").  The state injury

is thus clear: because States are harmed if private parties fail to follow the States' criminal laws,

and because ATF's action directly "aids and abets" such state-law violations by individuals and

sellers alike, the agency's imminent action harms the States' sovereign interest.  *See, e.g.*,

*Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1254–56 (W.D. Wash. 2018) (finding

that States "alleged harm to their legally protectable sovereign interests" where federal agency's

---

[3] To be clear, the States are not contending that the United States is itself obligated to follow state law. *See United States v. Washington*, 596 U.S. 832, 835 (2022) (noting intergovernmental immunity bars States from directly regulating the United States). Rather, where a federal agency violates *federal* law in a way that aids and abets private parties' violations of the States' legal codes, the States suffer an injury that confers standing to challenge those federal law violations.

allowance of distribution of files to create guns using 3-D printers contravened States'
comprehensive regulatory schemes).  ATF's imminent redistribution of FRTs thus does not merely
encourage private violations of state law; it will directly facilitate them.

And not only has ATF injured the States' sovereign interests by facilitating private parties'
violation of their laws, but it has hindered their ability to effectively investigate and enforce such
violations, which is itself a cognizable injury. *See, e.g.*, *Texas v. EEOC*, 933 F.3d at 447 (federal
government may not "undercut[]" the State's interest "in maintaining compliance with its laws").
Courts routinely find that States suffer Article III sovereign injuries when the federal government
fails to provide them information that would assist in enforcing their laws against the private
parties who violate them. *See NRDC v. EPA*, 961 F.3d 160, 169 (2d Cir. 2020); *Envtl. Def. Fund
v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019); *Pub. Citizen v. DOJ*, 491 U.S. 440, 449 (1989); *Baker
v. CVS Health Corp.*, 717 F. Supp. 3d 188, 192 (D. Mass. 2024).  Here, the Agreement facilitates
private violations of state criminal laws without even committing to provide States information as
to the possessors, distributors, or addresses to which the FRTs are being redistributed.  Together,
the picture is clear: ATF is facilitating state law *violations* without providing information to
Plaintiff States to facilitate their *enforcement*—imminently injuring sovereign interests.

The pocketbook harms are just as significant: by redistributing FRTs to possessors who
reside in these States (so long as they provide an out-of-state address for the handoff) and to
distributors that continue to sell directly or indirectly into the States, ATF will ensure Plaintiff
States must expend substantial resources to enforce their laws by seizing FRTs and suing or
prosecuting offenders. *See, e.g.*, *Gen. Land Office v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023)
(holding that States have an "interest in [their] fiscal policy" that suffers when a change in federal
policy requires States to "redirect resources"); *California v. ATF*, 718 F. Supp. 3d 1060, 1073–78

(N.D. Cal. 2024) (finding that States' "increased cost[s] of policing and law enforcement" based on changes to the federal regulation of ghost guns was an "injury"); *see also Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (agreeing that "financial harm is a classic and paradigmatic form of injury in fact"). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury,'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017), and the threatened costs here are far from minor. ATF has recovered at least 11,884 FRTs, Ex. 4 at ¶6, including from Plaintiff States. Once these FRTs reenter circulation, Plaintiff States will have to bear substantial financial costs in enforcing their own prohibitions on the ensuing sale, distribution, and possession of FRTs, including by Plaintiff States' residents—particularly given that (as ATF itself has explained) FRTs can be difficult for law enforcement to detect. *See* Ex. 1 (NJ) at ¶¶27–29; Ex. 2 at ¶33; Ex. 20 (CO) at ¶¶18–21; Ex. 21 (IL) at ¶¶15–17; Ex. 23 (MD) at ¶¶27–31; Ex. 26 (RI) at ¶¶11–14; Ex. 27 (WA) at ¶17. ATF's own evidence indicates that each FRT retrieval takes approximately 16 to 24 hours of law enforcement time. Ex. 2 at ¶¶24–31.

Plaintiff States—even those that do not separately ban FRTs—will also suffer considerable law enforcement and health care costs associated with the entirely "predictable" use of the thousands of FRTs the United States will distribute. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (finding the States' loss of federal funding to be an injury traceable to placement of a citizenship question on the Census where "third parties will likely react in predictable ways" by not responding to the Census, "even if they do so unlawfully"); Ex. 1 (NJ) at ¶¶22–24 (explaining that use of returned FRTs is likely, even in States that bar FRTs, given significant interstate gun trafficking networks); *cf. City of Columbus v. Trump*, 453 F. Supp. 3d 770, 789 (D. Md. 2020) (finding standing based on an increase in insurance premiums that resulted from insurance issuers' "predictable" reaction to a challenged policy). Because they involve more casualties, criminal

incidents that involve rapid-fire weapons predictably require greater emergency response and investigative resources, imposing greater costs on Plaintiff States. *See* Ex. 1 (NJ) at ¶ 26; Ex. 20 (CO) at ¶¶16–17; Ex. 23 (MD) at ¶¶25–26; Ex. 26 (RI) at ¶11; Ex. 27 (WA) at ¶15. Likewise, the redistribution of FRTs will predictably lead to increased healthcare costs at state-run healthcare facilities, because "[t]he more significant injuries caused by firearms with an accelerated rate of fire and higher firing velocity leads to more medical complications for patients." Ex. 3 (NJ) at ¶11; *see also Columbus*, 453 F. Supp. 3d at 787–92 (finding injury in fact where federal policy predictably caused increased costs to cities who would need increasingly "to provide uncompensated health care"); *Massachusetts v. HHS*, 923 F.3d 209, 223-27 (1st Cir. 2019) (finding a State faced a "substantial risk of fiscal injury" where the federal regulations made it likely that women would lose contraceptive coverage and thus turn to state-funded contraceptive services).

Plaintiff States' sovereign and fiscal harms are also "fairly traceable" to ATF's decision to redistribute FRTs and would be "redressed by [a] lawsuit" that enjoins the agency from doing so. *Nebraska*, 600 U.S. at 489; *see also Kenny*, 885 F.3d at 287. To be sure, the injunction issued by the district judge in the Northern District of Texas requires ATF to return *some* of the FRTs at issue. But the Agreement goes well beyond that: it requires redistribution to *any* distributor or possessor, including those who were not parties to the Texas action, whereas the court order was limited to those three persons and the members of two organizations. *Compare* Ex. 13 at 3–4 (Agreement) and Ex. 29 at 1 (June 9 Announcement), *with* Final Judgment at 2-3, *NAGR*, No. 23-830, ECF No. 101.[4] An injunction from this Court that bars FRT redistribution beyond the scope

---

[4] That distinction is significant: Rare Breed Triggers, the principal distributor of FRTs in the United States, was not a party to the Texas litigation.

of the Texas order is thus "not only likely to" prevent the additional injuries that will imminently result from the Agreement alone, "but will necessarily do so." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013). That satisfies the requirements for standing under Article III.

## II.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs are likely to succeed on the merits because the federal government lacks authority to redistribute FRTs across the country. As the Supreme Court has cautioned repeatedly, "agencies are creatures of statute," and "accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022); *see City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's power to act is "authoritatively prescribed by Congress"). "[A]ny action that an agency takes outside the bounds of its statutory authority is" therefore "*ultra vires,*" *PFLAG, Inc. v. Trump*, __ F. Supp. 3d ___, 2025 WL 685124, at *16 (D. Md. Mar. 4, 2025) (quoting *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020)), and contrary to law under the APA, *see* 5 U.S.C. § 706(2)(A), (2)(C). Said another way, "[a]gencies must operate within the legal authority conferred by Congress, and when those limits are transgressed, an individual may seek recourse in the Article III courts." *Med. Imaging & Tech. All. v. Libr. of Congress*, 103 F.4th 830, 828 (D.C. Cir. 2024). That is dispositive. The NFA and Gun Control Act ban machineguns, and so if the definition of machineguns that Congress chose covers FRTs, ATF may not redistribute them to private hands. *See* 18 U.S.C. § 922(o); 26 U.S.C. § 5845(b). It does.[5]

---

[5] Nothing about this analysis changes merely because ATF agreed to redistribute FRTs as part of a settlement agreement. It is "alien to our concept of law to allow" executive agencies to "violate [applicable] laws under the cover of settling litigation." *Exec. Bus. Media, Inc. v. U.S. Dep't of Defense*, 3 F.3d 759, 761-63 (4th Cir. 1993). After all, "parties can only agree to that which they have the power to do outside of litigation," *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995), and so they can "not agree to terms which would exceed their authority," *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997); *see also, e.g., St. Charles Tower, Inc. v. Kurtz*, 643

The textual definition of machinegun, Supreme Court precedent, context and history, and ATF's own consistent approach to FRTs and similar devices all compel the same conclusion: FRTs are machineguns. Congress, in the NFA, defined machineguns to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). And Congress clarified that the statutory definition would include not only the completed weapon, but also reaches "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." *Id.* As relevant here, the question thus becomes whether a firearm to which the FRT has been attached is one that can fire "more than one shot . . . by a single function of the trigger." *Id.* If it is, the FRT itself is a machinegun.

The statutory text answers this question. *See, e.g.*, *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025) (reiterating that "[s]tatutory interpretation begins with the text" and typically turns on the "ordinary" meanings of the terms it employs). As the U.S. Supreme Court has explained,

---

F.3d 264, 270 (8th Cir. 2011) ("State actors cannot enter into an agreement allowing them to act outside their legal authority . . . ."); *PG Pub. Co. v. Aichele*, 705 F.3d 91, 116 & n.28 (3d Cir. 2013) (similar); *Cleveland Cnty. Ass'n for Gov. by People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 476-77 (D.C. Cir. 1998) (similar); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Raimondo*, No. 20-431, 2024 WL 1332516, at *17 (E.D. Cal. Mar. 28, 2024) (similar); *United States v. Alex Brown & Sons, Inc.*, 963 F. Supp. 235, 240 (S.D.N.Y. 1997) (similar). Courts have thus held that federal executive agencies simply lack "license to agree to settlement terms that would violate the civil laws governing the[m]." *Exec. Business Media*, 3 F.3d at 762; *see also, e.g.*, *United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008); *Sweet v. Cardona*, 641 F. Supp. 3d 814, 823 (N.D. Cal. 2022); *Orbital ATK, Inc. v. Walker*, No. 17-163, 2017 WL 2982010, at *7 n.7 (E.D. Va. July 12, 2017); *Minard Run Oil Co. v. U.S. Forest Serv.*, No. 09-125, 2009 WL 4937785, at *22 (W.D. Pa. Dec. 15, 2009). So whether ATF had issued a standalone policy that required it to redistribute FRTs across the country, or whether the agency agreed (as here) to redistribute FRTs in a settlement agreement, the basic question remains: whether ATF's action follows federal law—including the NFA and its prohibition on machineguns.

The "function" of an object is "the mode of action by which it fulfils its purpose." 4 Oxford English Dictionary 602 (1933); *see also* American Heritage Dictionary 533 (1969) ("The natural or proper action for which a . . . mechanism . . . is fitted or employed"). And, a "trigger" is an apparatus, such as a "movable catch or lever," that "sets some force or mechanism in action." 11 Oxford English Dictionary, at 357; *see also* American Heritage Dictionary, at 1371 ("The lever pressed by the finger to discharge a firearm" or "[a]ny similar device used to release or activate a mechanism"); Webster's New International Dictionary 2711 (2d ed. 1934) ("A piece, as a lever, connected with a catch or detent as a means of releasing it; specif., Firearms, the part of a lock moved by the finger to release the cock in firing"). The phrase "function of the trigger" thus refers to the mode of action by which the trigger activates the firing mechanism. For most firearms, including the ones at issue here, the trigger is a curved metal lever. On weapons with these standard trigger mechanisms, the phrase "function of the trigger" means the physical trigger movement required to shoot the firearm.

*Garland v. Cargill*, 602 U.S. 406, 415–16 (2024). Said another way, because something "single" is "[s]eparate from others; individual and distinct,"[6] a "single function of the trigger" asks whether one single action—one application of the shooter's pressure—will produce multiple shots. In short, as the Court explained, a weapon is a machinegun where it "permits a shooter to fire multiple shots while engaging the trigger only once." *Id.* at 420 n.4.

Where, as here (and as is traditionally the case), the trigger is a curved metal lever that the shooter must pull backwards, the distinction becomes clear: a "machinegun" is a weapon that "fires continuously with a single pull on the trigger," unlike a semi-automatic firearm, which "requires a new pull on the trigger to fire." *United States v. Pérez-Greaux*, 83 F.4th 1, 13 (1st Cir. 2023); *see also, e.g.*, *Guedes v. ATF*, 920 F.3d 1, 30 (D.C. Cir. 2019) ("[A] quite common feature of weapons that indisputably qualify as machine guns is that they require both a single pull of the trigger *and* the application of constant and continuing pressure on the trigger after it is pulled."); *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (distinguishing semiautomatic arms from

---

[6] *Single*, American Heritage Dictionary of the English Language (5th ed. 2022), https://ahdictionary.com/word/search.html?q=single.

machine guns as requiring the shooter "to separately pull the [trigger] each time the weapon is fired," rather than "requir[ing] only one action . . . to fire multiple shots"); *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (weapon was a machinegun where "the shooter could, by fully pulling the trigger" and "obtain automation with a single trigger function").

The Supreme Court's recent decision in *Cargill* also confirms that the NFA distinguishes between machineguns and semi-automatic firearms based on "how many shots discharge when the shooter engages the trigger." 602 U.S. at 422. Semiautomatic firearms do not qualify because "engaging the trigger a single time will cause the firing mechanism to discharge only one shot." *Id.* at 416. And the Court explained that for a shot to be fired as "the result of a separate and distinct 'function of the trigger,' " the shot had to come after a "complete" "cycle," where a shooter would "release the trigger to allow it to reset." *Id.* at 421. *Cargill* built on the Court's earlier ruling in *Staples v. United States*, 511 U.S. 600 (1994), which explained that "[t]he terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger," and that a weapon that "will automatically continue to fire until its trigger is released" "once the trigger is depressed" is a machinegun. 511 U.S. at 602 n.1. A semiautomatic weapon, by contrast, "fires only one shot with each pull of the trigger." *Id.* at 602 n.1. *See also RBT*, 690 F. Supp. 3d at 75–83 (exhaustively canvassing the statutory text and definitions, pre-*Cargill* circuit precedent, and *Staples* to hold in the context of FRTs that a "firearm is a machinegun if it fires multiple rounds automatically with a single 'pull' of the trigger").[7]

---

[7] This test, which looks to the number of shots fired from a single pull of the trigger, accords not only with the text but also with the relevant legislative history. Both the House and Senate reports that accompanied the NFA in 1934 noted that a "machinegun" was given its "usual definition" as "a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." S. Rep. No. 73-1444, at 2 (1934); H.R. Rep. No. 73-1780, at 2 (1934). When the NFA was in committee, the NRA testified that weapons were "not properly machineguns" where "with

FRTs are "machineguns" under this standard.  In an ordinary semiautomatic rifle, when the shooter pulls the trigger, it releases the hammer, which strikes the firing pin, initiating the discharge of a bullet.  The recoil from the shot drives the bolt backwards, which depresses the hammer and returns it to its starting position—where it is held in place by a device known as a "disconnector."  *See, e.g.*, Ex. 14 at 14 (ATF Report on FRT-15) Ex. 15 at 4-5 (ATF Report on WOT); *Cargill*, 602 U.S. at 417–21 (explaining how semiautomatic weapons function); *RBT*, 690 F. Supp. 3d at 62-63.  That is, a shooter can only release the hammer and fire another shot if they release the firearm's trigger by "tak[ing] the pressure off the trigger and allow[ing] it to move forward."  *Cargill*, 602 U.S. at 420.  In a machinegun, however, an auto sear (not a disconnector) holds the hammer in place: if a shooter maintains pressure on the trigger, the auto sear will hold the hammer in place as the firearm automatically reloads, and as the bolt moves back forward, it uses a "trip surface" to release the hammer from the auto sear and fire another shot.  *See* Ex. at 14 at 46–47; Ex. 15 at 34–36; *Cargill*, 602 U.S. at 420 n.4 ("Machinegun variants . . . include an additional component known as an auto sear.  The auto sear catches the hammer as it swings backwards, but will release it again once a new cartridge is loaded if the trigger is being held back."); *RBT*, 690 F. Supp. 3d at 63-64 (discussing mechanics of M16 machinegun and auto sear).  So "as long as the shooter's finger is holding the trigger shoe rearward, the firearm will rapidly shoot multiple rounds of ammunition," without any need for a shooter to release it to reload or reset the hammer.  *RBT*, 690 F. Supp. 3d at 64.  As *Cargill* put the point, "[a]n auto sear thus permits a shooter to fire multiple shots while engaging the trigger only once"—the defining feature of a machinegun.  602 U.S. at 420 n.4.

---

a single pull of the trigger only one shot is fired."  National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. On Ways and Means, 73d Cong. 1 (1934).  And the then–Assistant Attorney General agreed that "automatic" guns are distinct from "auto-loading" ones because non-machineguns required that "you have to pull the trigger each time to fire them."  *Id.* at 97.

A gun outfitted with an FRT operates the same way. *See RBT*, 690 F. Supp. 3d at 65 (noting that, as for a standard machinegun, a "shooter need only pull the FRT-15 trigger once and maintain rearward pressure for the gun to rapidly fire multiple rounds, requiring no additional input from the shooter"). The attached declarations offer more detail, but the Eastern District of New York—based on both testimony and voluminous record evidence—has summarized how FRTs work:

> In the ready to fire position, the trigger is engaged with the hammer. When the shooter pulls the trigger shoe, the trigger releases the hammer, and the hammer strikes the firing pin, causing a shot to be fired. However—unlike a trigger in a standard semi-automatic weapon—the FRT-15 has no disconnector. Rather, as the bolt carrier moves rearward after a shot is fired, the force of the bolt pushes the hammer into the top of the trigger, rapidly forcing the trigger forward again against the rearward pressure of the shooter's finger on the trigger shoe. Once the bolt carrier then moves sufficiently forward again, the trigger will re-engage with the hammer by way of each piece's sear surface, returning the trigger and the hammer to their configuration in the ready-to-fire position.

> Without a mechanism to constrain the movement of the trigger at this moment, the trigger would immediately release the hammer, which would strike the firing pin again and repeat the firing process. If the trigger were to do so, however, it could strike the firing pin before the bullet from the magazine has been properly chambered, resulting in a malfunction. To prevent this, after a shot is fired, the FRT-15 trigger is momentarily held in place as the bolt moves rearwards and forwards; that is achieved by means of a mechanism not present in an AR-15 or M-16, called a "locking bar." The locking bar "times" the device to make sure that a bullet is in the chamber by the time the trigger is free to release the hammer again. As the rearward force of the bolt forces the trigger forward, the locking bar pivots counterclockwise, and the bottom of the locking bar captures the top rear of the trigger by way of each piece's sear surface. These pieces remain held in place, regardless of the shooter's rearward pressure on the trigger shoe, until the bolt moves sufficiently forward and the "trip surface" on the bolt pushes the top portion of the locking bar forward, pivoting the locking bar clockwise and freeing the trigger to move. At the same instant, a round is fully chambered, and the weapon is safe to fire. At this moment, *as long as the shooter has simply maintained rearward pressure on the trigger, the trigger releases the hammer, the hammer strikes the firing pin, and a cycle of fire begins.*

> Like the trigger on a standard semi-automatic weapon, the internal portion of the trigger on an AR-15 outfitted with an FRT-15 releases the hammer with each successive shot. Like a machinegun, however, *the shooter need only pull the FRT-15 trigger once and maintain rearward pressure for the gun to rapidly fire multiple rounds, requiring no additional input from the shooter.*

*Id.* at 64-65 (emphases added and citations omitted).

Voluminous record evidence, including evidence developed by ATF, establishes as much. *See, e.g.*, Ex. 14 at 1-47; Ex. 15 at 1-59; Ex. 16 at ¶¶50–52 (declaration of Daniel Koneschusky); Ex. 17 at 11 (Aug. 28, 2018 ATF Evaluation); Ex. 18 at 8–20 (Report to Special Agent Michael T. Nuttall). Just like using an auto sear, replacing the firearm's trigger assembly with an FRT allows the shooter to "fire multiple times, or even continuously, by engaging the trigger only once" and by continuing to maintain that rearward pressure. *Cargill*, 602 U.S. at 410. What drives the release of the hammer is not a separate and discrete act by the shooter, but the internal machinery of the firearm itself—automatically releasing the hammer and firing the gun as the bolt pushes forward to release the auto sear (for an M16) or locking bar (for an FRT).[8] The continuous release of the hammer ends, and with it, the gun's stream of automatic fire only when the shooter's continuous exertion of force ends (when they stop pulling). The shooter can maintain one "physical trigger movement required to shoot the firearm" and continue to fire until the gun's magazine is exhausted. *Id.* at 416. And an FRT shoots multiple times without completing a single "cycle" in the same way as an automatic weapon does: the trigger continues to receive constant pressure from the shooter's finger rather than coming to rest at its initial position.

ATF's longstanding and repeated classifications are in accord. *See Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025) (explaining that the "contemporary and consistent view of a coordinate branch of government can provide evidence of the law's meaning") (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)). In contrast to the non-mechanical bump stock, *see infra*,

---

[8] Even the plaintiffs' expert in the *NAGR* action admitted FRTs cause a weapon to continue to fire "even if the shooter does not lessen his rearward pressure on the trigger." Ex. 19 at 42-43 (Tr. of Evidentiary Hearing, ECF No. 56).

ATF has consistently—as far back as the 1970s—classified devices functionally similar to FRTs as "machineguns." *See* Ex. 2 at ¶12; *See, e.g.*, Ex. 7; Ex. 8; Ex. 9; Ex. 10; Ex. 11; Ex. 12 at 8.  And from the first time ATF confronted the FRT-15 until the Settlement Agreement, ATF understood that it was unlawful.  *See RBT*, 690 F. Supp. 3d at 65–74 (recounting history of FRT-15 and patents for predecessor devices and ATF's consistent responses based on observation and testing).  Simply put, ATF's experts have understood that FRTs and similar devices are machineguns for nearly fifty years—precisely the result that the plain-text definition of the NFA compels.

*Cargill*'s recent conclusion that non-mechanical bump stocks fall outside the definition of machineguns only bolsters the conclusion that FRTs and their distinct machinery fall within it. *See RBT*, 690 F. Supp. 3d at 85–86 (discussing the Fifth Circuit's decision in *Cargill*, which the Supreme Court ultimately affirmed, and finding both that it is "distinguishable" and "its analysis … in fact provides further grounds to find that the FRT-15 is a machinegun").  In contrast to FRTs, which physically alter the trigger mechanism to produce a much higher rate of fire, bump stocks do not replace the disconnector that holds the hammer in place after each trigger pull.  Rather, bump stocks are an external accessory that merely facilitates "bump firing"—a manual firing technique in which a shooter "uses the firearm's recoil to help rapidly manipulate the trigger."  602 U.S. at 411.[9]  Bump firing thus can, as the Court explained, be performed on a semi-automatic rifle

---

[9] In *Cargill*, the Supreme Court explained bump firing as follows: "As the rifle slides back and away from the shooter's stationary trigger finger, the trigger is released and reset for the next shot. Simultaneously, the shooter uses his nontrigger hand to maintain forward pressure on the rifle's front grip.  The forward pressure counteracts the recoil and causes the firearm (and thus the trigger) to move forward and 'bump' into the shooter's trigger finger.  This bump reengages the trigger and causes another shot to fire, and so on." *Id.*  As it noted, "Bump firing is a balancing act.  The shooter must maintain enough forward pressure to ensure that he will bump the trigger with sufficient force to engage it.  But, if the shooter applies too much forward pressure, the rifle will not slide back far enough to allow the trigger to reset.  The right balance produces a reciprocating motion that permits the shooter to repeatedly engage and release the trigger in rapid succession." *Id.*

with no "additional equipment," *id*, but a bump stock will make it "easier." *Id.* at 411–12.  The

bump stock is a "plastic casing . . . helps manage the back-and-forth motion required for bump

firing" and "a ledge to keep the shooter's trigger finger stationary," but it "does not alter the basic

mechanics of bump firing." *Id*. at 412.  That is, the shooter still engages the trigger for each shot.

They do so by manually "pushing the firearm forward to bump the trigger against [their] stationary

finger," *id*. at 422, but the trigger must be "released and reengaged to fire each additional shot,"

*id.* at 406.  And tellingly, *Cargill* expressly excluded *mechanical* bump stocks—which, like FRT-

equipped firearms, do not require manual application of forward pressure by the shooter—from its

holding.  *Id.* at 411 n.1.

The FRT is strikingly dissimilar to the non-mechanical bump stock: it allows a shooter "to

fire multiple shots while engaging the trigger only once" without releasing their pressure from that

trigger, and without taking any other physical motion beyond that single pull.  *Id.* at 420 n.4; *see

RBT*, 690 F. Supp. 3d at 83–88.  Said another way, an FRT does not require that a shooter "release

and reset the trigger between every shot," *Cargill*, 602 U.S. at 415; the shooter can maintain one

"physical trigger movement required to shoot the firearm" and fire until the magazine is exhausted,

*id.* at 416.  And an FRT shoots multiple times without completing a single "cycle" the same way

that other kinds of automatic weapons do.  *See RBT*, 690 F. Supp. 3d at 87; *compare Cargill*, 602

U.S. at 422 (for the non-mechanical bump stock, emphasizing the shooter must "push[] the firearm

forward" for each shot).  Moreover, although the Court emphasized that "[n]othing changes" for

the firearm's *trigger* "when a semiautomatic rifle is equipped with" a non-mechanical bump stock,

*Cargill*, 602 U.S. at 421, that "is decidedly not the case here," *RBT*, 690 F. Supp. 3d at 87.  Instead,

as the Eastern District of New York explained, rather than the shooter "pull[ing] the trigger only

one time" and then releasing it, *id.* at 83, the "repetitive mechanism in the FRT-15 is entirely self-

executing until the shooter releases the trigger, notwithstanding the fact that the trigger mechanically pushes against the shooter's finger throughout the process." *Id.* at 84.[10]

As *Cargill* recognized in the context of other automatic weapons, "pressing and holding the trigger down on a fully automatic rifle . . . is what causes the trigger to function in the first place." 602 U.S. at 425. So too with an FRT: pressing and holding down the trigger fires multiple shots. That places an FRT in the heartland of what the NFA defines as a machinegun, and because the FRT is a machinegun under the NFA, ATF's choice to redistribute thousands of FRTs it has previously seized is likely ultra vires and contrary to law.[11]

## III.    THE EQUITIES COMPEL PRELIMINARY RELIEF.

Absent preliminary relief, Plaintiff States will be severely and irreparably harmed by the United States's imminent redistribution of FRTs. Unleashing such dangerous and difficult-to-track weapons into Plaintiffs' communities will directly cause violations of Plaintiff States' laws banning FRTs or FRT-equipped firearms, divert state law enforcement resources that will never be recoverable, and lead to increased FRT-related crime that poses significant risks to public health

---

[10] Indeed, counsel for the challengers in *Cargill* in fact agreed the FRT would offer a "harder case" than the bump stock. No. 22-976 (U.S.), Oral Arg. Tr. 82:25-83:15; *see also* Br. of Resp. 39-40. Moreover, up until 2018, ATF consistently interpreted non-mechanical bump stocks to fall outside the statutory definition of machineguns. *See Cargill*, 602 U.S. at 412 (describing ATF's consistent view on this "[o]n more than 10 separate occasions over several administrations"). By contrast, in that same period, ATF consistently understood that devices operating through the same mechanical principles as FRTs were covered by the NFA. *See supra* at 22-23.

[11] Finally, it is of no moment that some of the federal investigations pursuant to which these FRTs were seized have ended, as per se contraband need not be returned even if a charge or investigation is dropped. *See, e.g.*, *Helton v. Hunt*, 330 F.3d 242, 248 (4th Cir. 2003); *United States v. Chambers*, 192 F.3d 374, 376 (3d Cir. 1999); *United States v. Hubbard*, 650 F.2d 293, 303 n.26 (D.C. Cir. 1980); *United States v. Farrell*, 606 F.2d 1341, 1344 (D.C. Cir. 1979). That makes sense: private individuals "cannot have a property right in that which is not subject to legal possession." *Helton*, 330 F.3d at 248 (citation omitted); *see also, e.g.*, *United States v. Gilbert*, No. 05-71, 2016 WL 11588376, at *1 (W.D. Wash. Feb. 26, 2016) (denying motion to return unregistered machinegun because it was "contraband" and as such "Defendant is not entitled to [its] return").

and safety. *See supra* at 2-6 & n.1. The harms that inexorably follow "cannot be fully rectified by the final judgment after trial"—the definition of irreparable injury. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted).

ATF's redistribution of FRTs will impose "ongoing irreparable harm" to the jurisdictions' "law enforcement and public safety interests." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Most immediately, the funneling of FRTs to Plaintiff States' residents would result in violations of many state law bans on the possession of FRTs or FRT-equipped firearms, *see supra* at 5 n.1 (listing state laws). Such sovereign injuries are inherently irreparable: they cannot be remedied after they occur by other forms of relief. *See Prayze FM v. FCC*, 214 F.3d 245 (2d Cir. 2000) (finding irreparable harm based on unlicensed broadcasting in violation of regulations). Indeed, as one district court found in analogous circumstances in which the federal government loosened firearms restrictions pursuant to a settlement agreement in a way that would have harmed the States, the federal government subjects the States to "irreparable harm" where it "subvert[s] the domestic laws of states with more restrictive firearm controls and threaten[s] the peace and security of the communities where these guns proliferate." *Washington*, 318 F. Supp. 3d at 1261 (preliminarily enjoining actions by the federal government that allowed for distribution of files that supported automated production of 3D-printed guns); *cf. e.g.*, *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 211-12 (5th Cir. 2024) (finding that actions imposed irreparable harm on State by preventing the State from enforcing "operational control over its own property"). Yet as detailed above, that is precisely what the planned redistribution of FRTs will do.

Moreover, the serious "[t]hreat[] to public health and safety" resulting from the violation of state laws, *see supra* at 2–6 & n.1, itself of course also "constitute[s] irreparable harm" that supports preliminary relief. *E.g.*, *Colorado v. U.S. Dep't of Health & Hum. Servs.*, __ F. Supp. 3d

26

___, 2025 WL 1017775, at \*4 (D.R.I. Apr. 5, 2025) (citation omitted)); *Duncan v. Bonta*, 83 F.4th 803, 806 (9th Cir. 2023) (finding that the State "will be irreparably harmed" by "influx of" illegal instruments because they "pose significant threats to public safety"). ATF's imminent redistribution of deadly MCDs "pose[s] threats to the citizens of the plaintiff States," who have a "legitimate fear" that the proliferation of such devices "will likely increase the threat of gun violence they and their people experience." *Washington*, 318 F. Supp. 3d at 1261-62; *see also Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024) (en banc) (recognizing that "excessively dangerous weapons" may present a "demonstrable threat to public safety"). The violence these machineguns enable is irrevocable, because any harms inflicted by the criminal use of redistributed FRTs while this litigation proceeds cannot be remedied by this Court.

The pocketbook injuries Plaintiff States will incur are likewise irreparable. The imminent redistribution of FRTs "will impose burdens on [the States'] ongoing operations" by forcing them to divert law enforcement resources and personnel to enforcing state bans, incurring costs to track and retrieve the redistributed FRTs. *See City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020); *California v. ATF*, 718 F. Supp. 3d at 1073–78 (recognizing injury inherent to "increased cost of policing and law enforcement"). Such pocketbook injuries are "irreparable" due to "the federal government's sovereign immunity," *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)), which likely "bar plaintiff[s] from obtaining a damages award," *Concord Hosp. v. N.H. Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024) (emphasizing that financial costs cannot be recouped where the public defendant is protected from damages claims); *see Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024). The same holds true for the increased law enforcement and health

27

care costs that Plaintiff States will incur when the returned FRTs—which, as explained, are illegal under federal law—are used in criminal incidents, *see supra* at 2-6 & n.1.

All of these harms will be compounded by the difficulty of retrieving redistributed FRTs once they have left federal agencies' hands.  The Court will not be able to "turn back the clock" to easily re-seize these devices, *LULAC v. Exec. Off. of the President*, __ F. Supp. 3d __, 2025 WL 1187730, at *42 (D.D.C. Apr. 24, 2025).  If, as ATF has acknowledged, the redistribution of FRTs alone is a "time consuming and logistically complicated" enterprise, Notice of Compliance at 2, *NAGR*, No. 23-830, ECF No. 126, then recovering them after they have been returned will be no less complicated.  *See supra* at 14 and Ex. 2 at ¶¶24–31 (noting ATF's testimony on hours necessary to seize FRTs).  The Agreement offers no mechanism for tracing FRTs redistributed to distributors, which will presumably be sold to unknown third parties (including through resellers), making it effectively impossible to re-seize them.  In the meantime, the FRTs—and the automatic fire that they exist specifically to enable—will produce increased death and injury, leading to greater costs to Plaintiff States and to long-term impacts on survivors and communities alike.  *See* Ex. 1 (NJ) at ¶¶26–28; Ex. 3 (NJ) at ¶¶14–18; Ex. 22 (MD) at ¶¶7–19; Ex. 24 (MI) at ¶¶8–18; Ex. 25 (OR) at ¶¶6–11; Ex. 28 (WA) at ¶¶4–21.

The equities and the public interest, which "merge when the government is the opposing party," *Nken v Holder*, 556 U.S. 418, 435 (2009), likewise demand preliminary relief.  Apart from the direct sovereign and financial harms that Plaintiff States will suffer, the public will be subjected to the risk of deadly and dangerous violence as increasing numbers of FRTs circulate across their States.  *See supra* at 3–5 (discussing the threats presented by MCDs generally, and FRTs in particular, including that they allow even novice shooters to fire faster than an M16 military rifle in automatic mode, firing multiple rounds in under a single second).  Conversely, preserving the

status quo will not present a material hardship to Defendants or any third parties, as it will merely freeze the "status quo" while this lawsuit is litigated without prejudice to any party or non-party's receipt of an FRT should ATF ultimately prevail. *See, e.g.*, *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (describing the purpose of a preliminary injunction as "protect[ing] the status quo and prevent[ing] irreparable harm during the pendency of a lawsuit"). Waiting a few months while the Court resolves this lawsuit will impose minimal hardship on the federal government and any third parties—especially because, if Plaintiff States are likely correct on the merits, the receipt of these FRTs would merely put the possessors and distributors themselves in violation of both federal and many state laws.

Put simply, if the court denies the preliminary injunction, the public-safety situation will evolve such that no court will be able to un-ring this bell. It will be exceptionally difficult, and in many cases impossible, to pull *thousands* of FRTs back from the field—notwithstanding the grave threat they pose. By contrast, if the Court awards preliminary relief, nothing will later stop federal agencies and any third parties from securing the return of FRTs if they ultimately prevail. Because the hardship suffered by Plaintiff States and the threats to the public will be truly irreparable absent a preliminary injunction, while other parties will face minimal burdens from preserving the status quo pending litigation, the equities tip decisively in favor of awarding preliminary relief.

## **CONCLUSION**

This Court should preliminarily enjoin Defendants from redistributing FRTs, except as required by any prior judicial order: (i) to individuals or entities in Plaintiff States, either directly or indirectly; and/or (ii) to any distributor, dealer, seller, or other entity that sells, resells, or otherwise distributes FRTs into Plaintiff States, either directly or indirectly.

Dated: June 10, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy (D. Md. Bar No. 28391)
  *Deputy Solicitor General*
Jeremy M. Feigenbaum*
  *Solicitor General*
Nathaniel Rubin*
  *Special Assistant to the Solicitor General*
Christopher Ioannou*
Max Lesser*
Marie Cepeda Mekosh*
Amanda McElfresh*
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 376-3377
Shankar.Duraiswamy@njoag.gov

*Counsel for the State of New Jersey*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

*/s/ Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Kate Aaronson*
  *Deputy Attorney General*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar. No. 31472)
Keith M. Jamieson (D. Md. Bar. No. 31543)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson*
  *Solicitor General*
Peter J. Baumann*
  *Senior Assistant Attorney General*
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov
Peter.Baumann@coag.gov

*Counsel for the State of Colorado*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ Eliza H. Simon
Eliza H. Simon (D.Md Bar No. 19648)
  *Senior Counsel to the Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C., 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

/s/ Michael M. Tresnowski
Michael M. Tresnowski*
  *Assistant Attorney General*
Cara Hendrickson*
  *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(312) 814-3000
Michael.Tresnowski@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks*
  *Chief State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
Katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail*
  *Deputy Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333
Tel.: 207-626-8800
Fax: 207-287-3120
vivian.mikhail@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

/s/ Adam R. de Bear
Adam R. de Bear*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI  48933
(517) 335-7573
debeara@michigan.gov
*Counsel for the People of the State of Michigan*

31

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

*/s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp\*
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall\*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (971) 673-1880
Fax: (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

*/s/ Jonathan T. Rose*
Jonathan T. Rose\*
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

*/s/ Heidi Parry Stern*
Heidi Parry Stern\*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Stephen N. Provazza*
Stephen N. Provazza\*
  *Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
(401) 274-4400
SProvazza@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

*/s/ Andrew R. W. Hughes*
Andrew R.W. Hughes\*
William McGinty\*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*

**\* Pro hac vice application forthcoming**