# Exhibit 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

NATIONAL ASSOCIATION FOR
GUN RIGHTS, INC., et al.,

Plaintiff,

- v. -

MERRICK GARLAND, et al.,

Defendants.

4:23-cv-00830-O

## DECLARATION OF SPECIAL AGENT CRAIG SAIER

I, Craig Saier, have personal knowledge of the following facts set forth below, and if called as a witness I would testify as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I am currently the Assistant Director for the Office of Intelligence Operations (OIO)[1] within the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice (DOJ), which is responsible for the national collection, analysis, and dissemination of crime gun intelligence; managing ATF's portfolio of international liaison and support activities; and managing ATF's Internet Investigations Center.

2. Prior to being promoted to the role of Assistant Director, I was the Special Agent in Charge of ATF's Tampa Field Division (TFD). The TFD covers 58 of the 67 counties in the State of Florida, and is comprised of 14 combined criminal enforcement and regulatory offices staffed by approximately 200 personnel. In my role as the Special Agent in Charge, I was responsible for oversight of all criminal and regulatory enforcement activities within the TFD, including the early stages of ATF's investigation of Rare Breed Triggers (RBT) and associated

---

[1] My directorate was previously named the Office of Strategic Information and Intelligence (OSII).

individuals and entities regarding their manufacture and distribution of the FRT-15, and ATF's investigation into the importation and distribution of the Wide Open Trigger (WOT) by Big Daddy Unlimited (BDU) and associated individuals and entities.

3. The facts set forth in this declaration are based on my personal knowledge; knowledge obtained as a result of my supervisory roles in OIO and TFD; information from other individuals, including ATF Special Agents and intelligence personnel involved in the investigation into the distribution and possession of the FRT-15, WOT, and similar devices; ATF records; and other sources. The information contained in this declaration is a summary and does not incorporate all facts known to me regarding these subjects.

## MACHINEGUNS AND MACHINEGUN CONVERSION DEVICES

4. In 1934, Congress enacted the National Firearms Act (NFA), 26 U.S.C. § 5801 et. seq., The NFA, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954); *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 516-17 (1992) (plurality opinion). The NFA was a direct response to Prohibition-era gang violence. The NFA defines firearms narrowly to include machineguns, silencers, short barrel rifles and shotguns, and destructive devices, among others. The NFA imposed registration, approval and background check requirements on the transfer and possession of all NFA firearms. The NFA also imposed making and transfer taxes on these weapons, and required anyone engaging in the business of manufacturing, dealing, or importing NFA firearms to be licensed, maintain records, and pay a Special Occupation Tax.

5. In 1986, Congress passed the Firearm Owners Protection Act (FOPA), which amended the Gun Control Act of 1968 (GCA) to include 18 U.S.C. § 922(o). Section 922(o) prohibits any person from transferring or possessing a machinegun unless the machinegun was

lawfully possessed before May 19, 1986, or the transfer or possession of the machinegun is "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof of a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o).

6.     Federal law defines the term "machinegun" as "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger" and includes a "combination of parts designed and intended for use in converting a weapon into a machinegun." 18 U.S.C. § 921(a)(24); 26 U.S.C. § 5845(b).  Accordingly, a combination of parts that convert a semiautomatic weapon to function automatically are properly classified as a "machinegun" under federal law.

7.     A combination of parts that convert a semiautomatic weapon to function automatically is generally referred to as a machinegun conversion device ("MCD").

## THE FRT-15 AND WOT

8.     On September 5, 2023, in *United States v. Rare Breed Triggers, LLC, et al.*, 23-cv-369 (EDNY), the Eastern District of New York granted the United States' Motion for Preliminary Injunction against RBT, finding the Government was likely to prevail on the merits and that the record established that since December 2020, RBT fraudulently induced their customers to buy an illegal product. The court restrained RBT, Rare Breed Firearms, Lawrence DeMonico, Kevin Maxwell, and their agents, officers and employees, and all other persons or entities in active concert or participation with them, from engaging in any sales of the FRT-15, WOT, forced reset triggers or other MCDs.

9.     On October 7, 2023, the Northern District of Texas, in *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830 (NDTX) granted a preliminary

3

injunction to three individual plaintiffs, two organizational plaintiffs, their members, and any "downstream customer" of a commercial member of the organizational plaintiffs, enjoining ATF from taking any enforcement action, criminal or civil, regarding FRT-15s and WOTs. Because of the injunction issued in EDNY, the NDTX injunction does not extend to the "Rare Breed Parties".[2]

10.     Both the FRT-15 and the WOT have been consistently classified as machineguns by ATF as they are MCDs. The FRT-15 and WOT are drop-in trigger systems designed for AR-type weapons. The WOT is a copy of the FRT-15. These triggers are easily installed into an AR-15 and require no special skills or tools.

11.     Individuals are generally prohibited from possessing or distributing MCDs, except under very limited circumstances. *See e.g.,* 18 U.S.C. § 922(o). Firearms equipped with MCDs are a particularly potent public safety threat as they allow for the rapid fire of several hundred rounds of ammunition per minute, often in an indiscriminate and uncontrolled fashion. As MCDs "make guns deadlier, they also make them far less accurate and harder to control for even the most experienced marksmen."[3]

## HISTORICAL PRACTICE OF CLASSIFYING FORCED RESET TRIGGERS AS MACHINEGUNS

12.     ATF has consistently classified devices functionally similar to the FRT-15 and WOT as "machineguns" going back to the 1970s. As ATF Firearms Enforcement Officer Anthony Ciravolo explained at the preliminary injunction hearing, ATF first classified as a machinegun a trigger device operating on these principles in 1975. Hearing Trans. 54:19-21. ATF subsequently

---

[2] *National Association of Gun Rights, Inc., et al., v. Merrick Garland, et al.,* 4:23-vc-00830, Opinion and Order, October 7, 2023, p. 43 (carving out Rare Breed Triggers, LLC, Rare Breed Firearms, LLC, or any of their agents, officers, and employees).

[3] Stephen Montemayor, *Modern-Day Machineguns*, Star Tribune, October 18, 2023, www.startribune.com/guns-switches-turning-more-firearms-into-automatic/600312536.

4

classified as machineguns devices materially similar to the FRT-15 and WOT in 1994, 2004, 2005, 2006, and 2017. *See, e.g.*, *Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *10 (E.D.N.Y. Sept. 5, 2023) (discussing 2006 classification of a device submitted by Hunter Kinetic Innovations). In total, ATF has classified approximately 17 similar, distinct devices as machineguns. Examples of such classification letters are attached as Exhibits A – C to this declaration.[4]

13. In addition, the AR-1, a predecessor device to the FRT-15, was classified by ATF as a machinegun in 2018. *See* Dkt. No. 40-1 at ATF0081-106. The AR-1 machinegun classification was known to RBT and its experts before the FRT-15 was marketed and distributed to the public. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *28 ("Having heard witness testimony about the AR-1's and FRT's development and classification, and having reviewed declarations and documentary evidence as to those devices' histories, the Court finds that (1) Defendants were aware of the AR-1 classification as a machinegun, (2) knew that the FRT had a functionally indistinguishable forced-reset trigger that would all but certainly lead the ATF to the same conclusion regarding its illegality, but (3) concealed that information from their customers in marketing the FRT-15 for sale from December 2020 onwards").

**RECENT PROLIFERATION OF FORCED RESET TRIGGERS**

14. In April 2021, a website selling Rare Breed Triggers, model FRT-15, came to the attention of ATF's Internet Investigations Center. Concerned that this was a machinegun, ATF purchased the model FRT-15 for examination by ATF's Firearms Technology Criminal Branch

---

[4] ATF has not classified all so-called forced reset trigger devices as machineguns. One such device, the 3MR, was submitted to ATF for classification in 2013. Importantly, this trigger system incorporated into its design a disconnector which prevents the weapon from continuing to fire until the shooter releases the trigger and initiates a subsequent firing sequence. For this device, the shooter must release the trigger for the disconnect to reset, and then pull the trigger for the firearm to fire a subsequent round.

5

(FTCB). The examination revealed that the FRT-15 was a combination of parts, designed and intended for use in converting a weapon into a machinegun and, as such, was a machinegun. The device was marked with "Rare Breed Triggers U.S. Pat. 10514223," the same patent number of the AR-1 which ATF previously determined to be a machinegun. Based on the FTCB examination, ATF's Tampa Field Division issued a letter dated July 26, 2021, to RBT demanding it "[c]ease and desist all manufacture and transfer of the Rare Breed Trigger FRT-15."

15. In issuing its preliminary injunction, the EDNY Court concluded that the government was likely to succeed in showing that RBT did not comply and instead proliferated an illicit market for these MCDs (the FRT-15, WOTs, and similar devices) through a conspiracy to defraud the United States and a scheme to defraud its customers. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770 at *27, *46.

16. As discussed above, ATF has long classified devices that operate like the FRT-15 and WOT as machineguns. As a result, such devices generally were not commercially available to the general public in the nearly fifty years since ATF first examined such a device.

17. As the EDNY court explained, however, RBT began manufacturing and selling these devices to the public without seeking ATF's opinion with respect to the FRT-15, despite knowing that ATF had previously classified materially similar devices as machineguns, including the AR1 device on which the FRT-15 was based. *See Rare Breed Triggers*, __ F. Supp. 3d __, 2023 WL 5689770, at *28.

18. Between approximately November 28, 2022, and January 16, 2023, the government has evidence that RBT shipped approximately 3,461 packages containing a suspected total of 7,700 WOTs to forty-seven states and U.S. territories. These packages represent only a fraction of the number of MCDs suspected to have been sold or distributed by RBT. It is estimated that RBT has

6

distributed at least 100,000 FRT-15s to almost every State, and it is known that RBT distributed FRT-15s to third-party sellers who distributed FRT-15s to every State.

19. The WOT was distributed by a company called Wide Open Enterprises (WOE) which is associated with BDU. It is not known by ATF how many WOTs were distributed by WOE and BDU, though between September 8, 2021, and March 21, 2022, WOE shipped packages to approximately 6,130 unique recipients. BDU was also, for a period of time, the sole distributor of the FRT-15. It is not known by ATF how many FRT-15s were distributed by BDU. It is also not known by ATF if WOE is continuing to distribute WOTs. While certain sellers may distribute these devices overtly, ATF has determined that some on-line sellers may do so in a manner intended to evade detection by law enforcement. Further, even where a seller does so overtly, it may not be readily determinable how many such MCDs are available for distribution; whether the devices constitute a finite stock; or whether the seller is capable of replenishment. ATF is aware for instance, that RBT continues to possess several thousand WOTs at locations which it has thus far refused to disclose.

20. To put the number of these devices distributed in perspective, the combined manufacture, importation, and distribution of the FRT-15 and the WOT from 2020 through 2023 likely exceeds the number of all lawfully manufactured and imported machineguns in that same period. For example, in 2020, only 16,161 machineguns were manufactured domestically by federally licensed firearms manufacturers, and only 3,445 were lawfully imported into the United States.[5] Indeed, excluding those registered to law enforcement agencies, there are less than 40,000 lawfully registered pre-1986 machineguns in the United States in total. Unlike those lawfully registered machineguns, FRT-15s and WOTs are not registered, their transfer and current

---

[5] *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce – Volume One*, Part 1, p. 26-27, App'x 1, p. 196, May 5, 2022.

7

possession cannot be tracked, and these devices are sold without background checks or identity verification.

21. Other third-party sellers have also distributed the FRT-15 and the WOT. In fact, these devices are currently advertised on the secondary online marketplace. Indeed, a large portion of RBT's customer base was its dealer network to whom RBT sold the FRT-15s for the purpose of resale. This spawned a secondary market for the FRT-15, WOT, and similar devices, which the preliminary injunction envisions continuing as to individuals or companies covered by the injunction. Further, other companies developed copycat devices that function in the same way as the FRT-15 and WOT. It is not known by ATF how many such devices are in the marketplace, what their market share is, or whether those entities are covered by the injunction. However, it is known that these devices are distributed without background checks, recordkeeping, registration, or identity verification common with firearms, which enables acquisition by persons prohibited under 18 U.S.C. § 922(g) or relevant state law.

**THE FRT-15 AND WOT ARE SUBJECT TO ACTIVE RETRIEVAL EFFORTS**

22. When machineguns are improperly distributed to the public, ATF must take steps to actively retrieve the devices, or encourage and solicit the voluntary destruction or abandonment of the devices. This is done to protect the public, to protect law enforcement, and to mitigate the risk of unlawful possession by an unaware or misinformed recipient. This final consideration is especially important here, where the EDNY Court found it likely that RBT committed fraud by telling customers that the FRT-15 was a lawful product.

23. The devices sold by RBT, WOE/BDU, and a third-party seller are the subject of an active retrieval effort by ATF, which is being coordinated by the ATF Tampa Field Division. They have been the subject of prior retrieval efforts of other third-party sellers as well. The current

retrieval efforts are directed towards approximately 8,849 unique purchasers who represent only a fraction of the recipients of such devices.

24. Retrievals are prioritized based on multiple factors, including, but not limited to, whether the recipient's criminal history requires heightened review, or the person has received multiple devices indicative of further re-selling or trafficking. Retrievals are resource intensive. ATF must individually assess each recipient to determine the individual's criminal history or association with criminal activity. This is necessary both to prioritize the retrievals based on public safety, as well as to ensure appropriate levels of officer safety for ATF personnel and our law enforcement partners. ATF estimates that each individual retrieval requires a combined expenditure of 16 to 24 man-hours, split between intelligence professionals engaged in analysis, and Special Agents engaged in the retrieval and associated investigatory work. ATF has expended thousands of man hours on these retrieval efforts nationally.

25. Retrieval difficulty is compounded by several factors. First, the volume of retrievals—which continue to represent only a fraction of the FRT-15s and WOTs in the marketplace—makes the process further resource intensive. Second, the FRT-15 and WOT are readily moveable and easily distributed illicitly. Transfers and re-transfers make the retrieval process exponentially more difficult because Agents are left to attempt to ascertain the ultimate recipient through chains of subsequent distributions, which, as noted, are generally conducted without records. These chains of distribution—applicable equally to resellers and in more limited circumstances end-customers—require further analysis of subsequent recipients, where they can be identified, to further assess and prioritize the retrieval process. Third, ATF is a very small Federal agency, with approximately 2,600 ATF Special Agents nationwide. ATF's primary mission is to investigate the most violent firearms offenders and investigate interstate and

9

international firearms trafficking. Hundreds of thousands of firearms are recovered and traced in the United States each year, any one of which is the potential source or part of a federal investigation. Engaging in retrievals—a necessary law enforcement function—nonetheless saps resources away from ATF to focus on the core mission of investigating and disrupting violent crime.

26. Because of the logistical hurdles in conducting retrievals, as explained above, ATF conducts them sparingly, but two factors warrant such action here, the danger to the public of these rapid-fire devices and the fact that machineguns are illegal to possess in all situations. Unlike other NFA firearms and GCA firearms, there is no way or manner in which to legally possess them.

27. The preliminary injunction here compounds these difficulties. As discussed, any retrieval of these devices is extremely time-consuming and complex. The injunction specifically contemplates further sale and distribution of these devices during the pendency of this litigation—including sales to individuals who are not members of the plaintiff associations. Each subsequent sale of a device currently held by a distributor would increase the number of such devices that must be retrieved from members of the general public if ATF's longstanding treatment of these devices as machineguns is ultimately upheld. Each transfer of these devices also makes it more difficult and time-consuming to undertake a retrieval and increases the likelihood that the device will never be recovered if ATF ultimately prevails, because these devices are bought, sold, and distributed outside of the background check and registration requirements generally applicable to firearms. Indeed, there has already been a YouTube video posted encouraging people to buy and sell the FRT-15 and to those who have turned in these devices during the recall to demand them

10

back from ATF. See https://youtu.be/IeUWgzkTxo8?feature=shared (https://youtu.be/IeUWgzkTxo8?feature=shared).

28. Retrievals of these devices can also be particularly dangerous to law enforcement because ATF prioritizes retrievals from individuals who meet certain risk factors. These individuals are likely to be armed, and sometimes may be dangerous. Threats to law enforcement associated with the retrieval of FRT-15s or WOTs have already been documented. Declaration of ATF Special Agent Cheryl Harrell, *United States v. Rare Breed Triggers, LLC, et al.*, E.D.N.Y 23-cv-369 (ECF No. 56, Exhibit C).

29. The fact that the RBT Parties are not covered by the injunction does not ameliorate this risk. Third parties sell these and similar devices. As of the date of this declaration, there are FRTs (specifically the WOT) for sale on the secondary market from non-manufacturing vendors. A quick internet search revealed numerous sale listings from various sites for the RBT and similar devices. These are marketed on numerous platforms to include traditional vendor websites and do not require much to complete a purchase and have shipped to your location.

30. In addition, manufacturing of these devices may increase as a result of the injunction here, putting further strain on retrieval efforts and increasing risks to the public even if ATF's view is ultimately upheld. It is difficult to quantify the numbers of these devices currently being manufactured or imported because ATF's longstanding classification of these devices as machineguns, its retrieval efforts, and the civil lawsuit brought against Rare Breed Trigger in the Eastern District of New York may make manufacturers unlikely to do so overtly. But insofar as the Court's injunction specifically contemplates that manufacturing of these devices by members of the associations at the time the injunction issued would be permissible, there is a serious prospect that such manufacturing will occur.

31. ATF would not generally be informed about such manufacturing or distribution, but this prospect is not hypothetical. After this court's injunction, for example, ATF was contacted by an attorney representing the subject of a previous cease-and-desist letter related to the distribution of the FRT-15, who acquired the devices from RBT for the purpose of further distribution. The attorney advised ATF that the subject individual intended to resume distribution of the WOT and intended to manufacture the FRT-15 with the authorization of RBT. The subject individual is a convicted felon prohibited under 18 U.S.C. § 922(g)(1). Counsel for this individual subsequently advised that the individual does not intend to distribute WOTs or manufacture FRT-15s, but this exchange highlights the inherent risk that additional devices will be manufactured and distributed under the court's injunction.

### THESE DEVICES POSE A RISK TO THE PUBLIC AND LAW ENFORCEMENT

32. The continued availability of these devices puts the public at risk. ATF has identified the FRT-15 and WOT being used in or associated with criminal activity. This is particularly alarming because an AR-type firearm equipped with an FRT-15 or WOT is capable of maintaining a rate of fire similar to the rate of fire of a commercially manufactured M16 machinegun. For instance, in ATF testing, a commercially manufactured M16-type M-4 machinegun had an average rate of fire of 870.4 rounds per minute, while an AR-15 semi-automatic firearm converted with a WOT had an average rate of fire of 933 rounds per minute. Importantly, both the FRT-15 and WOT allow a shooter to maintain this rate of fire irrespective of the shooter's training, skill, or stamina.

33. The precise number of incidents of firearms recovered and found to be equipped with an FRT-15, WOT, or similar device is likely underreported. The inclusion of such a device would not ordinarily be captured during the firearms tracing process, and many state and local law

enforcement agencies may not be well-informed to ascertain whether a recovered AR-type firearm has been retrofitted with a drop-in trigger device such as the FRT-15 or WOT. Many of these triggers can be installed on AR-type rifles without any visible modification to the firearm. Even when such devices are identified, the law enforcement agency may not capture that information in a way in which the true scope of recoveries can be properly assessed by ATF.

34. ATF has nevertheless encountered such devices in numerous criminal settings. For example, in the Tampa Field Division, I am aware that in July of 2021, an eight-time convicted felon on state probation was found, during the execution of a federal search warrant, to be in possession of 22 firearms, including 15 ghost guns and a non-serialized and unregistered short-barreled rifle, 2,000 rounds of ammunition, narcotics, and drug paraphernalia. The short-barreled rifle was equipped with an FRT-15. Similarly, in January 2023, ATF Special Agents assigned to the Charlotte Field Division recovered an AR-type firearm equipped with a WOT during the execution of a federal search warrant as part of an investigation into an armed narcotics trafficker. Through ballistic evidence, this AR-type firearm was determined to have been involved in seven separate shootings, including a drive-by shooting targeting a home and a shooting directed at an unmarked police vehicle. While it cannot be confirmed that the WOT was equipped in the firearm at the time of the shootings, a witness to one of the shootings reported hearing automatic gun fire, and the number of .223 and .556 shell casings recovered during some of the shootings was indicative of someone firing an automatic weapon, including seventy casings at one shooting and forty-two at another. In another drive-by shooting involving the same firearm, audio of the shooting demonstrated that the shooter fired 14 shots in less than two seconds.

35. From January of 2021 through October, 23, 2023, the ATF Firearms and Ammunition Technology Division conducted approximately seventy-one criminal examinations

of these types of devices as a part of multiple criminal cases, involving a variety of criminal conduct. For instance, aside from examinations directly related to the manufacture or importation of the FRT-15 or WOT (there have been approximately seven (7) such examinations) and similar devices, these devices and similar devices have been examined in connection with dozens of investigations related to National Firearms Act violations (apart from possession of an FRT-15 or WOT), firearms trafficking, illegal firearms manufacturing (apart from the manufacture or importation of an FRT-15 or WOT), narcotics trafficking, gang investigations, possession of firearms by felons and other prohibited individuals, at least one shooting (involving the suspected illicit discharge of 60 rounds of ammunition), and other criminal activity.

36.     There is additional evidence that these devices are being acquired by individuals who are prohibited from receiving or possessing firearms under 18 U.S.C. § 922(g). ATF has initially determined that RBT, between approximately November 28, 2022, and January 16, 2023, shipped WOTs to approximately 13 such individuals. WOE and BDU, between approximately September 8, 2021, and March 21, 2022, shipped WOTs to at least 45 such individuals. The third-party seller distributed FRT-15s to at least five such individuals between approximately March 17, 2021 through August 22, 2021. Because of the secondary market and other third-party sellers, and because ATF has assessed only a limited number of sales by RBT and WOR/BDU, it is highly likely that this represents only a small portion of the individuals prohibited under 18 U.S.C. § 922(g) that have an FRT-15 or WOT. Although the Court excluded from its preliminary injunction individuals prohibited under 18 U.S.C. § 922(g), these devices are sold without background checks or identity verification. Accordingly, the continued distribution of the FRT-15 and WOT will invariably result in their acquisition by these very individuals, as we have already seen. The continued distribution of these devices will also result in harm to the public because individuals

intent on using them to facilitate criminal activity will similarly be able to easily acquire them, and ATF will have limited ability to disrupt or interdict the acquisition or distribution.

37. FRT-15 and WOTs may be associated with other types of criminal activities outside of criminal use, possession, or domestic distribution. For instance, because the FRT-15 and WOT are classified as machineguns under the NFA and GCA, they are subject to stringent importation restrictions under 26 U.S.C. § 5844 and 18 U.S.C. § 922(l). The Arms Export Control Act (AECA), 22 U.S.C. § 2778, also requires an individual to obtain approval prior to the importation of a defense article as enumerated on the United States Munitions Import List (USMIL). The FRT-15 and WOT are Category 1 defense articles on the USMIL as a component and part of a firearm. *See* 27 C.F.R. Part 447. It is believed that all WOTs were unlawfully imported from outside the United States. Similarly, WOTs have been interdicted during at least one attempted illicit exportation.

38. Additionally, there are ongoing prosecutions in which defendants have been indicted for their possession of the FRT-15, WOT, or both. These include prosecutions in the Southern District of Texas, the District of Puerto Rico, and the District of Massachusetts. Some of these defendants were charged with other criminal offenses, which underscores that that these devices are not being distributed solely to law-abiding citizens.

39. The continued availability of these devices creates other risks to the public. As stated earlier, a weapon with an FRT-15 or WOT fires 800 to 900 rounds per minute. Also as stated earlier, it is not obvious by looking at a semi-automatic weapon equipped with an FRT-15 that such weapon will fire automatically, making them extremely dangerous for those who may acquire a firearm equipped with such trigger and may have no idea what they are possessing and have absolutely no skill or ability to handle a weapon with that rate of fire.

40. In addition, as discussed, law enforcement and members of the public may not be aware that a recovered or possessed firearm is equipped with such a device. This presents a risk to law enforcement officers who encounter firearms equipped with FRT-15 and WOT triggers and the general public who may not understand what they possess.

41. More broadly, the threats to the public as a result of these devices are not theoretical. There is a national, escalating trend of MCDs being used in the commission of violent crimes or being recovered from individuals and criminal organizations. One national media outlet has reported that "[i]ncidents of machine gun fire have exploded by about 1,400% from 2019 through [2021]," with acoustic sensors in 130 U.S. cities detecting "roughly 5,600 incidents of automatic weapons fire" in 2021.[6] Between 2017 and 2021, ATF recovered 5,454 MCDs, a 570% percent increase as compared to 2012-2016.[7]

42. This trend continues. ATF has determined that as of October 11, 2023, there has been an approximately 44% increase in the number of MCDs recovered by law enforcement as compared to recoveries of MCDs in 2022. As of the same date, for 2023, the state with highest number of recoveries is Texas. Further, during the same time-period, there has been an approximately 400% increase in firearm traces involving an MCD in which the trace was also associated with a crime of violence. The crimes of violence involving MCDs include homicides, aggravated assaults, robberies, car jackings, and the murder of a police officer.

43. The preliminary injunction will allow for the continued proliferation of these devices. The risk of their illicit misuse will only increase, both as a result of their continued

---

[6] Scott Glaver and Curt Devine, *A Device that can Turn a Semi-Automatic Weapon into a Machine Gun in Moments is Wreaking Havoc on American Streets*, CNN, August 30, 2022, www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html
[7] *National Firearms Commerce and Trafficking Assessment: Crime Guns – Volume Two, Part VII, p. 4*, January 11, 2023, www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-vii-recommendations (NFCTA Vol. 2).

distribution but also because of the prevention of law enforcement action to remove these devices from the marketplace.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 6th, 2023.

By: _____
Craig Saier
Assistant Director, OIO