# Exhibit 27

## DECLARATION OF PATRICIA COLE-TINDALL

Pursuant to 28 U.S.C. § 1746, I, Patricia Cole-Tindall, hereby declare as follows:

1. I am a resident of Washington State. I am over the age of 18. If called as a witness, I could and would testify competently to the matters set forth below.

### The King County Sheriff's Office

2. I am the Sheriff for the Martin Luther King, Jr. County Sheriff's Office (KCSO).

3. I am a commissioned officer in the State of Washington, and I have been a member of the KCSO Leadership Team since 2015. In 2022, I was appointed to the post of King County Sheriff.

4. The KCSO employs over 1,200 people and directly serves the law enforcement needs of over half a million people in unincorporated areas of the County, as well as twelve cities that contract with KCSO for police services. The KCSO also provides police services for the Muckleshoot Tribe, Metro Transit, the King County International Airport, and offers secondary support to the Seattle Police Department and other police agencies in the Puget Sound area.

5. Metro provides transit services throughout King County, with an average of 200,000 people boarding the coaches each day. Sound Transit covers an area that includes 53 cities. The County is bigger than the state of Rhode Island, encompassing more than 2,300 square miles and more than 40% of Washington's population. Due to the concentration of coaches and transit trains in downtown Seattle, the Sound Transit and Metro Police (who are KCSO employees) work in partnership on a Joint Transit Anti-Terrorism Team (JTATT), which provides visible deterrence and operations focused on terrorism and trains other employees on proper response to mass casualty events.

2

6. Several major corporations are headquartered within King County, including Microsoft, Amazon, Starbucks, and Costco.

7. There are multiple major league sports arenas in the County where Seattle's National Hockey League team, National Football League team, Major League Baseball, Women's National Basketball Association, and Major League Soccer teams compete. The Port of Seattle, a major West Coast port, and the SeaTac International Airport are also located within King County.

8. Gun violence is a significant challenge for King County. In 2024, there were 75 firearm homicides and 319 nonfatal shootings in King County. including 61 shooting victims under the age of 18.[1] As the Sheriff, I consider gun violence a significant challenge. Finding meaningful ways to address gun violence is a high priority for the KCSO.

<u>Washington Law Regarding FRTs and Prohibited Possessors</u>

9. The KCSO's commissioned personnel recover firearms in a variety of ways, including as a result of court orders to surrender a firearm and as a result of criminal investigations. In recent years, there are increasing numbers of weapons altered in a way that impacts the way in which they fire rounds. Forced Reset Triggers (FRTs) are one example of an alteration to a firearm that changes the way in which it fires. A firearm altered with an FRT is capable of firing five or more shots per second. Washington law prohibits possession of a machine gun, which is defined as "any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or instrument not requiring that the trigger be pressed for each

---

[1] King County Prosecuting Attorney's Office, 2024 Year End King County Firearm Violence Report, December 2024 available at: https://cdn.kingcounty.gov/-/media/king-county/depts/pao/documents/data-reports/shots-fired-reports/2024-yearend-report.pdf?rev=5ea6751622604ad2aeedc0d6e0fda8f9&hash=75B882793CFE875B1A3B402EC21A2E77.

shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second." RCW 9.41.010(31). Machine guns and "any part designed and intended solely and exclusively for use in . . . converting a weapon into a machine gun" are prohibited under Washington Law. RCW 9.41.190(1).

10. KCSO's Records Unit regularly conducts criminal background checks for persons attempting to purchase firearms or seeking a concealed pistol license. Therefore, we are familiar with the federal law prohibitors that are supposed to prevent some persons from legal possession of a firearm. This includes a person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year (along with other enumerated factors) to "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S. Code § 922(g). Similarly, it is a crime in Washington for a person to "own, access, [have] in in the person's custody, control, or possession, or receive[] any firearm after having been previously been convicted or found not guilty by reason of insanity in [Washington] or elsewhere" certain crimes. RCW 9.41.040.

<u>Prevalence of Machinegun Conversion Devices in Washington</u>

11. Our agency's Gun Violence Reduction Unit (GVRU) began tracking information on firearms KCSO recovered during the investigations of criminal conduct approximately 2 years ago. This is separate from the KCSO Property Management Unit, which also receives firearms in the regular course of business. In 2024, GVRU recovered a total of 71 firearms, including 6 fully automatic firearms. In 2025, GVRU has recovered 27 firearms so far, and 4 of the

4

firearms are fully automatic. All of the fully automatic firearms recovered were altered with a pin that is inserted into the firearm and causes the firearm to fire continuous rounds when pulling the trigger only once. Our Property Management Unit currently holds 11 fully automatic firearms, which were also altered to cause them to fire continuous rounds while pulling the trigger only once. These numbers only represent a portion of the altered firearms collected within our County. I do not have access to similar data for all the cites incorporated within the County, which includes the Cites of Seattle, Bellevue, Kirkland and more than 35 other incorporated cities.

12. I understand that the United States recently entered into a settlement agreement in which it promised to return all FRTs in its possession to any owner—including those who may not lawfully possess firearms given their prior felony convictions under federal law, and even in States that prohibit FRTs or FRT-equipped firearms—and obligated the United States not to enforce against anyone any statute or agency interpretation under which an FRT is "contended to be" a machinegun under the National Firearms Act in perpetuity. I also understand, based on statements from ATF personnel, that as of August 1, 2024, ATF had in its possession 11,884 FRTs.

13. I anticipate that if ATF proceeds with executing the promised returns, the number of FRTs and FRT-equipped firearms in King County, and the use of such FRTs, will increase, resulting both from direct returns to individuals residing in King County and from returns to individuals in other States who either bring their FRTs into our State or transfer the FRTs in their possession to individuals residing in our State. Interstate trafficking of firearms and related devices, even when banned under state law, is a common problem that law enforcement in King County routinely confronts. KCSO routinely recovers firearms and

related devices that are banned in Washington, including weapons that are used for criminal purposes.

14. I know that not all states prohibit the use of FRT's, and this creates a risk that such devices will come into our County from other states. As a result of the historical trends with other firearms and firearm-related devices outlined in the previous paragraphs KCSO reasonably anticipates that a greater number of FRTs will come into King County from other states where FRTs are not banned as a result of ATF's classification of FRTs as machineguns being vacated nationwide and the federal government's settlement agreement ceasing federal enforcement against FRTs as machineguns.

### Cost of Responding to Incidents Involving Forced Reset Triggers

15. The County incurs greater costs when responding to crime scenes involving devices that increase a firearm's rate of fire, such as FRTs. Crimes committed using weapons with an accelerated rate of fire cause increased casualties. As a result, the County must send more law enforcement officers to the scene, in the attempt to limit further harm or loss of life and to conduct a thorough investigation of the crimes committed. Simply gathering shell casings at a crime scene involving a rapid firing weapon requires additional resources. The fire power of a machine gun, increases the likelihood of multiple victims and witnesses that law enforcement officers will have to interview while investigating the crime

16. It is concerning that firearms altered with FRT's are legally available in other states and will no longer be federally regulated. And it is even more concerning if these devices are returned to individuals in King County or Washington. This presents a risk for our deputies and

requires we provide broad training so they can recognize, track, and safely handle such technologies. The lack of a nationwide prohibition on FRTs will lead to the greater proliferation of FRTs in King County. Consequently, law enforcement officers will require more extensive training on FRTs now that federal regulation of these devices has essentially ceased. Deputies who respond to the scene of a crime must be able to recognize weapons altered with FRTs so they can safely recover them from crime scenes or during firearm seizures, which means we must provide the training.

### Costs of Enforcing Laws Against Forced Reset Triggers

17. As a result of the increase in altered firearms within its borders described above, KCSO will have to divert greater law enforcement resources to enforce Washington's own ban on machinegun conversion devices. Although we have in-house trainers, the training still requires additional funding. The annual salary of a KCSO deputy ranges from $92,215 to $129,121 or $44.33-62.08 per hour. Any time we provide in person training to our deputies, it means we have to backfill that shift, often at overtime rates of pay, to provide the minimum patrol staffing that is needed to cover patrol operations. Even if we trained only a fraction of our 800 commissioned personnel to recognize and safely handle firearms altered to perform as machine guns, the cost could easily exceed $ 40,000. KCSO is in the process of developing additional training to prepare our deputies to respond to an incident where an altered firearm is part of the investigation because these weapons present specific risks and liabilities. In the experience of KCSO, many of the firearms altered to perform as machine guns are used in crimes committed by juveniles. The skill to safely alter firearm is obtained by extensive experience and should only be performed by a trained armorist. There is some risk associated with even handling an inexpertly altered firearms and also risk if our deputies

are not trained to recognize the signs of an altered firearm. Additionally, deputies will need training on how to test fire the altered firearms, so that we can add details of the firearm into national databases that are used to investigate homicides and other violent crimes.

### Practical Challenges in Returning Forced Reset Triggers

18. Most of the firearms altered to convert them to automatic weapons are obtained through theft. A stolen weapon is illegal to possess, and doubly so once it is converted to a firearm that is considered a machine gun, under Washington law. The KCSO would normally return stolen property once recovered, but stolen firearms converted to machine guns are not legal for the registered owner to possess. The KCSO does not have the expertise or resources needed to return a stolen and altered firearm to its original state. It would be necessary for the owner of the firearm to secure a trained armorist to restore the firearm to its original state, before KCSO could lawfully return it to the registered owner. Additionally, some of the weapons recovered by KCSO in criminal investigations have no visible serial number and we have no way of tracing that firearm back to its registered owner. If FFT-altered firearms also lack serial numbers, it is unclear how they can be returned to anyone.

19. In addition, the federal government's settlement agreement to return all FRTs in its possession to any owner creates a conflict under Washington law if the intended recipient has prior felony convictions under federal law. The return of the FRT to the felon violates the state law prohibiting firearm possession by persons with certain criminal convictions. RCW 9.41.040. Enforcing these state laws against individuals being returned FRTs who are prohibited from possessing them will also result in increased state law enforcement costs.

20. In all, we expect to incur greater law enforcement costs as a result of the federal government's return of thousands of previously recovered FRTs.

8

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of June, 2025, in Renton, Washington

*Patricia Cole-Tindall*

PATRICIA COLE-TINDALL
King County Sheriff