## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*,      ) | |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | |
| ) | Civil Action No. 1:25-CV-01807-PX |
| PAMELA J. BONDI, *et al.*,    ) | |
| ) | |
| Defendants.    ) | |
| ) | |
| ) | |
| ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................................. 1

**BACKGROUND** ................................................................................................................... 3

    A.   Litigation Surrounding FRTs ............................................................................... 4

    B.   The Settlement Agreement.................................................................................... 6

    C.   The Challenged Return Policy. ............................................................................. 8

    D.   This Collateral Attack. .......................................................................................... 9

**LEGAL STANDARD**......................................................................................................... 9

**ARGUMENT** ..................................................................................................................... 10

    I.   Plaintiffs Lack Article III Standing............................................................................ 10

        A.   States have no standing to challenge the exercise of enforcement
            discretion..........................................................................................................11

        B.   Plaintiffs' asserted injuries are speculative and not fairly traceable to the
            Settlement Agreement. ....................................................................................... 13

            1.   The Return Policy causes no direct "sovereign injury" to Plaintiffs. ....... 14

            2.   Plaintiffs' alleged "sovereign injuries" are not cognizable. ..................... 16

            3.   Plaintiffs' remaining harms are too attenuated to establish standing........ 17

    II.   Plaintiffs' Claims Fail On The Merits. ...................................................................... 18

        A.   The Return Policy does not violate § 922(o). ...................................................... 19

        B.   The Settlement Agreement Is Unreviewable Under the APA .............................. 19

        C.   The *ultra vires* claim fails for other reasons. ........................................ 22

    II.   Plaintiffs Fail To Show Irreparable Harm Absent An Injunction.................................. 23

    III.   The Balance of Equities and Public Interest Disfavor Injunctive Relief. ..................... 25

**CONCLUSION** ................................................................................................................ **27**

# TABLE OF AUTHORITIES

**CASES**

*Advanced Res. Int'l, Inc. v. Tri-Star Petro. Co.*,
  4 F.3d 327 (4th Cir. 1993) ........................................................................... 24

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982) ..................................................................................... 16

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ......................................................................... 18

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ...................................................................... 23, 24

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..................................................................................... 23

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ....................................................................................... 15

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 14

*Cort v. Ash*,
  422 U.S. 66 (1975) ....................................................................................... 23

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ..................................................................................... 18

*Di Biase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017) ........................................................................ 23

*Dourlain v. Comm'r of Tax'n & Fin.*,
  133 F. App'x 765 (2d Cir. 2005) .................................................................. 23

*Energy Transp. Grp., Inc. v. Skinner*,
  752 F. Supp. 1 (D.D.C. 1990) ...................................................................... 21

*Exec. Business Media, Inc. v. U.S. Dep't of Def.*,
  3 F.3d 759 (4th Cir. 1993) ............................................................................ 22

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................................................................ 17, 18

*Florida v. Mellon,*
   273 U.S. 12 (1927) ........................................................................................... 15

*Frazier v. Prince George's Cnty.,*
   86 F.4th 537 (4th Cir. 2023) ............................................................................. 10

*Friends for Ferrell Parkway, LLC v. Stasko,*
   282 F.3d 315 (4th Cir. 2002) ............................................................................ 14

*Garland v. Cargill,*
   602 U.S. 406 (2024) ....................................................................................... 1, 4

*Healy v. Beer Inst., Inc.,*
   491 U.S. 324 (1989) ................................................................................... 14, 16

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ............................................................................. 19, 20, 21

*Henderson v. United States,*
   575 U.S. 622 (2015) .......................................................................................... 14

*Holbrook v. Tenn. Valley Auth.,*
   48 F.4th 282 (4th Cir. 2022) ............................................................... 19, 20, 21

*In re Aiken Cnty.,*
   725 F.3d 255 (D.C. Cir. 2013) .......................................................................... 26

*John Doe Co. v. CFPB,*
   849 F.3d 1129 (D.C. Cir. 2017) ........................................................................ 24

*Lebron v. Rumsfeld,*
   670 F.3d 540 (4th Cir. 2012) ............................................................................ 15

*Leedom v. Kyne,*
   358 U.S. 184 (1958) .......................................................................................... 22

*Linda R.S. v. Richard D.,*
   410 U.S. 614 (1973) ..................................................................................... 11, 12

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................................................... 10

*Mahoney v. U.S. Consumers Prods. Safety Comm'n,*
   146 F. App'x 587 (3d Cir. 2005) ...................................................................... 21

*Marx v. Centran Corp.,*
   747 F.2d 1536 (6th Cir. 1984) .......................................................................... 23

*Maryland v. King*,
   567 U.S. 1301 (2012) ......................................................................................... 25

*McCleskey v. Kemp*,
   481 U.S. 279 (1987) ........................................................................................... 21

*NAGR v. Garland*,
   697 F. Supp. 3d 601 (N.D. Tex. 2023) ............................................................... 5

*NAGR v. Garland*,
   741 F. Supp. 3d 568 (N.D. Tex. 2024) ........................................................... 1, 5

*N.Y. State Dep't of Law v. FCC*,
   984 F.2d 1209 (D.C. Cir. 1993) ........................................................................ 21

*Nat. Res. Def. Council v. EPA*,
   961 F.3d 160 (2d Cir. 2020) .............................................................................. 17

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................... 25

*Nuclear Regul. Comm'n v. Texas*,
   Nos. 23-1300, 23-1312, 2025 WL 1698781 (U.S. June 18, 2025) ................. 19, 22

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2023) ......................................................................... 10, 23

*Raines v. Byrd*,
   521 U.S. 811 (1997) ...........................................................................................11

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ........................................................................................... 26

*Safari Club Int'l v. Jewell*,
   47 F. Supp. 3d 29 (D.D.C. 2014) ...................................................................... 25

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) ............................................................................................. 14

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
   145 S. Ct. 1556 (2025) ....................................................................................... 17

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
   528 F.3d 310 (4th Cir. 2008) ............................................................................. 21

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................................... 10

*Summer v. Earth Island Institute*,
    555 U.S. 488 (2009) ......................................................................................... 10

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ......................................................................................... 12

*Swift & Co. v. United States*,
    276 U.S. 311 (1928) ......................................................................................... 21

*Tel. & Data Sys., Inc. v. FCC*,
    19 F.3d 42 (D.C. Cir. 1994) ............................................................................. 15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................................................... 11

*United States v. Bruggeman*,
    No. 2:22-cr-185, ECF No. 84 (S.D. Tex. Jan. 16, 2025) ............................... 1, 6

*United States v. Carpenter*,
    526 F.3d 1237 (9th Cir. 2008) ......................................................................... 21

*United States v. Hercules, Inc.*,
    961 F.2d 796 (8th Cir. 1992) ........................................................................... 21

*United States v. Rare Breed Triggers, LLC*,
    690 F. Supp. 3d 51  (E.D.N.Y. 2023) .............................................................. 1, 5

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................................. *passim*

*Virginia v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ........................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................... 9

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................................... 23, 24

*Young Hee Ko v. Johns Hopkins Univ.*,
    No. 05-cv-1475, 2005 WL 8174349 (D. Md. June 25, 2005) .......................... 25

*Young v. EPA*,
  No. 21-cv-2623, 2022 WL 474145 (D.D.C. Feb.16, 20202) .................................................. 24

**STATUTES**

5 U.S.C. § 701 ................................................................................................................ 19

18 U.S.C. § 921 ................................................................................................................ 3

18 U.S.C. § 922 ..................................................................................................... *passim*

26 U.S.C. § 5845 ....................................................................................................... 1, 3, 6

**REGULATIONS**

27 C.F.R. § 478.152 ........................................................................................................ 7

28 C.F.R. § 8.7 .............................................................................................................. 22

83 Fed. Reg. 66514 (Dec. 26, 2018) ............................................................................... 4

**OTHER AUTHORITIES**

*Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive
  Branch Discretion*, 23 Op. O.L.C. 126 (1999) ......................................................... 20

DOJ, Press Release, Department of Justice Announces Settlement of Litigation Between the
  Federal Government and Rare Breed Triggers (May 16, 2025),
  https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-
  between-federal-government-and-rare-breed ............................................................. 6

Elysa Dishman, *Public Availability of Settlement Agreements in Agency Enforcement
  Proceedings* (Nov. 29, 2022) .................................................................................... 26

*Power of the Attorney General in Matters of Compromise*,
  38 Op. Att'y Gen. 124 (1934) ................................................................................... 20

Rare Breed Triggers' FRT-15s and Wide-Open Triggers (WOTs) Return (June 9, 2025),
  https://www.atf.gov/firearms/rare-breed-triggers%E2%80%99-frt-15s-and-wide-open-
  triggers-wots-return ................................................................................................... 8

*Settlement Authority of the United States in Oil Shale Cases*,
  4B Op. O.L.C. 756 (1980) ......................................................................................... 20

*The Attorney General's Role as Chief Litigator for the United States*,
  6 Op. O.L.C. 47 (1982) .............................................................................................. 20

## INTRODUCTION

Federal law has long restricted the transfer or possession of a "machinegun." *See* 26 U.S.C. § 5861; *id.* § 5845(b) (defining that term); *see also* 18 U.S.C. § 922(o)(1). Last year, in *Garland v. Cargill*, the Supreme Court held that bump stocks do not convert rifles into machineguns, contrary to the views of the Government at the time. 602 U.S. 406, 410 (2024). Post-*Cargill*, lower courts have split over whether a similar type of accessory—known as forced reset triggers (FRTs)—convert rifles into machineguns. *Compare NAGR v. Garland*, 741 F. Supp. 3d 568 (N.D. Tex. 2024) (FRTs not machineguns), and Order on Def.'s MTD Count One, *United States v Bruggeman*, No. 2:22-cr-185, ECF No. 84 (S.D. Tex. Jan. 16, 2025) (same), *with United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 123 (E.D.N.Y. 2023) (FRTs are machineguns).

Against this backdrop, the Administration negotiated to settle outstanding FRT litigation while protecting the public. The agreement resolved three pending lawsuits, including within the Fifth Circuit. And the agreement included other important terms designed to advance public safety. For example, the settling FRT manufacturers and designers agreed not to develop or design FRTs for use in any handgun and further agreed to file patent enforcement actions against any person or entity that manufactures or distributes an infringing device. For its part, the Government agreed not to enforce various federal prohibitions regarding machineguns against certain types of FRTs that have a particular mode of operation.

As part of that enforcement decision, the Government agreed to return a subset of FRTs that had been seized or surrendered. To comply with that obligation, the Bureau of Alcohol, Tobacco, and Firearms (ATF) on June 9 posted a notice on its website indicating that it would be contacting owners of eligible FRTs and providing instructions regarding the return process. ATF specified that it would not return FRTs (1) into any jurisdiction in which such devices are illegal under state law, or (2) to any individual prohibited by law from possessing firearms.

Sixteen States (including the District of Columbia) filed suit to collaterally attack the settlement agreement, and now seek to enjoin the provision of the agreement that governs the return of certain seized or surrendered FRTs. They purport to worry that individuals and entities who receive returned FRTs in states where they are lawful may bring those devices into states where they are unlawful, in turn imposing sovereign harm (and perhaps downstream economic harm). And they insist that, contrary to the views of ATF and at least two district courts, FRTs are, in fact, "machineguns," such that the return of the devices is ostensibly contrary to law. The Court should deny the preliminary injunction.

At the threshold, Plaintiffs lack standing to challenge the Executive's decisions about how to enforce federal law. The settlement agreement reflects a quintessential exercise of Executive enforcement discretion. Having weighed the risks posed by various lawsuits, developments in the law, resource constraints, the benefits to public safety gained by extracting concessions from manufacturers of FRTs, and the effect on individuals' right to bear arms, the Government decided that it was not in the interest of the United States to continue enforcing the prohibition against machineguns against certain FRTs. And the return of seized FRTs is simply the inevitable consequence of the Government's agreement to stop attempted enforcement of certain federal forfeiture statutes. The Supreme Court has squarely held that a plaintiff lacks standing to challenge the Executive's exercise of law enforcement discretion.

Even if injuries caused by the Executive's enforcement priorities were legally cognizable, the injuries Plaintiffs allege are speculative and not fairly traceable to Defendants. As explained, ATF will *not* return FRTs into States where they are illegal. The States' hypothesized injuries could thus only be caused by the intervening criminal actions of third parties not before the Court. Such speculative and downstream harms are insufficient to establish Article III standing.

2

Plaintiffs' claims also fail for other fundamental reasons. On the merits, the premise of the States' claims is that FRTs are in fact "machineguns" and therefore it would violate federal law to transfer them. But even if FRTs *were* machineguns, federal law expressly provides that the machinegun prohibition "does not apply" to any "transfer to or by … the United States or any department or agency thereof." 18 U.S.C. § 922(o)(2). That dooms all of Plaintiffs' claims. On top of that, Plaintiffs' APA claim is unreviewable because the decision to settle litigation is committed to agency discretion, and their *ultra vires* claim is not cognizable because Plaintiffs lack a cause of action to enforce federal criminal law.

Not only are Plaintiffs unlikely to succeed on the merits; they also cannot demonstrate irreparable harm. For all the reasons Plaintiffs' asserted injuries are too speculative to establish standing, those hypothetical injuries cannot meet the high bar of showing imminent irreparable harm. The balance of the equities and public interest also tip decisively against injunctive relief. An injunction would threaten the separation of powers by interfering with the Executive's core Article II prerogative to make decisions about how to enforce federal criminal law. And, in addition to upsetting the expectations of the parties to that agreement and interfering with the Second Amendment rights of law-abiding citizens in jurisdictions where FRTs are legal, enjoining a settlement would undermine the Government's ability to credibly negotiate when trying to settle any manner of litigation going forward.

## BACKGROUND

ATF regulates lawful commerce in firearms and administers and enforces federal firearms laws, including the National Firearms Act of 1934 (NFA) and Gun Control Act of 1968 (GCA), as amended. Both the NFA and GCA regulate machineguns.

"Machinegun" is defined under 26 U.S.C. § 5845(b) and 18 U.S.C. § 921(a)(23) as:

> Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

There has been substantial litigation over whether particular accessories that enable a semi-automatic rifle to achieve a high rate of fire convert those firearms into "machineguns" for purposes of federal law. In *Garland v. Cargill*, the Supreme Court held that "a bump stock—an accessory for a semiautomatic rifle that allows the shooter to rapidly reengage the trigger (and therefore achieve a high rate of fire)"—does not "convert [a] rifle into a 'machinegun.'" 602 U.S. at 410; *cf. Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) (previously classifying bump stock devices as machineguns). An FRT is a device that allows the trigger of a semiautomatic weapon to reset quicker than it otherwise would using the standard trigger-return spring; this allows a firearm equipped with an FRT to fire at a faster rate than with a traditional trigger.

In 2022, ATF issued an open letter stating that it had determined that devices commonly known as "forced reset triggers" met the statutory definition of "machinegun." ATF then initiated certain enforcement actions based on this determination. Litigation ensued, and this case challenges a judicial settlement agreement to resolve three such lawsuits with private entities: Rare Breed Triggers, LLC (RBT), which manufactures a model of FRT called the FRT-15, as well as Rarebreed Firearms, LLC (RBF), National Association for Gun Rights, Inc. (NAGR), Texas Gun Rights, Inc. (TGR), Patrick Carey, James Wheeler, Travis Speegle, Lawrence DeMonico, and Kevin Maxwell (collectively, "private parties").

## A.    Litigation Surrounding FRTs.

*New York Litigation.* In 2023, the Government sued RBT, RBF, and their executives, Kevin

Maxwell and Lawrence DelMonico in the Eastern District of New York, seeking to enjoin them from selling FRT-15s on the basis that such devices were "machineguns" under the NFA and GCA. *See* Compl., *United States v. Rare Breed Triggers, LLC* (*RBT*), No. 23-369, ECF No. 1 (E.D.N.Y. Jan. 19, 2023). The district court agreed and entered a preliminary injunction prohibiting the RBT Defendants from selling FRTs. *See RBT*, 690 F. Supp. at 123. Defendants appealed. *See* Dkt., *RBT*, No. 23-7276 (2d Cir.).

*Texas Litigation*. NAGR challenged the ATF's classification of FRTs as machineguns. *See NAGR v. Garland*, No. 23-cv-830-O (N.D. Tex.). On October 7, 2023, the district court granted a preliminary injunction. *NAGR v. Garland*, 697 F. Supp. 3d 601 (N.D. Tex. 2023). Applying *Cargill*'s reasoning, the court concluded that "FRTs do not fire multiple rounds with a single function of the trigger and, thus, do not qualify as machineguns." *Id.* at 604. The court vacated Defendants' classification of FRTs as "machineguns" and enjoined Defendants "from implementing or enforcing against the parties in this lawsuit … the ATF's expanded definition of 'machine gun' to FRTs." *Id.* at 616. The court further ordered "Defendants to return to all parties, including manufacturers, distributors, resellers, and individuals, all FRTs and FRT components confiscated or seized pursuant to their unlawful classification[.]" *Id.* at 617.[1]

On July 23, 2024, the court granted Plaintiff's motion for summary judgment and entered final judgment. *NAGR*, 741 F. Supp. 3d at 568. The United States appealed to the Fifth Circuit. Dkt., *NAGR v. Bondi*, No. 24-10707 (5th Cir.). New Jersey and some fifteen other States subsequently filed an opposed motion to intervene. No. 24-10707, ECF No. 83 (5th Cir. Jan. 16, 2025). The Fifth Circuit denied this motion but allowed the States to "seek participation as amici."

---

[1] Plaintiffs do not seek to enjoin ATF's ability to return FRTs pursuant to this order or "any prior judicial order." *See* Pls.' Proposed Order, ECF No. 5-2.

No. 24-10707, ECF No. 89-1.  The States later filed a motion for reconsideration, which the court denied.  No. 24-10707, ECF No. 109-1 (5th Cir. Jan. 30, 2025).

Meanwhile, in a separate criminal case, the Southern District of Texas arrived at the same conclusion as the court in *NAGR*.  The United States indicted James Bruggeman under 18 U.S.C. § 922(o) for possession of RBT FRT-15s, among other charges.  The district court ultimately granted a motion to dismiss this count, explaining that, "under the *Cargill* case, the Court is constrained to grant the motion to dismiss count one because FRTs are not machineguns as defined by 26 U.S.C. § 5845(b)." *Bruggeman* Order at 9.  The United States appealed to the Fifth Circuit. Dkt., *Bruggeman*, No. 25-40082 (5th Cir.).

*Utah Litigation.*  On February 14, 2023, the United States filed an *in rem* action over FRTs seized by ATF on the grounds that they were machineguns in violation of the NFA.  Dkt., *United States v. Misc. Firearms & Related Pts. & Equip. Listed in Ex. A (MFRPE),* No. 1:23-cv-17 (D. Utah).  Rare Breed Triggers, LLC later filed a claim to the property.  No. 23-cv-17, ECF No. 6 (D. Utah Mar. 20, 2023).

## B.    The Settlement Agreement.

On May 9, 2025, the Government executed a Settlement Agreement with the private parties to "avoid[] the need for … continued litigation," which "include[d] … conditions that significantly advance public safety with respect to FRTs, including that Rare Breed will not develop or design FRTs for use in any pistol and will enforce its patents to prevent infringement that could threaten public safety."  DOJ, Press Release, *Department of Justice Announces Settlement of Litigation Between the Federal Government and Rare Breed Triggers* (May 16, 2025).[2]

---

[2]    https://www.justice.gov/opa/pr/department-justice-announces-settlement-litigation-between-federal-government-and-rare-breed

Specifically, the Agreement included promises that certain private parties "will not develop or design FRTs for use in any handgun," "will not market, advertise, or encourage individuals to put FRT triggers on any handgun," and will "take all reasonable efforts to engage in patent enforcement seeking prohibitory injunctions against any person or entity that manufacturers, sells, or distributes any FRT during the life of" the operative "patent." Settlement Agreement ¶¶ 7-9, ECF No. 2-1. RBT also "agree[d] to promote the safe and responsible use of its devices including by displaying such material on its website and other online platforms." *Id.* ¶ 15.

The Agreement also resolved the three pending civil lawsuits described above. *Id.* ¶¶ 1-2. ATF further agreed, "to the extent practicable, to return FRTs … that it has seized or taken as a result of voluntary surrender." *Id.* ¶ 3. The definition of "FRT" was limited to devices having the mode of operation described in the district court's opinion in *NAGR*. *Id.* ¶ 11(a). The Agreement stipulated that "[s]uch returns must be requested by individual owners by September 30, 2025, consistent with the instructions provided on ATF's public website." *Id.* ¶ 3. This paragraph does "not apply to FRTs that are evidence in criminal investigations or prosecutions or are subject to forfeiture pursuant to 27 C.F.R. § 478.152." *Id.*

Pursuant to the Agreement, the parties moved to dismiss all three civil lawsuits. When the United States moved to dismiss the appeal in *NAGR*, then pending in the Fifth Circuit, No. 24-10707, ECF No. 135 (May 16, 2025), New Jersey and other States filed a renewed motion to intervene. No. 24-10707, ECF No. 140 (May 18, 2025). On May 19, 2025, the Fifth Circuit dismissed the appeal. No. 24-10707, ECF No. 139-2. The district courts in Utah and New York subsequently dismissed the cases that were pending in those courts too. No. 23-cv-17, ECF No. 46 (D. Utah May 16, 2025); No. 23-369, ECF No. 149 (E.D.N.Y. May 16, 2025). The final judgment in *NAGR* was unaffected by the Agreement.

C.     **The Challenged Return Policy.**

On June 9, 2025, ATF posted on its website an update concerning the return of FRTs under

to the Settlement Agreement.  The notice specifies:

> Some states independently prohibit the possession of forced reset triggers or trigger
> activating devices.  If you live in a jurisdiction in which the possession of a forced reset
> trigger is prohibited by law, ATF will work with you to return the device in a place where
> it may be lawfully possessed, or upon request, will transfer the device to a third party who
> may lawfully receive it.

> FRTs will not be returned to individuals who are prohibited by law from possessing
> firearms.[3]

Consistent with the above and to effectuate its obligations under the Agreement, ATF has

inventoried the FRTs in its custody subject to the Agreement.  *See* Ex. 1, Decl. of Matthew P.

Varisco ¶¶ 7-10.  One of two notices will be mailed to covered FRT owners regarding the potential

return of their devices pursuant to the Agreement.  *See id.* ¶ 11.  The first notice will be sent to

owners in States where the possession of FRTs is not prohibited by state law.  *Id.*  This notice

directs owners to contact a specific email address in the field division in which they reside to make

arrangements with the closest field office to facilitate the transfer.  *Id.*

The second notice will be sent to owners in States where FRTs are prohibited under state

law.  *Id.*  Because ATF will not return FRTs in States where possession is illegal under state law,

these owners will be given three options.  *First*, the owner can request that ATF transfer the device

to them in a State where it is legal to possess, either by shipping or in person.  *Id.*  *Second*, the

owner can request ATF transfer the device to a third party located in a State where it is legal to

possess.  *Id.*  *Third*, the owner can withdraw the request for the return and abandon the device to

ATF.  ATF would then destroy the abandoned property without compensation and in accordance

---

[3] Rare Breed Triggers' FRT-15s and Wide-Open Triggers (WOTs) Return (June 9, 2025),
https://www.atf.gov/firearms/rare-breed-triggers%E2%80%99-frt-15s-and-wide-open-triggers-wots-return

with federal law.  *Id.*  These notices warn individuals that they may not bring the device into a jurisdiction prohibiting FRTs or trigger activating devices and doing so could subject them to state prosecution.  *Id.*

Moreover, FRTs will not be returned to individuals prohibited by law from possessing firearms.  *See id.* ¶ 12.  A National Instant Criminal Background Check System (NICS) check will be conducted on every individual requesting the return of an FRT.  A transfer will not take place if a "deny" response is received from NICS.  *Id.*

**D.    This Collateral Attack.**

Soon after ATF posted the FRT return update on its website, Plaintiff States filed this lawsuit.  Plaintiffs bring two claims, both premised on the notion that ATF's agreement to return seized FRTs ("the Return Policy") violates 18 U.S.C. § 922(o).  One invokes the Administrative Procedure Act (APA) and the other an *ultra vires* cause of action in equity.

The States also sought a preliminary injunction.  Specifically, Plaintiffs ask this Court to "preliminary enjoin Defendants from redistributing FRTs … (i) to individuals or entities in Plaintiff States, either directly or indirectly; and/or (ii) to any distributor, dealer, seller, or other entity that sells, resells, or otherwise distributes FRTs into Plaintiff States, either directly or indirectly."  Pls.' Mot. for Prelim. Inj. ("Mot") at 29, ECF No. 5-1.  FRTs are illegal in 14 of the 16 Plaintiffs States.[4]

**LEGAL STANDARD**

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555

---

[4] Defendants understand that FRTs are illegal in the following Plaintiff States: New Jersey; Maryland; Delaware; Colorado; Hawaii; Illinois; Massachusetts; Michigan; Minnesota; Nevada; Oregon; Rhode Island; Washington; and the District of Columbia.  Varisco Decl. ¶ 12.  Defendants understand that FRTs are not prohibited in Maine or Vermont.  *See id.*

U.S. 7, 24 (2008).  A plaintiff must clearly show that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm if preliminary relief isn't granted," (3) "the balance of equities favors" it, and (4) "that an injunction is in the public interest."  *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023).  That Plaintiffs are unlikely to succeed on the merits of their claims is sufficient on its own to deny their request for preliminary relief.  *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2023) (explaining that following *Winter*, the Fourth Circuit requires that "each preliminary injunction factor be satisfied").

## ARGUMENT

### I.    Plaintiffs Lack Article III Standing.

At the threshold, this Court lacks subject matter jurisdiction because Plaintiffs have failed to establish their standing to pursue this collateral attack on the Settlement Agreement.

A plaintiff must demonstrate three elements to meet the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992): (1) "injury in fact," (2) "that is fairly traceable to the challenged conduct of the defendant," and (3) "likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Where "the plaintiff is not himself the object of the government action or inaction he challenges, standing . . . is substantially more difficult to establish."  *Lujan*, 504 U.S. at 562.  The Settlement Agreement neither regulates nor forbids any action on the part of any Plaintiffs, so this higher standard applies. *See Summer v. Earth Island Institute*, 555 U.S. 488, 493 (2009).

Plaintiffs' alleged injuries do not confer standing.  As the Supreme Court has squarely held, States may not sue over incidental harms allegedly flowing from the Executive Branch's exercise of enforcement discretion.  *See United States v. Texas*, 599 U.S. 670, 677-79 (2023).  And even if Article III could tolerate such suits, Plaintiffs' asserted injuries are insufficient under traditional

standing principles—their alleged harms are speculative and not fairly traceable to the challenged Settlement Agreement.

**A.      States have no standing to challenge the exercise of enforcement discretion.**

Suits that attempt to control the Executive Branch's exercise of enforcement discretion "run up against the Executive's Article II authority to enforce federal law." *Id.* at 678. Parties thus lack standing to bring such suits, and federal courts are not empowered to assert jurisdiction over such claims. Plaintiffs' suit, which is a straightforward attempt to control the Government's discretion to decide how to enforce federal forfeiture and firearms laws, is no exception.

In *Texas*, the Supreme Court rejected States' standing "to challenge[] … the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." *Id.* at 677. The Court reaffirmed the longstanding principle that to confer Article III standing an asserted injury must be "legally and judicially cognizable"—*i.e.*, "the 'dispute [must be] traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Because Article II assigns the Executive Branch the "authority to decide 'how to prioritize and how aggressively to pursue legal actions,'" suits challenging the Executive's exercise of that discretion are generally not cognizable in federal court. *Id.* at 678 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)). Accepting "[t]he States' novel standing argument," the Court explained, "would entail expansive judicial direction of" the Executive's Article II prerogatives and violate the separation of powers. *Id.* at 681.

This conclusion follows longstanding Supreme Court precedent that a plaintiff lacks standing to challenge the government's policies concerning enforcement actions against third parties. In *Linda R.S.* v. *Richard D.*, 410 U.S. 614 (1973), the Supreme Court established that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 619. As the Court there explained, "in

American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.*

So too here. The "policy" challenged here—the Government's decision to return certain FRTs seized under civil forfeiture laws or voluntarily surrendered—is a quintessential exercise of prosecutorial discretion that is not cognizable for purposes of standing. Indeed, nearly every Plaintiff involved in this case has elsewhere argued that enforcement discretion (1) "has been a hallmark of the Executive's law enforcement authority since the Nation's founding"; (2) has been exercised "on an individual, case-by-case basis" and "also at a categorical level"; and (3) "has historically extended to both criminal and civil enforcement matters"—including "*whether to pursue civil-forfeiture enforcement action*[*s*]."[5] Here, the Government has decided "not to enforce," against the persons or entities from which the FRTs were seized, the federal statutes under which a covered FRT may be considered an unlawful machinegun. Settlement Agreement ¶¶ 3, 11. As a corollary of that enforcement decision, the Government has agreed to stop enforcement of certain federal forfeiture statutes by returning the FRTs it seized under those authorities. Suits challenging that exercise of enforcement discretion are plainly outside the bounds of Article III. *See Texas*, 599 U.S. at 681; *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984) (a plaintiff has "no judicially cognizable interest in procuring enforcement of the immigration laws").

To be sure, *Texas* recognized that "Congress might (i) specifically authorize suits against the Executive branch by a defined set of plaintiffs who have suffered concrete harms from executive under-enforcement and (ii) specifically authorize the Judiciary to enter appropriate

---

[5] *See* Br. for States of N.Y., Cal., Conn., Del., Ill., Me., Md., Mass., Minn., Nev., N.J., N.M., Or., R.I., Vt., Wash., & D.C., as Amici Curiae in Supp. of Pet., *United States v. Texas*, No. 22-58, ECF No. 21 (Sept. 19, 2022).

orders requiring additional arrests or prosecutions by the Executive Branch." *Texas*, 599 U.S. at 682. But Congress has not done that here. Nor is there any allegation that "the Executive has entirely ceased enforcing the relevant statutes." *Id.* at 683. The Settlement Agreement applies only to certain specified FRTs; it is not a wholesale abdication of the Executive's responsibility to enforce 18 U.S.C. § 922(o). *See*, *e.g.*, *United States v. Morgan*, No. 24-3141 (10th Cir.) (pending Government appeal of dismissal of indictment under § 922(o) for possessing machinegun and machinegun conversion device); *United States v. Brown*, No. 25-60102 (5th Cir.) (similar).

Plaintiffs' theory of standing is thus foreclosed by *Linda R.S.* and *Texas*. Indeed, the Supreme Court "anticipate[d] complaints in future years about alleged Executive Branch under-enforcement of" other laws, including "gun laws"—and, given the threats to the separation of powers that would be posed by such suits, it expressly "decline[d] to start the Federal Judiciary down that uncharted path." *Texas*, 599 U.S. at 681. Plaintiffs have offered no basis to erode bedrock principles of Executive law enforcement discretion by allowing this case to proceed to the merits. This suit must be dismissed for lack of subject matter jurisdiction.

**B.     Plaintiffs' asserted injuries are speculative and not fairly traceable to the Settlement Agreement.**

Even if suits challenging the Executive's exercise of prosecutorial discretion were cognizable as a general matter, Plaintiffs' hypothesized injuries do not confer standing here. The Return Policy already provides that ATF will not return the devices into States where they are illegal. Plaintiffs' theory is thus that FRTs will nonetheless be brought into their States by third parties, resulting in "sovereign injuries" and downstream monetary harms caused by illegal use of those FRTs. Mot. 11-16. This theory falls flat both legally and factually.

13

### 1. The Return Policy causes no direct "sovereign injury" to Plaintiffs.

Even assuming sovereign injuries are cognizable, that principle does not help the States here. Because ATF has expressly represented that it will not return FRTs to jurisdictions in which such devices are illegal, the Return Policy does not impinge Plaintiffs' sovereign interests in enforcing their state law bans.[6] Plaintiffs' basis for standing is thus entirely reliant on "unadorned speculation" that private parties not before the court might violate the law in a way that causes Plaintiffs harm. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 44 (1976). That is, Plaintiff States automatically assume individuals who possess FRTs will immediately return them to their homes in violation of state law. Of course, there is no warrant for that immediate assumption. Individuals may lawfully store and use these devices out of state. They may go to homes of friends or family, or may also have second homes. Or individuals may choose to sell returned FRTs in a State where such commerce is permitted.[7]

Plaintiffs' speculation about future illegality flunks Article III's traceability requirement. "The traceability requirement ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). A plaintiff thus "cannot rely on speculation about the unfettered choices made by independent actors" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). And in

---

[6] With respect to the two Plaintiff States that do not prohibit FRTs, there of course can be no sovereign injury caused by the Return Policy. It is unclear why they are Plaintiffs at all.

[7] Returned FRTs are the property of their owners. *Cf. Henderson v. United States*, 575 U.S. 622, 628 (2015) (explaining even felons have "right . . . to sell or otherwise dispose of" a firearm). Plaintiff States lack authority to prohibit their residents from possessing or disposing of FRTs outside their borders. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority"). States have no standing to bring suits that are backdoor attempts to impermissibly exercise extraterritorial jurisdiction.

particular, courts should not "presume illegal activities on the part of actors not before the court." *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 48 (D.C. Cir. 1994).  More broadly, any litigant seeking "to enjoin a future action must demonstrate that he 'is immediately in danger of sustaining some direct injury as the result of the challenged conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'"  *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Moreover, the Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "*direct* injury" as a result of a federal action or policy.[8]  *Florida v. Mellon*, 273 U.S. 12, 18 (1927).  In *Mellon*, the Court held that Florida lacked standing to challenge the constitutionality of a federal inheritance tax that Florida argued would cause it financial harm by "inducing potential taxpayers to withdraw property," thereby diminishing the State's tax base.  *Id.* at 17-18.  The Court rejected that theory of standing, explaining that any harm caused by the federal tax was "purely speculative, and, at most, only remote and indirect."  *Id.* at 18.

Applying those principles here is straightforward: Implementation of the Return Policy will cause no direct harm to Plaintiffs' sovereign interests given that ATF will not return FRTs to States in which they are prohibited.  As Plaintiffs acknowledge, any harm would flow instead from the intervening downstream and illegal conduct of others.  *See* Mot. 12 ("individuals will presumably return home to Plaintiff States with that unlawful item"); *id.* (predicting "state-law violations by individuals and sellers"); *id.* at 13 ("the Agreement facilitates private violations of state criminal

---

[8] The reason for this principle is that our federal system necessarily contemplates that the United States' policies will have derivative effects on the State itself, and a State has no judicially cognizable interest in avoiding the *incidental* effects of federal policies—especially where, as here, those effects derive from the independent actions of individuals in the State.

laws"). But Plaintiffs cannot merely "presum[e]" that independent actors will violate the law. *Id.* at 12. And that principle applies with extra force here given that FRTs will not be returned to individuals who are prohibited by law from possessing firearms, and ATF will conduct background checks on any individual that requests the return of an FRT. *See* Varisco Dec. ¶ 12. Plaintiffs thus cannot establish standing to seek to enjoin the federal government.

### 2. Plaintiffs' alleged "sovereign injuries" are not cognizable.

Speculation aside, Plaintiffs' "sovereign injury" theory fails as a matter of law. Even if ATF were planning to distribute FRTs directly into States that prohibit such devices—which it is not—those States would have no sovereign interest in challenging such a policy. As the Fourth Circuit has explained, "the mere existence of a state law . . . does not license a state to mount a judicial challenge to any federal [policy] with which the state law assertedly conflicts." *Virginia v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011). Rather, a federal policy must "interfere[] with a state's *exercise* of its sovereign 'power to create and enforce a legal code.'" *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (emphasis added)). The Settlement Agreement does not. States remain free to prohibit FRTs as a matter of state law, and they may continue to exercise their sovereign power to enforce such prohibitions. States may not, however, regulate possession of these items outside their borders. *See Healy*, 491 U.S. at 336. A return of seized devices to private individuals and entities "does not affect [a State's] ability to enforce" *its* prohibitions against them. *Virginia*, 656 F.3d at 270.

Accepting Plaintiffs' sweeping "sovereign injury" theory would allow any State to challenge any federal action simply by enacting a statute in opposition to the federal policy. Such an unbounded theory of standing "contravenes settled jurisdictional constraints" and must be rejected. *Id.* at 272; *see also id.* (rejecting standing theory under which "each state could become

a roving constitutional watchdog of sorts" where "no issue, no matter how generalized or quintessentially political, would fall beyond a state's power to litigate in federal court").

Plaintiffs' related suggestion that they suffer sovereign injuries "when the federal government fails to provide them information that would assist in enforcing their laws against private parties who violate them" is equally unpersuasive. Mot. 13. Indeed, the premise of this argument—that a State has some free-floating and judicially enforceable right to demand the federal Government turn over private personal information simply because a State asks for it—is specious. Unsurprisingly, then, the cases Plaintiffs cite in support of this incredible proposition deal with a plaintiff's standing to challenge the withholding of information that the Government is statutorily *required* to divulge. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 961 F.3d 160, 168 (2d Cir. 2020) ("a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed"). Plaintiffs have not even attempted to identify a law which could plausibly entitle them to the identity of "the possessors, distributors, or addresses to which FRTs are being redistributed." Mot. 13.

### 3. Plaintiffs' remaining harms are too attenuated to establish standing.

Plaintiffs' speculation that the Return Policy will increase law enforcement and healthcare costs does not establish standing either. As the Supreme Court has emphasized, the causation requirement of standing "rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects [a] plaintiff[] cannot establish Article III standing." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024); *cf. Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025) (rejecting in another context a claim by a sovereign seeking to sue manufacturers for alleged downstream harm from the lawful sale of firearms). A theory of standing predicated on a federal policy's eventual downstream effect on law enforcement agencies or state-run hospitals is a quintessential example of this deficiency.

17

Just as doctors cannot "challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries," *All. for Hippocratic Med.*, 602 U.S. at 391, States cannot sue the Government over its enforcement of criminal law based on speculation that state instrumentalities will have to divert resources responding to violent crime. Such an "unprecedented and limitless approach" is just as untenable as Plaintiffs' sovereign injury theory, as both would permit States to "challenge virtually every government action that they do not like." *Id.* at 391–92.

*Department of Commerce v. New York*, 588 U.S. 752, 768 (2019), does not rescue Plaintiffs' flawed theory of standing. There, States alleged that the addition of a citizenship question on the census would cause noncitizen residents to fail to answer, leading to a direct loss of federal funds distributed based on state population. Because adding the question would reduce response rates among noncitizens, this "render[ed] the causal link between the addition of the question and the loss of federal funds sufficiently direct" for Article III. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, J.). But here, the Return Policy "does not impose any direct costs on the States or threaten the loss of any federal funding." *Id.* "Any downstream costs of the" Settlement Agreement would instead flow from third parties' "actions in response to" the Return Policy, Plaintiffs' own "discretionary enforcement choices," and "other social-welfare policy choices." *Id.* "[E]ven if predictable," such distant "ripple effects" on the State fisc are too attenuated to establish Article III standing. *All. for Hippocratic Med.*, 602 U.S. at 383.

## II.    Plaintiffs' Claims Fail On The Merits.

Even if Plaintiffs had standing to sue, their claims fail several times over. Both counts rest on a premise about the scope of the federal ban on machineguns that is demonstrably false. And, even apart from that, they have no viable cause of action under the APA or otherwise.

### A.     The Return Policy does not violate § 922(o).

Plaintiffs bring two counts.  Count I asserts that the Return Policy is *ultra vires* because it "contravenes 18 U.S.C. § 922(o) by giving possession of 'machineguns' to individuals and entities throughout the United States," Compl. ¶ 98, and Count II alleges the Return Policy is contrary to law under the APA for the same reasons, *see id.* ¶¶ 105-06.  Both claims thus hinge on the premise that the Return Policy would involve violations of federal criminal law.

That premise is demonstrably false.  Even if FRTs were, in fact, machineguns post-*Cargill*, § 922(o) *expressly does not apply* to "a transfer to or by … the United States or any department or agency thereof."  18 U.S.C. § 922(o)(2)(A).

Both the APA and *ultra vires* claim are thus doomed.  Each is based only on ATF's alleged violation of § 922(o)—Plaintiffs identify no other law or regulation that the Settlement Agreement is allegedly inconsistent with.  Because § 922(o) does not apply to transfers by ATF, the Return Policy is not contrary to law under the APA.  Similarly, an equitable *ultra vires* claim "applies only when an agency has taken action … contrary to a *specific prohibition*' in a statute."  *Nuclear Regul. Comm'n v. Texas*, Nos. 23-1300, 23-1312, 2025 WL 1698781, at *9 (U.S. June 18, 2025).  Since the § 922(o) prohibition has no application to ATF, the *ultra vires* claim is similarly baseless.

### B.     The Settlement Agreement Is Unreviewable Under the APA

Plaintiffs' APA challenge to the Settlement Agreement is also unlikely to succeed because the Settlement Agreement is an exercise of enforcement discretion that is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus beyond the scope of APA review.

The Fourth Circuit has established a "two-party inquiry" to determine whether an agency action is unreviewable under § 701(a)(2).  *Holbrook v. Tenn. Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022).  First, a court assesses whether the action "is the kind of agency action that 'has traditionally been "committed to agency discretion."'"  *Id.* (quoting *Heckler v. Chaney*, 470 U.S.

821, 832 (1985)).  If so, the court asks whether a law governing the agency "intentionally limits agency discretion by setting guidelines or otherwise providing a limit." *Holbrook*, 48 F.4th at 290. Here, the Attorney General's authority to settle litigation is a classic example of action committed to agency discretion,[9] and Plaintiffs have identified no law applicable to ATF that limits that discretion.  This Court thus lacks jurisdiction over Plaintiffs' APA claim.

In *Heckler v. Chaney*, the Supreme Court held that an agency's decision to "refus[e] to take enforcement steps" is a decision presumptively committed to "an agency's absolute discretion" and "general[ly] unsuitab[le] for judicial review."  470 U.S. at 831.  *Chaney* gave three reasons for this presumption.  *First*, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as whether "agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies," and whether the agency has the resources to undertake or continue the action at all.  *Id. Second*, "when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect."  *Id.* at 832.  *Finally*, "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch, . . . inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'"  *Id.* (citation omitted).

---

[9] The Office of Legal Counsel has long recognized the exceptionally broad authority of the Attorney General to settle litigation.  *See Power of the Attorney General in Matters of Compromise*, 38 Op. Att'y Gen. 124 (1934); *Settlement Authority of the United States in Oil Shale Cases*, 4B Op. O.L.C. 756 (1980); *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47 (1982); *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126 (1999).

Courts have extended the *Chaney* presumption to agency decisions to settle enforcement actions.[10] Like the decision not to initiate an enforcement action, the decision to settle is a decision to "[r]efus[e] to take enforcement steps." *Chaney*, 470 U.S. at 831. What is more, the same rationales for the *Chaney* presumption apply in the settlement context. The decision to settle involves a "complicated balancing" of factors within the agencies' expertise, such as the availability of resources, policy goals, and prospects for success. *N.Y State Dep't of Law*, 984 F.2d at 1213. The refusal to take additional enforcement steps also does not constitute an exercise of coercive power. *Id.* And to continue the analogy to prosecutorial discretion, just as prosecutors have the discretion to enter plea bargains, *McCleskey v. Kemp*, 481 U.S. 279, 312 (1987)—agencies have the discretion to settle enforcement actions. In short, precedent and reason demonstrate that a decision to settle "is a decision committed by tradition to agency discretion," which carries "a presumption against judicial review." *Holbrook*, 48 F.4th at 293; *see Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 318 (4th Cir. 2008) ("Indeed, an agency's exercise of its enforcement discretion is an area in which the courts have traditionally been most reluctant to interfere." (citation omitted)).

The presumption against judicial review can only be overcome if another law "cabin[s] the exercise of that traditional discretion." *Holbrook*, 48 F.4th at 293. Thus, the Fourth Circuit has

---

[10] *See, e.g.*, *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1213-15 (D.C. Cir. 1993); *Mahoney v. U.S. Consumers Prods. Safety Comm'n*, 146 F. App'x 587, 589 (3d Cir. 2005); *see also United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (concluding that the Attorney General's decision to settle civil litigation is committed to agency discretion); *Energy Transp. Grp., Inc. v. Skinner*, 752 F. Supp. 1, 13 (D.D.C. 1990), *aff'd sub nom. Energy Transp. Grp., Inc. v. Mar. Admin.*, 956 F.2d 1206 (D.C. Cir. 1992) ("[T]he decision to settle litigation or approve the settlement of litigation to which the United States is a party is akin to an agency's decision not to institute enforcement proceedings or a prosecutor's decision not to prosecute."). A clear and unambiguous expression from Congress is required to limit the Attorney General's authority to conduct litigation involving the United States. *See Swift & Co. v. United States*, 276 U.S. 311, 316-17 (1928); *United States v. Hercules, Inc.*, 961 F.2d 796, 798-99 (8th Cir. 1992).

held that an action in settlement is not committed to agency discretion when it "would violate the civil laws governing the agency," including its own regulations. *Exec. Business Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993) (courts may review allegation that an agency's settlement agreement "failed to follow its own regulations"). But Plaintiffs do not suggest that the Settlement Agreement violates any regulation. Nor is there any suggestion that the return of FRTs would be contrary to any regulation. To the contrary, the return of seized property is entirely consistent with DOJ regulations. *See, e.g.*, 28 C.F.R. § 8.7(b) ("at any time after seizure and before any claim is referred, such seized property may be released if the appropriate official of the seizing agency determines that there is an innocent party with the right to immediate possession of the property or that the release would be in the best interest of justice of the government"). Accordingly, the Return Policy is committed to agency discretion and unreviewable under the APA.

### C.    The *ultra vires* claim fails for other reasons.

Plaintiffs' *ultra vires* claim fails too. The Supreme Court recently clarified the narrow scope of an equitable *ultra vires* claim, describing it as the judicial equivalent of a "Hail Mary pass" that "rarely succeeds." *Nuclear Regul. Comm'n*, 2025 WL 1698781, at *9 (citation omitted). The Court explained that *ultra vires* claims are "strictly limited" to the "painstakingly delineated procedural boundaries of" the Court's decision in *Leedom v. Kyne*, 358 U.S. 184 (1958), which applies only where an "agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Id.* at *9. Yet neither is true here. Plaintiffs merely attempt to "dress up a typical statutory-authority argument as an *ultra vires* claim." *Id.* And, as explained above, as the Return Policy does not violate § 922(o); there is certainly no clear and unambiguous violation of the sort that might support an *ultra vires* claim.

Plaintiffs' *ultra vires* claim separately fails because Plaintiffs lack a cause of action under § 922(o).  Only the United States can enforce federal criminal law.  *E.g.*, *Dourlain v. Comm'r of Tax'n & Fin.*, 133 F. App'x 765, 767 (2d Cir. 2005) ("It is a truism long recognized by federal courts that in our federal system crimes are always prosecuted by the Federal Government, not by private complaints.").  "[W]here there is a 'bare criminal statute, with absolutely no indication that civil enforcement of any kind was available to anyone,' a private cause of action will not be inferred."  *Marx v. Centran Corp.*, 747 F.2d 1536, 1549 (6th Cir. 1984) (quoting *Cort v. Ash*, 422 U.S. 66, 80 (1975)).  The Supreme Court "has rarely implied a private right of action under a criminal statute, and where it has done so 'there was at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) (quoting *Cort*, 422 U.S. at 79).  Nothing in § 922(o), which is a bare prohibition on transfer or possession, suggests that Congress intended to create a private right of action.

## II.    Plaintiffs Fail To Show Irreparable Harm Absent An Injunction.

Another essential prerequisite to preliminary relief is a showing that irreparable injury is likely in the absence of an injunction.  *See Pashby*, 709 F.3d at 320.  A mere possibility of irreparable harm at some future time is not enough—a plaintiff must provide evidence that the asserted harms are "imminent" and likely to occur.  *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("[A] showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of *immediate* irreparable harm").  In other words, the asserted harm "must be both certain and great" and "actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiffs have failed to show that the Government's compliance with the Settlement Agreement is likely to imminently cause irreparable harm.

Plaintiffs primarily contend that the return of seized FRTs is likely to cause "harms inflicted by the criminal use of" such devices in their jurisdictions, including increased law enforcement and health care costs. Mot. 27. The core inadequacy of these assertions of irreparable harm is that they would not be caused by, and could not be traced to, ATF's Return Policy or the challenged Settlement Agreement. *See supra* at 15-18. Rather—if these harms occur at all—it will be because individuals not before the Court have decided to violate state criminal law in some form. This is insufficient, as Plaintiffs must show that the asserted harms would "directly result from the action which [they] seek[] to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. The connection between Plaintiffs hypothesized injuries and the return policy "is too attenuated to warrant preliminary relief." *Young v. EPA*, No. 21-cv-2623, 2022 WL 474145, at *4 (D.D.C. Feb.16, 20202).

Relatedly, as explained with respect to Plaintiffs' lack of standing, all the harms that Plaintiffs hypothesize are based on speculation that independent actors might at some point in the future break state law. But plaintiffs who assert harms that are "speculative at best" do not make the requisite showing of irreparable injury necessary to justify the extraordinary remedy of injunctive relief. *Advanced Res. Int'l, Inc. v. Tri-Star Petro. Co.*, 4 F.3d 327, 331 (4th Cir. 1993) (affirming denial of preliminary injunction). This is especially true when a plaintiff's conjecture "is nothing more than speculation about how *third parties* might respond" at some future time. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (emphasis added) (denying motion for injunction pending appeal). The harms asserted here flunk that standard. Plaintiffs' speculation that bad actors will bring returned FRTs into their jurisdictions "in the indefinite future," *Campbell*, 977 F.2d at 91, is precisely the kind of "hypothetical" harm that is insufficient to justify injunctive relief, *Wis. Gas Co.*, 758 F.2d at 674.

Moreover, that some Plaintiffs plan "to divert . . . resources . . . to enforcing state bans" in the eventuality that FRTs enter their jurisdictions does not show irreparable harm, either. Mot. 27. Leaving aside that this contention is again premised on speculation that individuals who receive FRTs will take FRTs into jurisdictions where they are prohibited, this is a harm of Plaintiffs' own making. And "self-inflicted injuries are an insufficient basis for preliminary injunctive relief." *Young Hee Ko v. Johns Hopkins Univ.*, No. 05-cv-1475, 2005 WL 8174349, at *2 (D. Md. June 25, 2005); *see also, e.g.*, *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 33 (D.D.C. 2014) (irreparable harm "cannot arise from plaintiff's own actions"). Just as it cannot manufacture standing, a State cannot create irreparable harm by choosing to divert resources to enforce particular state laws.

Plaintiffs' "sovereign injuries" theory is similarly deficient. Mot. 26. Plaintiffs contend that *if* FRTs enter jurisdictions in which they are banned, those States' sovereign interests in their state law bans will be irreparably damaged. Not so. The primary case they cite, *Maryland v. King*, 567 U.S. 1301 (2012), holds that a State suffers irreparable harm if it is "enjoined" from "employ[ing] a duly enacted statute." *Id.* at 1303. The Settlement Agreement does no such thing. Plaintiffs remain free to enforce their state law prohibitions. Again, as with standing, a State cannot manufacture irreparable injury merely by passing a law in opposition to federal policy. The extraordinary remedy of injunctive relief demands more.

## III.  The Balance of Equities and Public Interest Disfavor Injunctive Relief.

Finally, Plaintiffs have not shown that the balance of equities and the public interest— which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favor relief. These factors actually tilt decisively *against* granting a preliminary injunction.

Although Plaintiffs have not shown irreparable harm, their requested injunction would impose significant burdens on the Government and is not in the public interest. As discussed, the

return of FRTs under the Settlement Agreement reflects a quintessential exercise of the Executive's law enforcement discretion.  An injunction that interferes with that discretion thus "invade[s] a special province of the Executive" and raises grave separation of powers concerns.  *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999).  Indeed, "[t]he Executive's broad prosecutorial discretion" is a "key" feature of "the Constitution's separation of powers," and is "essential to preserving individual liberty."  *In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C. Cir. 2013) (Kavanaugh, J.).  The public has a strong interest is seeing that those guiderails are respected by courts.  Allowing States to collaterally attack the President's enforcement discretion through litigation is intolerable under our Constitution.  The remedy for a disagreement with the President's enforcement decisions lies with Congress or the electoral process—not emergency litigation by States or private individuals.  *See id.*; *Texas*, 599 U.S. at 685.

The equities further weigh against granting injunctive relief because an order preventing the Government from complying with its obligations under a settlement agreement would not just unfairly upset the expectations of the parties to that agreement—it would more broadly undermine the Government's ability to settle litigation going forward.  States and private parties would have little incentive to settle litigation with the Government if courts were in the practice of undoing such agreements any time a third party complains that a settlement might have some attenuated effect on it.  And, as a policy matter, this would be disastrous.  Regulators have long embraced settlements as fundamental components of the administrative process.  Federal agencies "resolve a vast number of enforcement proceedings through settlement agreements," which allows agencies "to resolve disputes more efficiently, conserving resources and obtaining relief for the public more expeditiously."  Elysa Dishman, *Public Availability of Settlement Agreements in Agency Enforcement Proceedings* at 4 (Nov. 29, 2022) (report to the Admin Conf. of the U.S.).

The Settlement Agreement here is no exception.  In addition to conserving government resources by resolving several pending lawsuits, the Government extracted important concessions designed to increase public safety.  *See supra* at 7.  Allowing Plaintiffs to undo aspects of the Settlement Agreement that they do not like will set a dangerous precedent and make it impossible for the Government to credibly negotiate with regulated parties in the future.

Last, eligible owners of FRTs also have a property interest in their devices.  ATF has no authority to seize and hold articles of personal property because their property is unlawful in their states of residence.  Nor do the States claim that their statutes authorize any extraterritorial jurisdiction to regulate the conduct of their residents in other states.  As with any other kind of state prohibited weapon, the residents of these States have the option to obtain devices outside the States that prohibit them and use them in States where they are lawful.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction.  A proposed order is attached.

DATED: June 27, 2025                              Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
Civil Division

ANDREW I. WARDEN
Assistant Director
Federal Programs Branch

*/s/ John Bailey*
JOHN BAILEY

27

Ohio Bar No. 104260
MICHAEL VELCHIK
D.C. Bar No. 187249
Counsel
United States Department of Justice
Civil Division
950 Constitution Ave. NW
Washington, DC 20005
Phone: (202) 514-6993
Email: john.bailey@usdoj.gov

*Counsel for Defendants*