UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE STATE OF NEW JERSEY, et al., *Plaintiffs*, v. PAMELA J. BONDI, et al., *Defendants*. | CIVIL ACTION NO. 1:25-CV-01807-PX |

**THE STATE OF TEXAS, GUN OWNERS OF AMERICA, INC., GUN OWNERS FOUNDATION, GUN OWNERS OF CALIFORNIA, COALITION OF NEW JERSEY FIREARM OWNERS, GRASS ROOTS NORTH CAROLINA, TENNESSEE FIREARMS ASSOCIATION, TENNESSEE FIREARMS FOUNDATION, RIGHTS WATCH INTERNATIONAL, AMERICA'S FUTURE, U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND, AND CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

Amici curiae, State of Texas, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Coalition of New Jersey Firearm Owners, Grass Roots North Carolina, Tennessee Firearms Association, Tennessee Firearms Foundation, Rights Watch International, America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund (collectively, *Amici Curiae*) jointly submit this amicus brief in support of Defendants' oppositions (ECF 64, 65) to the State Plaintiffs' motion for preliminary injunction (ECF 5).

## IDENTITY AND INTEREST OF AMICI CURIAE

Texas is considered a leader in defending the Second Amendment. In fact, Texas has enacted Second Amendment Protection Acts, which specifically make it Texas's policy to fight federal government overreach. Valid reasons exist for such policies, as Texas has strong interests in ensuring its citizens can freely exercise their constitutionally guaranteed right to bear arms. The preliminary injunction Plaintiffs seek would violate the Second Amendment and Texas's sovereign and quasi-sovereign interests in its own territory.

Gun Owners of America, Inc. ("GOA") was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including tens of thousands within Texas and within the Plaintiff States.

The remaining *Amici Curiae* are tax-exempt nonprofit organizations under Sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. These organizations, inter alia, participate in the public policy process, including conducting research, informing, and educating the public on the proper construction of State and Federal Constitutions, as well as statutes related to the rights of citizens, and questions related to human and civil rights secured by law. Each organization has

filed numerous *amicus curiae* briefs in Federal and State courts defending U.S. citizens' rights against government overreach.

## SUMMARY OF THE ARGUMENT

Plaintiffs improperly attempt to enjoin the Federal government's return of unlawfully seized forced-reset triggers ("FRTs"), including to individuals and entities located in States where such items may be lawfully possessed under Federal and State law.

Importantly, Plaintiffs do not assert claims based on violations of their own State laws, some of which purportedly deem FRTs illegal because, as Plaintiffs concede, States cannot regulate the United States. *See* PI, ECF 5-1 at 12, n.3. Instead, Plaintiffs claim that the return of FRTs violates Federal law, even though that issue has already been decisively determined in the alternative. *See Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 741 F. Supp 3d 568 (N.D. Tex. 2024) ("*NAGR*").

The issuance of a preliminary injunction requires Plaintiffs to show a likelihood of success on their claims that FRTs are illegal machineguns, as defined in 26 U.S.C. § 5845(b) and prohibited by 18 U.S.C. § 922(o).[1] But applying recent Supreme Court precedent and the plain text of the statute, FRTs clearly are not machineguns.

First, FRTs simply fail the statute's mechanical test because they fire only one shot per function of the trigger. This mechanical reading of the statute is the *only* permissible reading after *Garland v. Cargill*, 602 U.S. 406 (2024), which repudiated the very same "single pull of the trigger" theory that Plaintiffs now seek to resurrect here. To indulge Plaintiffs' request would require this Court to effectively overrule the Supreme Court – naturally something this Court has

---

[1] Of course, Plaintiffs must also clear the hurdles of demonstrating standing to bring the asserted claims, that they will suffer irreparably harm if the relief is not granted, that the balance of equities favors the injunction, and the injunction is in the public's interest. *See Frazier v. Prince George's Cnty*, 86 F.4th 537, 543 (4th Cir. 2023). Plaintiffs cannot meet any of those burdens, as reflected in Defendants' opposition. *See* ECF 64 and 65.

3

declined to do.

Furthermore, in *NAGR*, consistent with the "*Cargill* decisions from the en banc Fifth Circuit and the Supreme Court [which] are squarely dispositive of the issue in this case," another district court issued a final judgment declaring a vacatur of the ATFs classification of FRTs as machineguns. *NAGR*, 741 F. Supp. 3d at 607-08. Plaintiffs cannot collaterally attack this valid, non-appealable final judgment that is dispositive on this issue.

Finally, the Second Amendment presumptively protects "all instruments that constitute bearable arms, even those that were not in existence at the time of founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Any preliminary injunction against the return of FRTs would be presumptively unconstitutional under the Supreme Court's Second Amendment.

**ARGUMENT**

I. **Plaintiffs have no likelihood of success on the merits because firearms equipped with FRTs are not "machineguns" under Federal law.**

In their respective filings opposing Plaintiffs' request for preliminary relief, the Federal and private Defendants present a number of jurisdictional, constitutional, and statutory arguments against Plaintiffs' claims. This Court should deny Plaintiffs' motion for those reasons alone, as any one is dispositive. But in addition, Plaintiffs' motion also fails under the text of the National Firearms Act of 1934 ("NFA") itself, because Plaintiffs show that FRTs are "machineguns" under Federal law. *See* ECF 5 at 16-25. Plaintiffs rely on the U.S. Supreme Court's recent decision in *Cargill,* 602 U.S. at 406, and a pre-*Cargill* district court opinion issued on a preliminary posture. ECF 5 at 20 (citing *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 (E.D. N.Y. 2023)). But this claim fails several times over.

First, the statute plainly does not reach FRTs—AR-15 triggers that help increase a shooter's rate of fire, but which nevertheless "reset" forwards during each mechanical function of

the trigger. In other words, even using an FRT, a single function of the trigger will still only fire one shot, and their installation on semiautomatic firearms, does not convert them to fully automatic. Second, *Cargill* expressly repudiated Plaintiffs' reading of the statute, eschewing Plaintiffs' revisionist "single *pull* of the trigger" theory in favor of the statute's mechanical focus on the "*function* of the trigger." Third, Plaintiffs fail to address *NAGR,* 741 F. Supp. 3d at 568, a post-*Cargill* final judgment on the merits that concluded – with the benefit of a fully developed factual record – that FRTs are *not* "machineguns." And fourth, what Plaintiffs ultimately seek is for this Court to overrule the Supreme Court, which this Court cannot do. With the weight of authority favoring Defendants, Plaintiffs cannot claim they are "likely to succeed on the merits" at this preliminary stage. This Court should deny Plaintiffs' motion.

### A. Plaintiffs misrepresent the FRT's semiautomatic cycle of operation.

At the outset, Plaintiffs insist that "[t]he statutory text answers th[e] question" of the FRT's status under federal law. ECF 5 at 17. But in fact, a plain reading of the statute forecloses any notion that FRTs fall within its purview. Federal law defines "machinegun" to include "any weapon which shoots … *automatically* more than one shot, without manual reloading, by a *single function of the trigger*." 26 U.S.C. § 5845(b) (emphases added). Seeking to pound a square peg (FRTs) into a round hole (NFA), Plaintiffs offer red herrings, claiming that "[a] firearm with an FRT can fire faster than an M16 military rifle in automatic mode,"[2] and pointing to "the number of shots fired from a single pull of the trigger." ECF 5 at 4, 19 n.7. Yet notably absent from the statute's definition is any reference to a firearm's rate of fire – *i.e.*, how quickly it fires successive

---

[2] Even if this rate-of-fire claim were relevant (it is not), it is factually misleading. Numerous factors influence the AR-15 (M16) platform's mechanical rate of fire, including ammunition selection, buffer and bolt carrier weight, buffer spring rate, system backpressure, gas system length, and gas port dimensions. Depending on how a host firearm equipped with an FRT is "tuned," it may well fire *slower* than an M16 – or perhaps not at all, as FRT malfunctions are common. *See, e.g.*, Paul Carlson, *AR15 Firearm: Tuning the Buffer on a 12.5 in. Build*, GunMag Warehouse (Jan. 26, 2020), https://tinyurl.com/yr365twj; William Lawson, *The Rare Breed FRT-15 Trigger: What Is It and How Does It Work?*, GunMag Warehouse (Sept. 28, 2021), https://tinyurl.com/up82tmay.

5

shots – or any reference to the shooter's input (the trigger "pull"). In other words, even a slowly-firing machinegun is still a machinegun, and even a rapidly-firing semiautomatic is still a semiautomatic. Meanwhile, the shooter's input – the impetus to make the weapon fire – is not a factor in the equation. Thus, Plaintiffs' chosen factors are not only *not dispositive* – but are *entirely irrelevant* – to determining what constitutes a "machinegun." As Justice Alito summarized with respect to firearm "bump stocks,"[3] even if "a bump stock can have the same lethal effect as a machinegun," the "statutory text is clear, and we must follow it." *Cargill*, 602 U.S. at 429 (Alito, J., concurring). So too must this Court.

Following the text's focus on weapons that fire "automatically … by a single function of the trigger," an FRT simply does not fit. When a shooter of a prototypical AR-15 equipped with an FRT engages the trigger, pulling it to the rear, the FRT begins a cycle of operation visibly demarcated by its rearward-forward mechanical travel.[4] *Every single shot fired by an FRT-equipped firearm corresponds to one rearward travel of the trigger, followed by one forward return of the trigger to its starting position.* This "reset" in trigger position is a mechanical feature inherent to *all* semiautomatic firearms and yet notably absent in fully automatic machineguns,[5] as side-by-side demonstrations confirm.[6] The trigger's rearward-forward travel is one cycle – one discrete *function* – of the trigger, and thus an FRT-equipped firearm never fires "more than one shot" before its trigger physically resets to its starting position. *See* 26 U.S.C. § 5845(b). That the

---

[3] Bump stocks, like FRTs, are equipped on a semiautomatic firearm to allow for a faster rate of fire, but still only allow for the shooting of one round per function of the trigger.

[4] *See* Rare Breed Triggers, *Rare Breed Triggers FRT – Animation*, Vimeo (Dec. 2, 2020), https://tinyurl.com/yxkn5883, at 1:33.

[5] *See, e.g.*, Jeff Gonzales, *Trigger Reset – Understanding the Process and Practicing the Right Sequence*, Truth About Guns (Mar. 27, 2019), https://tinyurl.com/54fhfdmj.

[6] *See* Poormans Machine Gun, *M16 v RB FRT15 Comparison*, YouTube (Mar. 1, 2023), https://tinyurl.com/25r359nv. On the FRT-equipped firearm on the right side of the video, note that the trigger physically travels rearwards and forwards for each shot fired. That semiautomatic, mechanical "reset" is not present in a real "machinegun," featured on the left. The machinegun's trigger remains stationary for "more than one shot" fired. 26 U.S.C. § 5845(b).

FRT assists the trigger's mechanical reset does not render it a "machinegun" under the statute's plain terms. Plaintiffs' theory cannot overcome the statute's clear mechanical focus on trigger "function."

> **B. Plaintiffs propose a "shooter-focused" test that the Supreme Court recently rejected in favor of a "mechanical reading."**

Faced with the mechanical impossibility of their theory under the statute's plain text, Plaintiffs invoke the Supreme Court's recent *Cargill* decision, claiming it "only bolsters the conclusion that FRTs" are machineguns. ECF 5 at 23. But how this is so, Plaintiffs do not explain.[7] In fact, not only does *Cargill* fail to support Plaintiffs' reading of the statute, it *repudiates* Plaintiffs' reading entirely.

Consider Plaintiffs' claim that "a 'single function of the trigger' asks whether one single action – *one application of the shooter's pressure* – will produce multiple shots." ECF 5 at 18 (emphasis added). If that were so – that a shooter's application of pressure made the difference – then *Cargill* would have declared bump stocks "machineguns" under the same statute, as "pressure must be applied" to fire a bump stock-equipped AR-15, too. *Cargill*, 602 U.S. at 412. Yet *Cargill* made clear that "[t]he phrase 'function of the trigger' … refers to the mode of action by which *the trigger* activates the firing mechanism," which "means *the physical trigger movement* required to shoot the firearm." *Id.* at 416 (emphases added). Thus, "[b]ecause the statutory definition is keyed to a 'function of the trigger,' *only the trigger assembly is relevant for our purposes*" – not the shooter, the shooter's finger, or the pressure it applies. *Id.* (emphasis added). And when the trigger

---

[7] Plaintiffs' reliance on pre-*Cargill* appellate decisions and *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), in apparent support of synonymizing "single function" with "single pull," also fails. ECF 5 at 18-19. As the U.S. Navy-Marine Corps Court of Criminal Appeals explained in *United States v. Alkazahg*, 81 M.J. 764 (N-M. Ct. Crim. App. 2021), the *Staples* footnote "is not the interpretation of a statute" but rather "merely a general and basic explanation for a reader who may be unfamiliar with firearms." *Id.* at 780. Coupled with *Cargill*'s express repudiation of Plaintiffs' theory, Plaintiffs' manufactured judicial consensus disintegrates.

"resets," a "complete process" of a "function of the trigger" has occurred. *Id.* at 421. Indeed, following a trigger's mechanical reset, "a new firing cycle" begins, and "[a]ny additional shot fired after one cycle is the result of a separate and distinct 'function of the trigger.'" *Id.* The FRT's mechanical reset of the trigger between each shot fits squarely within *Cargill*'s elucidation of the statute.

But perhaps more importantly, *Cargill* roundly rejected the notion that a "single *function* of the trigger" instead means a "single *pull* of the trigger," calling such blatant statutory revisionism not only "logically inconsistent" but also incapable of "succeed[ing] on its own terms." *Cargill*, 602 U.S. at 422-23. Rather, *Cargill* made clear that the statute "does not … define a machinegun *based on whether the shooter has assistance engaging the trigger*." *Id.* at 422 (emphasis added). That holds true regardless of what kind of "assistance" a shooter receives—recoil pushing the trigger rearward when using a bump stock, or an FRT pushing the trigger forward.

At bottom, *Cargill* unequivocally forecloses Plaintiffs' statutory argument. Like the bump stock, the FRT "merely reduces the amount of time that elapses between separate 'functions' of the trigger." *Cargill*, 602 U.S. at 421. And its assisted reset "helps the shooter press the trigger against his finger very quickly thereafter." *Id.* But again, a series of rapid "single functions" does not make a "machinegun," and this Court should reject any attempt to suggest otherwise.

**C.    To accept Plaintiffs' "single pull" theory would require this Court to overrule the Supreme Court.**

Plaintiffs latch onto one district court's pre-*Cargill* award of a preliminary injunction against an FRT manufacturer (ECF 5 at 20-25), ignoring that this holding was impliedly repudiated by *Cargill*. However, even Plaintiffs' reliance on the preliminary relief granted in the New York case is misguided. Indeed, a far more recent and persuasive decision from the Northern District of

Texas applied *Cargill* to conclude that FRTs definitively are not "machineguns." *NAGR*, 741 F. Supp. 3d at 568. In *NAGR*, the district court found the following *undisputed* facts about a weapon equipped with an FRT:

- "[T]he trigger moves forward into its reset state and is depressed to release the hammer from its sear surface for every round fired;

- [T]he trigger in an FRT-equipped firearm must reset after every round fired," and

- "[A] shooter who attempts to prevent the reset by holding the trigger in a fully depressed position will cause the weapon to malfunction."

*Id.* at 601.

The district court observed that *Cargill* "emphatically rejected" the "single pull" theory, noting that the statutory phrase "'single function of the trigger' means what it says: a single function of the trigger. It does not mean a single pull by the shooter or some analogous motion." *Id.* at 602; *see also id.* at 603 ("'Function' and 'pull' are not synonymous. The former is based on a mechanical perspective whereas the latter is based on the shooter's perspective."). Thus, "according to *Cargill*, the statutory definition unambiguously turns on the movement of the trigger and not a trigger finger," and so "the critical consideration is how the trigger mechanically functions." *Id.* at 602-03, 605. And as the mechanical "reset" operation of the FRT makes clear, the trigger's rearward-forward movement with each shot fired is definitionally *semiautomatic*.

Detached from that reality, Plaintiffs urge this Court to ignore *Cargill* and its progeny, to instead latch on to a pre-*Cargill* district court opinion that has been soundly repudiated, and to adopt a reading of the statute that is fundamentally at odds not only with the statutory text itself but also with binding Supreme Court precedent. In the past, this Court has refused to indulge such invitations to effectively overrule the Supreme Court, since "this court has no authority to disregard

Supreme Court precedent." *Retail Indus. Leaders Ass'n v. Fielder*, 435 F. Supp. 2d 481, 495 (D. Md. 2006). This Court should heed that advice and deny Plaintiffs' motion.

II. **Plaintiffs improperly attempt to collaterally attack the non-appealable final judgment in *NAGR*.**

On May 9, 2025, following the post-*Cargill* final judgment in *NAGR*, the Federal Government entered into a settlement agreement whereby all pending lawsuits involving FRTs were dismissed (the "Settlement Agreement"). Plaintiffs are no doubt displeased with the *NAGR* final judgment and associated Settlement Agreement. However, such displeasure with the United States' post-*Cargill* legal position and Settlement Agreement does not confer a right to collaterally attack another jurisdiction's judgment after the fact. Courts have long emphasized that collateral attacks on judgments undermine finality, predictability, and trust in the legal system, and so they are rarely appropriate. Plaintiffs' approach here is precisely this sort of disfavored collateral attack.

A. **Plaintiffs cannot vacate *NAGR*.**

Plaintiffs' claims seek to set aside the final judgement in *NAGR* pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201. However, Plaintiffs are not appealing the judgment through the normal and appropriate channels—*i.e.*, participation in that court and circuit. Plaintiffs' challenge therefore bears all the hallmarks of a collateral attack. *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

Contrary to Plaintiffs' novel approach taken here, the appropriate method to seek relief from a judgment would be to file a motion specifically requesting such relief in the action in which the judgment was rendered. *See, e.g. Horwitz v. Alloy Auto, Co.,* 992 F.2d 100, 104 (7th Cir.1993) (noting that filing a new lawsuit was not proper process for attacking judgment which may have been entered erroneously; rather, proper process was to file a Rule 60(b) motion in the

case in which judgment was entered). But, instead, Plaintiffs request that a different court more than halfway across the country – *this Court* – vacate the non-appealable final judgment and associated settlement.

But even under Rule 60(b), Plaintiffs cannot vacate the *NAGR* judgment. Relief under Rule 60(b)(4) is an "extraordinary remedy," and courts are wary of granting it—and understandably so. *See Garcia Fin. Grp. Inc., v. Va. Accelerators Corp.*, 3 F. App'x 86, 88 (4th Cir. 2001). Finality in litigation matters, and Rule 60(b)(4) is not a loophole for parties to relitigate losing arguments or disliked judgments. *Id.* Assuming – *arguendo* – that the *NAGR* judgment is incorrect (which as noted herein it is not post-*Cargill*), the judgment would still not be void because it is wrong—or even if it were egregiously wrong. *See Baumlin & Ernst, Ltd. V. Gemini, Ltd.*, 637 F.2d 238, 242 (4th Cir. 1980). Rather, the Fourth Circuit has explained that a judgment can be voided *only* where the court issuing it lacked jurisdiction in the first place, or acted in a manner inconsistent with due process. *Garcia Fin. Grp.*, 3 F. App'x at 88. These are narrow exceptions to an otherwise unyielding rule to "promote finality and to discourage circumvention of the appellate process." *Id.* And certainly, it is not up to a sister district in an entirely different State to make that determination.

Thus, *even* if a judgment were based on an illegality (*NAGR*'s judgment was not), the judgment cannot be collaterally attacked, unless the district court that issued it (1) lacked subject matter jurisdiction; (2) lacked jurisdiction over the parties; or (3) violated due process. *Id.* For example, in *Garcia Financial Group Inc. v. Virginia Accelerators Corp.*, the Fourth Circuit refused to vacate a judgment entered on a settlement agreement, even though the underlying contract violated multiple Federal and State laws. Indeed, the Fourth Circuit held that, because the district court had jurisdiction and both parties signed the settlement, the resulting judgment was not void. *Id.* at 89. Illegality alone could not overcome the finality of a consent judgment. *Id.*

Of course, the Fourth Circuit's rejection of this sort of collateral attack was no outlier. Rather, the Fourth Circuit merely reiterated the principle expressed in *In re Genesys Data Techs. Inc.*, 204 F.3d 124, 130 (4th Cir. 2000), where the court held that a default judgment obtained through a fraudulent affidavit was not void under Rule 60(b)(4). There, the court made clear again that even legal error will not automatically justify a voided judgment. *Id.*

The Supreme Court also has weighed in on this issue, again in Defendants' favor. In *United Student Aid Funds Inc. v. Espinosa*, 559 U.S. 260 (2010), a bankruptcy court had discharged a student loan debt without a requisite finding of undue hardship finding—a clear legal error. *Id.* at 273. The creditor argued that because the bankruptcy court acted "without statutory authority," the order was void. *Id.* But the Supreme Court disagreed, holding that even clear legal error does not render a judgment void under Rule 60(b)(4) unless it amounts to a jurisdictional defect or a violation of due process. *Id.* at 273-75. As the Court explained "a judgment is not void . . . simply because it is or may have been erroneous." *Id.* at 270 (quoting *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995)).

And even under the catch-all provision of Rule 60(b)(6), which permits relief for "any other reason that justifies relief," courts remain loath to indulge litigants' collateral attacks on judgment. Such relief, is reserved for only the most "extraordinary circumstances." *Aikens v. Ingram*, 652 F.3d 496, 500 (4th Cir. 2011). Indeed, as the Fourth Circuit emphasized, a broad reading of Rule 60(b)(6) "would undermine numerous other rules that favor finality of judgments." *Id.* Accordingly, a litigant's failure to show coverage under any of the other five Rule 60(b) categories does not justify reliance on Rule 60(b)(6) as some sort of free-for-all fallback provision. *Id.*

With these principles in mind, this Court should dispense with Plaintiffs' flagrant attempt to relitigate the *NAGR* judgment. Plaintiffs challenge it not because the *NAGR* court lacked

jurisdiction or violated due process, but because they believe the *NAGR* final judgment is legally flawed. That is not enough.

> **B. Plaintiffs improperly attempt to restrict the return of FRTs to States where it is lawful to possess them under both Federal and State law, like Texas.**

Texas has a sovereign interest in protecting its desired permissive policies. Of Course, other States that wish to ban or otherwise regulate FRTs have done so. But Texas, by comparison, has purposefully chosen permissive policies with respect to firearms, as evidenced by its history of deregulating Second Amendment activities. Because Plaintiffs' vaguely worded request for preliminary relief[8] risks enjoining the return of FRTs to States where they may be lawfully possessed, like Texas, such relief would infringe on Texas's positive policy choices, undermining important State interests.

Moreover, while the Constitution allows States to regulate activity within their borders, that authority ends at their borders. The Supreme Court has made clear that States may not pass laws with the practical effect of regulating commerce or conduct that occurs outside their territorial jurisdiction. *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). In *Healy*, the Court struck down a statute that allowed a State to set the minimum prices for the sale of beer in other States. *Id.* at 328. The Court reasoned that any act of a State attempting to regulate outside its boundaries "exceeds the inherent limits of the enacting State's authority and is invalid." *Id.* at 336. One concern raised by the Court was that if one State is allowed to regulate another State, so too may ever other State in the nation. *Id.* at 339. Furthermore, the Court reaffirmed that the Constitution takes special concern with "the autonomy of the individual states within their respective spheres." *Id.* at 336.

Here, Plaintiffs attempt to exercise exactly the kind of extraterritorial control that the

---

[8] Indeed, Plaintiffs complain that ATF will "work with" the rightful owners of FRTs to return them in such a manner as to comport with local prohibitions in the owners' States of residence. ECF 5 at 12. That can only mean Plaintiffs wish to enjoin the return of FRTs to *neighboring* States, as well, where FRTs are legal.

Constitution and the Supreme Court forbid. Plaintiffs seek to interfere with the return of FRTs to States where they are lawful, simply because an item is purportedly banned under the laws of (some) Plaintiff States, but that – just like in *Healy* – oversteps State authority. Plaintiffs' theory for seeking this relief is that the return of FRTs *to States where they are lawful* could undercut their internal regulations. This argument mirrors the claim rejected in *Healy*. One State cannot regulate at the expense of other States. And while Plaintiffs make the argument of protecting public safety to justify encroaching on another State's sovereignty, those interests do not grant them the power to override the constitutional limits on State authority. *Shaffer v. Heitner*, 433 U.S. 186, 197 (1977) ("any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power"); *Brown-Forman Distillers Corp. v. N. Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986) (holding that a State may not "project its legislation into [other States].").

### III. A preliminary injunction would infringe Second Amendment rights.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of the State, the right of the people to keep and bear Arms, shall not be infringed." This "unqualified command" contains no limitation as to who may exercise the right, what arms may be owned or carried, where the right may be exercised, or for what purpose. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). The right therefore belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," presumptively protects all locations, and presumptively covers all "lawful purposes." *Heller*, 554 U.S. at 581-82; *Bruen*, 597 U.S. at 31. And "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

Here, citizens enjoy a presumption of constitutional protection under the Second

Amendment's plain text to possess FRTs. Thus, Plaintiffs improperly seek to regulate conduct that the Second Amendment clearly protects. *See, e.g.*, *Lynchburg Range & Training, LLC v. Northam*, 105 Va. Cir. 159, 3 (Lynchburg 2020) (observing "the right to keep and bear arms 'inclu[des] the otherwise lawful possession, carrying, transportation, sale, or transfer of firearms'"); *Kole v. Village of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *10 (N.D. Ill. Nov. 6, 2017) (citing "Thomas Jefferson … 'Our citizens have always been free to make, vend, and export arms.'"). Entry of preliminary relief – depriving Americans of the return of their wrongfully taken "arms" – would be *presumptively unconstitutional*, and this Court should deny Plaintiffs' request to do so.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary injunction.

Dated: July 3, 2025                    Respectfully submitted,

*/s/ Brian R. Della Rocca*
**BRIAN R. DELLA ROCCA, JD, LLM**
DELLA ROCCA LAW LLC
9801 Washington Blvd. Suite 710
Gaithersburg, Maryland 20878
(240) 455-5090
brian@dellaroccalaw.com
Maryland Bar No. 0312160172

**COUNSEL FOR STATE OF TEXAS, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, GUN OWNERS OF CALIFORNIA, COALITION OF NEW JERSEY FIREARM OWNERS, GRASS ROOTS NORTH CAROLINA, TENNESSEE FIREARMS ASSOCIATION, TENNESSEE FIREARMS FOUNDATION, RIGHTS WATCH INTERNATIONAL, AMERICA'S FUTURE, U.S. CONSTITUTIONAL RIGHTS LEGAL DEFENSE FUND, AND CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND**

| K EN  P AXTON<br>Attorney General of Texas | /s/ Wade A. Johnson<br>W ADE  A. J OHNSON<br>Special Counsel<br>Texas State Bar No. 24062197<br>wade.johnson@oag.texas.gov |
|---|---|
| B RENT  W EBSTER<br>First Assistant Attorney General | |
| R ALPH  M OLINA<br>Deputy First Assistant Attorney General | O FFICE OF THE  A TTORNEY  G ENERAL OF  T EXAS<br>Special Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548<br>(512) 463-2100 |
| R YAN  D. W ALTERS<br>Deputy Attorney General for Legal Strategy | |
| R YAN  G. K ERCHER<br>Chief, Special Litigation Division | **C OUNSEL FOR  T HE  S TATE OF  T EXAS** |

**C ERTIFICATE OF  S ERVICE**

    Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on July 3, 2025, a true and correct copy of the above and foregoing document was filed and served electronically via CM/ECF.

                                                                                   /s/Brian R. Della Rocca