# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| STATE OF NEW JERSEY, et al., | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-1807-PX |
| PAMELA J. BONDI, et al., | |
| *Defendants.* | |

## REPLY BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

<u>**Page(s)**</u>

INTRODUCTION ................................................................................................. 1

I.  THE STATES HAVE STANDING. ...................................................................... 2

   A.  The Redistributions That The Federal Defendants Have Not Disputed Or Foresworn Will Predictably Injure The States. ...................................................... 2

   B.  The States Challenge Affirmative Redistributions, Not Nonenforcement. ...................... 7

II.  THE STATES ARE LIKELY TO SUCCEED ON THE MERITS ........................................ 9

   A.  Section 922(o) Does Not Allow The Redistribution Policy. ........................................ 10

   B.  Because ATF Is Violating The NFA, Its Actions Are Reviewable Under The APA, And The Ultra Vires Claim Is Likely To Succeed. ....................................... 14

III.  THE EQUITIES COMPEL PRELIMINARY RELIEF. ................................................... 16

IV.  THE COURT NEED NOT ADDRESS THE NON-FEDERAL ENTITIES' PERSONAL JURISDICTION AND VENUE ARGUMENTS BECAUSE THE STATES SEEK NO INJUNCTIVE RELIEF AGAINST THEM. ............................................................. 19

CONCLUSION. ................................................................................................... 20

## INTRODUCTION

Since the States filed this Complaint, Defendants have made key concessions that clarify—but do not eliminate—the States' need for preliminary relief. As the States have already explained, redistribution of illegal machineguns (1) to the residents of Plaintiff States and (2) the sellers and distributors that sell and distribute to residents in the Plaintiff States would impose sovereign and pocketbook harms on the States. Recognizing that at least fourteen Plaintiff States independently prohibit FRTs under their own state law, Federal Defendants have responded by committing not to redistribute such devices directly into those States and to warn owners receiving FRTs outside of those States not to bring them into a State where possession is unlawful. In light of the Federal Defendants' concessions, Plaintiffs submit to the Court redlined and clean versions of the revised proposed order narrowing their requested relief. The RBT Defendants have likewise committed not to sell returned FRTs into the Plaintiff States, directly or indirectly. But those developments, while welcome, leave a significant loophole in the relief Plaintiff States sought and the injury they confront—redistribution to sellers *other than RBT* that "continue to ship FRTs into states where they are illegal under state law." Decl. of Lawrence A. DeMonico at ¶6, ECF 65-1 (DeMonico Decl.). ATF could resolve this by committing not to make such redistributions, at least while this lawsuit is pending—but it has refused to do so in response to Plaintiffs' explicit requests. Nor has ATF produced evidence that sellers to which FRTs will be redistributed have—like RBT—agreed not to sell into Plaintiff States. So the States need narrow but important preliminary relief from this Court, specifically to enjoin the Federal Defendants' redistributions to third-party sellers.

And the States are indeed entitled to that narrow but crucial relief. Redistributions to third-party sellers will have all the harms the States described, including that they will predictably and directly put illegal FRTs into the hands of Plaintiff States' residents. ATF's role in facilitating the violations of Plaintiff States' firearms laws imposes significant sovereign harms and predictable

pocketbook injuries, both on an imminent and irreparable basis. And the States' argument that the redistributions are illegal is overwhelming. ATF refuses to argue that these FRTs fall outside the definition of machineguns, and its only remaining argument that it stayed within the bounds of the law—a two-paragraph reference to Section 922(o) that is contrary to the statute and reams of case law—fares no better. Nor do any of its claims that this Court lacks power to review or enjoin its violations of federal law withstand scrutiny. So although Defendants' significant concessions are welcome, this Court should still issue preliminary relief to prevent the imminent redistributions to third-party sellers that sell, directly or indirectly, into Plaintiff States.

## I.    THE STATES HAVE STANDING.

The States have standing to challenge redistribution of FRTs to sellers and distributors that sell and distribute to residents in Plaintiff States. While RBT has properly agreed that it would no longer sell and distribute to residents in Plaintiff States, other sellers still do so. And since those redistributions predictably impose sovereign and pocketbook harms on the States, the States have every right to challenge them. The Federal Defendants' remaining arguments fall short.

### A.    The Redistributions That The Federal Defendants Have Not Disputed Or Foreswon Will Predictably Injure The States.

While Federal Defendants' representations *narrow* the scope of the preliminary relief that the States need to prevent their imminent harms,[1] Plaintiff States will still suffer injuries from the

---

[1] Defendants' representations do not undermine this Court's jurisdiction to hear this case. A defendant's voluntary cessation of challenged conduct does not render a case moot unless "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Porter v. Clarke*, 852 F.3d 358, 360 (4th Cir. 2017) (citation omitted). And conduct is especially at risk of recurring when the cessation is made in the context of litigation itself, raising the concern that the conduct could begin again once litigation terminations. *See id.* at 364 ("[T]he [voluntary cessation] exception seeks to prevent 'a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after.'") (citation omitted); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (recognizing that if a defendant could "automatically moot a case by ending its unlawful conduct once sued," then the "defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends"). A subsequent court order (albeit not preliminary relief) is thus a tool to ensure the Federal Defendants cannot resume the redistribution of FRTs that was threatened at the time the States first filed suit. *See Porter*, 852 F.3d at 362, 365

imminent redistribution of FRTs to third-party resellers (beyond what is required by a court order) who ATF reasonably should know sell FRTs into Plaintiff States contrary to their own state laws—especially until they make the same commitments RBT has sensibly made in this litigation.

Plaintiff States face concrete harm. The record shows that many third parties sell FRTs into Plaintiff States against their laws, including an admission from RBT's President that he is "aware of more than 75 sellers in the United States who are actively marketing and selling FRTs[,] … many of [whom] continue to ship FRTs into states where they are illegal under state law." DeMonico Decl. ¶6; *see also* Ex. 30 at 29-30 (DeMonico Dep.) (RBT "ha[s] dealers that choose to sell in" jurisdictions—including some Plaintiff States—into which RBT does not sell for legal reasons); Ex. 31 at ¶15 (Second Decl. of Eric Barlow) (third-party reseller shipped two packages of FRT-15s to New Jersey in 2021); Ex. 6 at ¶7, ECF 5-9 (documenting RBT's sale of FRTs to a reseller in Massachusetts, who then resold the devices over the Internet to purchasers across the United States); Ex. 2 at ¶18, ECF 5-5 (RBT distributed FRTs to third-party sellers who distributed FRTs to every State); Ex. 16 at ¶¶15, 37, 41, ECF 5-19 (RBT sold FRTs to third-party vendors that sold to States that RBT itself said it did not sell to). Consistent with that representation, the States have directly confirmed numerous companies selling FRTs online appear to permit sales into Plaintiff States, and at least two sellers expressly indicated that they would ship the devices to New Jersey. Ex. 31 at ¶¶7-11. In other words, FRTs redistributed to third-party sellers are highly likely to end up in Plaintiff States in violation of their own state laws, causing sovereign injuries by aiding and abetting violations of state law, *see* Br. 11-13, ECF 5-1; pocketbook injuries due to Plaintiff States' increased need to enforce state-law bans, *id.* at 13-14; and law enforcement and healthcare costs due to the predictable use of FRTs in criminal activity, *id.* at 14-15.

---

(finding that a defendant's "refus[al] to commit to keep the revised policies in place and not revert to the challenged practices"—including, for example, the "refus[al] to agree to [a] consent decree"—bears on the mootness question).

Nor is causation too attenuated; to the contrary, these injuries are the direct and predictable result of redistribution of unlawful FRTs to third-party resellers who sell into Plaintiff States. It is well documented—and Defendants acknowledge—that non-RBT sellers sell into Plaintiff States even in spite of state-law bans. *See supra* at 3. Therefore, Plaintiff States' concern about such sales is not "mere speculation about the decisions of third parties," but instead "the predictable effect" of returning or selling FRTs to those resellers. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *Phila. Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 317 (D. Md. 2025). If anything, "the predictability of this reaction is stronger than in *Department of Commerce* because there is evidence" that resellers "already" sell the FRTs into Plaintiff States in violation of state statutes. *Phila. Yearly Meeting*, 767 F. Supp. 3d at 318 (explaining that third parties' actions in response to federal policy were even more predictable given evidence that the predicted effect had in fact already been observed); *see supra* at 3.

The mere fact that third-party conduct is illegal does not undermine the harms where—as here—sufficient evidence shows that the illegal conduct will be a "predictable" reaction to the Government's action. *Dep't of Com*, 588 U.S. at 768. The resellers not only violate state-law bans on FRTs; they also skirt the law in sales to buyers, posting instructions on how to avoid using personally identifiable information during a transaction and encouraging use of alternative, hard-to-trace methods of payment. *See* Ex. 31 at ¶¶12-13; Ex. 2 at ¶19 (ATF's determination that some on-line sellers of FRTs may distribute these devices in a manner intended to evade detection by law enforcement). Since the third-party resellers are engaged in and facilitating illegal conduct, the connection between ATF's redistribution to those resellers and their subsequent violations of the law—along with the resultant costs to enforce the law—are far from attenuated. Even more so

4

here, where redistribution itself is illegal under federal law, it is entirely predictable that resellers who receive the prohibited MCDs would be willing to continue breaking state law too.

Even though it is predictable that these sellers and distributors will sell redistributed FRTs into Plaintiff States, causing them sovereign and pocketbook harms, the Federal Defendants resist both harms—arguing the sovereign injuries are not cognizable, and the pocketbook harms are still too attenuated. As to the former, the Federal Defendants misunderstand the sovereign interests and thus the Article III harms. It is true, of course, that one paradigmatic example of a sovereign injury is from an action that "interferes with a state's exercise of its sovereign power to create and enforce a legal code"—e.g., if federal law preempts enforcement of a state law. *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011).[2] But the States have a cognizable interest not merely in the creation and enforcement of a legal code, but "in maintaining compliance with [their] laws." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *accord Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).[3] Multiple courts have therefore identified Article III sovereign harms when the federal government encouraged or facilitated the private violation of state law— cases to which the Federal Defendants offered no answer. *See* Br. 11-13 (citing *Daily Wire, LLC v. U.S. Dep't of State*, 733 F. Supp. 3d 566, 577-79 (E.D. Tex. 2024) and *Washington v. U.S. Dep't*

---

[2] Although the Fourth Circuit found a lack of standing in *Cuccinelli*, its reasoning has no bearing here: the outlier state law at issue there "regulate[d] nothing" and "simply purport[ed]" to "immunize [state] citizens from federal law." *Id.* at 270. The Federal Defendants have leveraged no such charges at the Plaintiff States, whose laws do indeed regulate FRTs within their borders, and are not in any way aimed at thwarting federal law.

[3] While Federal Defendants insist the States' cited information-deficit cases speak to "the withholding of information that the Government is statutorily *required* to divulge," Opp. 17, they miss the key point: States have a "particularized interest" in whether "expected informational deficits" "will affect [their] ability to enforce state laws," *NRDC v. EPA*, 961 F.3d 160, 168-69 (2d. Cir. 2020)—whether or not a statute requires the federal government to divulge information to them. *See, e.g.*, *New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 610-15 (S.D.N.Y. 2019) (explaining that although "many of these cases involved statutory entitlements to certain information," States retained a cognizable sovereign interest in information collected or shared by the federal government "because if such an injury were not already 'concrete' enough for Article III purposes, Congress could not make it so"). Though the lack of information did not vitiate the States' formal authority to make laws and bring enforcement actions, the States nonetheless had a cognizable interest in a failure to share information that burdened their efforts to ensure compliance. *Id.*

*of State*, 318 F. Supp. 3d 1247, 1254-56 (W.D. Wash. 2018)). And ATF recognized that at least some distributions of FRTs could "aid and abet" harms to that sovereign interest. Resp. to Pls.' Notice at 2-3, *NAGR*, No. 23-830 (N.D. Tex.), ECF No. 128. Redistributing FRTs to third parties who indisputably sell into Plaintiff States that prohibit such devices easily fits that bill.

Nor are the pocketbook harms—including to enforce the very laws for which ATF would be actively facilitating private violations—attenuated or speculative. Courts often recognize that changes in federal policy could cause states to incur higher costs and divert greater resources to address the harms caused by that change. *See Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 489-90 (D. Md. 2019) (standing); *City & County of San Francisco v. U.S. Citizenship & Immigration Servs.*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019), *aff'd*, 981 F.3d 742 (9th Cir. 2020); *California v. ATF*, No. 20-cv-06761, 2023 WL 1873087, at *9-11 (N.D. Cal. Feb. 9, 2023) (such injuries are not self-inflicted). And ATF's action is far afield from that at issue in *Alliance* or *Smith & Wesson*. Unlike in those cases, "where the government action [wa]s so far removed from its distant (even if predictable) ripple effects," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024), the conduct here is closely connected to the harms. By redistributing devices to resellers who sell into Plaintiff States, the federal government is not "passive[ly]" assisting a legal violation, *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1569 (2025), but giving illegal devices to those it knows violate state laws. And because those actions will be aiding and abetting violations of those state laws, the increase in law enforcement costs for enforcing those state laws is both predictable and inexorable.

That such harms persist is a problem entirely of the Federal Defendants' own making. The States' preliminary-injunction motion laid out how redistributions to possessors in Plaintiff States that ban FRTs, and to sellers and distributors that directly and indirectly sell into the States, would

harm the States themselves. ATF responded by addressing *some* of those harms. It agreed not to return directly, or to otherwise facilitate returns to, possessors in Plaintiff States that ban FRTs, Declaration of Matthew P. Varisco at ¶12, ECF No. 64-1 (Varisco Decl.), including via notices warning recipients in other States not to bring the FRTs into Plaintiff States. And RBT affirmed it will not sell into Plaintiff States. DeMonico Decl. at ¶5. But ATF has not disputed—including in response to Plaintiffs' direct questions—that its redistribution policy extends to other sellers. *See* Ex. 4 at ¶7, ECF 5-7 (stating FRTs seized pursuant to Distributor Investigations "include[d]" those seized from RBT); Ex. 16 at ¶¶72-79 (describing FRT retrieval operation from one of RBT's third-party distributors); *id.* at ¶¶84-88 (ATF took remedial actions with respect to sellers and possessors of FRTs, including recoveries). Nor is that a surprise, as ATF's own investigation turned up sales from third party sellers. *See supra* at 3. Yet ATF has conspicuously declined to mitigate the harms that States will suffer from imminent redistribution of FRTs to sellers who sell into Plaintiff States in violation of state law—whether by promising not to make such returns at least while this lawsuit is pending, or introducing factual information of the kind RBT proffered here. Until that happens, predictable sovereign and pocketbook injuries will soon ensue.

**B.    The States Challenge Affirmative Redistributions, Not Nonenforcement.**

The Federal Defendants wrongly claim that this lawsuit contravenes *United States v. Texas*, 599 U.S. 670 (2023), which held States lacked standing to challenge decisions by federal agencies not to arrest or prosecute another. ATF's view that Plaintiff States lack standing to challenge their decision "not to enforce" the NFA against FRTs, Opp. 12, ECF 64, is a red herring: Plaintiffs challenge the *affirmative distribution* of FRTs, rather than non-enforcement decisions within the Agreement. *See* Proposed Order, ECF 5-2 at ¶2 ("Government Defendants are ENJOINED" from enforcing redistribution policy—not from nonenforcement of the NFA). That requires the Federal Defendants to pivot to a new argument: that "returning the FRTs [ATF] seized" *is* a "corollary" of

that non-enforcement decision and thus falls within the same Article III doctrine against challenges to nonenforcement. Opp. 12. But that argument fails.

The decision not to enforce the NFA and the decision to affirmatively redistribute unlawful FRTs across the country are two distinct decisions, with only the latter challenged in this lawsuit. After all, those FRTs seized as part of a criminal investigation need not be redistributed, even if ATF terminates the underlying investigations. *See* Br. 25 n.11 (cases Federal Defendants do not dispute). In short, it is "well settled" the Federal Government "must return [seized] property once the criminal proceedings have concluded, *unless it is contraband.*" *United States v. Bein*, 214 F.3d 408, 411 (3d Cir. 2000) (emphasis added); *see also United States v. Farrell*, 606 F.2d 1341, 1344 (D.C. Cir. 1979) ("It is well established that a claimant has no right to have ([p]er se contraband) returned to him."). And because Federal Defendants forgo arguing that FRTs are not contraband prohibited by the NFA, the Federal Government had to make an independent choice to redistribute them.[4] So *Texas* limits when States can challenge a federal decision not to arrest or prosecute, but the Court recognized a "different standing analysis" if a policy "implicat[es] more than simply the Executive's traditional enforcement discretion" over "arrest or prosecution priorities," 599 U.S. at 683, and the Federal Defendants in this case simply offered no "precedent, history, or tradition" suggesting that redistribution of contraband machineguns is part of the "Executive's traditional enforcement discretion," *id.* at 677. Nor do Federal Defendants cite *any* case barring a challenge to an affirmative policy of redistributing illegal items on such grounds.[5]

---

[4] Although Federal Defendants gesture at "certain federal forfeiture statutes," Opp. 12, they fail to explain the relation of those (unnamed) statutes to redistribution of contraband like FRTs. Indeed, even when the United States "does not[] file a complaint for forfeiture or return the [taken] property," 18 U.S.C. § 983(a)(3)(B), DOJ's regulations explicitly recognize that "the United States is not required to return property for which it has an independent basis for continued custody, *including but not limited to contraband*," 28 C.F.R. § 8.13(a) (emphasis added).

[5] And in any event, at least some of the FRTs come from voluntary surrenders, which are irrelevant to investigations terminated under the non-enforcement decision. *See* Varisco Decl. at ¶8.

8

The Federal Defendants' own approach reveals that they very much understand that the nonenforcement decision and affirmative redistribution of illegal machineguns are distinct policy decisions—and that the latter does not follow inexorably from the former. First, if redistributions were automatically a corollary to non-enforcement, then the Settlement Agreement would not have broken out those policy choices into separate paragraphs, and it would not have needed to promise further redistributions. *Compare* Ex. 13, ECF 5-16 at 3-4 (redistribution), *with id.* at 5-6 (non-enforcement). Second, the Federal Defendants' contentions are belied by their own decoupling of enforcement and redistributions in this litigation: while ATF claims it is no longer enforcing the NFA against FRTs nationwide, the Federal Defendants will only redistribute FRTs in States that do not independently prohibit them. In other words, the Federal Defendants themselves are treating the decision not to enforce and to redistribute (including when, how, and to whom) as two separate policy choices. Redistributions are thus not only distinct from traditional enforcement discretion generally—they are distinct in this very case. And they are subject to challenge.

## II.    THE STATES ARE LIKELY TO SUCCEED ON THE MERITS.

The merits strongly favor the States. Notably, Defendants do not even *attempt* to argue that the policy of imminently redistributing thousands of FRTs is at all consistent with the definition of machineguns under federal law. To the contrary, while the States briefed extensively that FRTs cause guns to fire multiple rounds with "a single function of the trigger," and are MCDs under the NFA, Defendants conspicuously fail to respond. Br. 16-25. They thus concede, at least for present purposes, that the devices ATF will imminently return are machineguns under federal law. The responses Federal Defendants do offer, by contrast, are unpersuasive. ATF seems to claim some blanket statutory authority to distribute any prohibited machineguns into *private hands*, but as case law confirms, 18 U.S.C. §922(o)(A) applies to the transfer and possession of machineguns for law enforcement—not to a policy like this one. Because ATF is violating the proper understanding of

a federal statute, ATF's actions violate the APA and are *ultra vires*. Neither the use of a settlement agreement nor the criminal penalties Section 922 imposes change that picture.

A.    **Section 922(o) Does Not Allow The Redistribution Policy**.

The Federal Defendants summarily argue that even if ATF's imminent redistributions put machineguns into private hands, 18 U.S.C. §922(o)(2)(A) allows the agency to do so. But the brief reference to 18 U.S.C. §922(o) badly misunderstands that law. Section 922(o) makes it "unlawful for any person to transfer or possess a machinegun," and then carves out "(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect." As the text and structure of 18 U.S.C. §922(o)(2)(A) establish, and as reams of case law confirm, nothing in this subsection allows *private individuals* to possess machineguns, as this is instead a protection for law enforcement officers, who possess these weapons under the authority of a government agency. And nothing in this subsection somehow authorizes ATF (or any state or local agency) to transfer illegal machineguns to those who may not lawfully possess them.

Begin with who may lawfully possess a machinegun under Subsection 922(o)(2)(A). That provision, as text, structure, history, and precedent all establish, does *not* mean a private individual can possess an M16 merely because they got permission from a federal, state, or local agency, or received it from that agency. To the contrary, the statute's reference to "under the authority of" a government agency refers to an individual who possesses a machinegun in their official capacity— namely, a law enforcement officer working for a federal, state, or local law enforcement agency— thus exercising governmental authority. *See United States v. Aiken*, 974 F.2d 446, 449 (4th Cir. 1992) (machinegun possession is still "illegal for anyone other than government personnel").

Nor is the Fourth Circuit's conclusion unique. Other courts read Subsection 922(o)(2)(A) "to permit only lawful possession of machine guns by federal or state agents acting in an official capacity." *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir. 1993); *see also, e.g.*, *Farmer v. Higgins*, 907 F.2d 1041, 1045 (11th Cir. 1990) ("Congress intended to limit lawful transfer and possession of machine guns to instances authorized by the government for the benefit of federal, state, or local governmental entities."); *United States v. Theunick*, 651 F.3d 578, 587 (11th Cir. 2011) (describing Section 922(o)(2)(A) as "the law enforcement defense," and holding it cannot apply if a person "possessed the weapons exclusively in a personal capacity, without any legitimate law enforcement purpose"); *Doe v. Biden*, No. 22-1197, 2022 WL 16545125, at *4 (Fed. Cir. Oct. 31, 2022) (following *Farmer*); *United States v Neuner*, 535 F. App'x 373, 374 n.1 (5th Cir. 2013) ("Clear statutory language and Congressional intent limited lawful transfer and possession of machine guns to authorized governmental personnel for use in their official capacities."); *United States v. Bascue*, No. 95-30320, 1996 WL 554488, at *2 (9th Cir. 1996) ("exemption for transfers to a government agency is intended to exempt from liability the purchase of machineguns by law enforcement officers and other government agencies for law enforcement uses.").

That consistent understanding—that government agencies *and their officers* alone can still possess machineguns, from these MCDs to M16s—makes sense of Section 922(o)(2)(A)'s text, structure, and history. The text protects "possession by" federal, state, and local entities, but to protect individuals who are wielding their law enforcement powers, it also protects those acting under an agencies' "authority." That "authority" is limited to agents who work on behalf, and exercise the power of, federal, state, and local governments, as it is commonly understood to refer to a delegation of official power and the ability to be bound. *See Authority*, Black's Law Dictionary (12th ed 2024) (1. "The official right or permission to act esp. to act legally on another's

11

behalf...the power delegated by a principal to an agent"); *Authority*, Am. Heritage Dictionary (5th ed. 2022) (1.a. "The power to enforce laws, exact obedience, command, determine, or judge," b. "One that is invested with this power, especially a government or body of government officials").

Other statutory tools are in accord. When the Senate debated what would become Section 922(o)(2)(A), its members agreed the bill would "bar[] future sales and possession of machineguns by private citizens," 132 Cong. Rec. S5358-04, 1986 WL 774609 (May 6, 1986), but authorize possession for "military," "police," or "law enforcement purposes," *id*. Senator Hatch went on to explain that a police officer's "possession or transfer of those weapons would cease to enjoy the authorization of the State agency or subdivision when the officer was no longer on the police force." *Id*. And the contrary reading—in which "possess[ion]" covers any private citizen who has some permission from a federal, state, or local agency—would also impermissibly render Section 922(o)(2)(B) superfluous. *See N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 494 (4th Cir. 2025). Section 922(o)(2)(B) grandfathers possession of pre-1986 NFA machineguns, which are possessed pursuant to federal licenses—a requirement ever since the 1934 NFA. But if "under the authority" already covered any private possession approved by some government agency, there would be no need for that separate grandfathering provision. That is yet one more sign that Section 922(o)(2)(A) only allows possession by government agencies and by the law enforcement officials operating under their authority. *See Farmer*, 907 F.2d at 1044; *see also Roe v. Richardson*, No. 21-cv-125, 2022 WL 112023, at *6-7 (S.D. Ill. Jan. 12, 2022) ("the Court agrees [ATF does] not have authority to provide an amnesty period for Plaintiff's [MCD]"); *United States v. Hunter*, 843 F. Supp. 235, 248 (E.D. Mich. 1994) (surveying Congressional colloquy establishing that ATF could not administratively establish amnesty under Section 922(o)).

Contrary to the Federal Defendants' startling contention, nothing in Section 922(o)(2)(A) authorizes them to give machineguns to persons who could not lawfully possess them. The Federal Defendants do not deny that federal agencies traditionally act beyond their power if they facilitate private violations of federal law or authorize private parties to contravene the governing federal statutes. Instead, the Federal Defendants say that Section 922(o)(2)(A)'s exemption for "a transfer to or by" a federal, state, or local agency permits them to transfer MCDs to private persons. The breadth of the argument is striking: because the "United States" is just one entry in a broader list that includes a "State" or a "political subdivision thereof," ATF's view of the statute advanced in this brief would permit any local government to freely provide machineguns (and not just MCDs, but M16s too) to civilians—wherever they reside—under this authority. Neither a court nor ATF could, on that view, bar a Mayor from directing his police force to distribute the machineguns they possess to private persons anywhere. That result is of course absurd, and it is not what the statute adopts. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (statutory language should be interpreted to "ensure that the statutory scheme is coherent and consistent").

Instead, the text and structure of the statute—consistent with the statute's history—confirm what common sense makes plain: the transfers that Section 922(o)(2)(A) allows must involve the very same agencies and officials who are permitted to possess machineguns in an official capacity. That is why the statute links, in a unitary provision, "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (discussing doctrine that "a word is known by the company it keeps" and that courts employ this principle "to avoid ascribing to one word a meaning so broad that it is inconsistent with its

accompanying words, thus giving unintended breadth to the Acts of Congress") (citation omitted).[6]

In other words, protection for transfers "by" or "to" the United States, its agencies, and state and

local governments is connected to the act of lawful possession—transactions with the parties who

can have machineguns for law enforcement purposes. *See Farmer*, 907 F.2d at 1045 (emphasizing

that Congress limited machinegun transfers to those "authorized by the government for the benefit

of federal, state, or local governmental entities"—"for the benefit of" law enforcement). At bottom,

consistent with both the history and precedent, *see supra* at 10-14, Section 922(o)(2)(A) protects

machinegun transfers between federal law enforcement and military agencies, federal agencies to

States and cities, between local and state police forces, and so on. It exempted transfers "to or by"

these agencies not to suddenly allow government agencies (including local ones) to distribute any

M16s to any persons as they see fit, but to protect both sides of a lawful transfer transaction.

Because private persons, including sellers of FRTs, do not act "under the authority" of any

federal, state, or local government when they possess machineguns, and because nothing in federal

law permits federal, state, or local government transfers to private entities that cannot have them,

the Federal Defendants' imminent redistributions violate the NFA itself—and find no exemption

in the text, structure, history, or precedent of Section 922(o)(2)(A).

### B.  Because ATF Is Violating The NFA, Its Actions Are Reviewable Under The APA, And The Ultra Vires Claim Is Likely To Succeed.

With Defendants' Section 922(o) objection out of the way, their claim that the Settlement

Agreement is unreviewable fails easily. Under binding Fourth Circuit precedent, even if settlement

---

[6] Subsections 922(o)(1) and 922(o)(2)(B) support the same conclusion that transfer and possession refer to the same entities. *Cf. Nijhawan v. Holder*, 557 U.S. 29, 39 (2009) ("Where, as here, Congress uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations."). Subsection 922(o)(1) says persons may not "transfer or possess" these items (without drawing a distinction between which persons can transfer and which can possess) and Subsection 922(o)(2)(B) equivalently grandfathers "lawful transfer or lawful possession" of a pre-1986 machinegun. It would be passing strange for Subsection 922(o)(2)(B) alone to distinguish between what transfers are permitted and who may possess these otherwise-illegal machineguns.

agreements are traditionally left to agency discretion, *see* Opp. 19-21, they are reviewable where they "violate the civil laws governing the" agency. *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 761-63 (4th Cir. 1993). *See* Br. 16-17 n.5. The Federal Defendants have foregone arguing that FRTs fall outside the NFA's definition of machineguns, which means that the redistributions *would* violate the civil laws governing the agency. And their cited out-of-circuit cases on general settlement discretion, Opp. 21 n.10, are not to the contrary: these cases also recognize that "not every agency settlement, whatever its terms, is unreviewable," *N.Y. State Dep't of L. v. FCC*, 984 F.2d 1209, 1215 (D.C. Cir. 1993), including when—as here—the agency "circumvented federal law by entering into the settlement agreement," *U.S. v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (agreeing with the Fourth Circuit that "such claims are reviewable under the APA"). The redistributions contemplated by this Settlement Agreement are reviewable.

In addition to violating the APA, the imminent redistributions to non-RBT sellers are *ultra vires*. *Nuclear Regulatory Commission v. Texas* (*NRC*), reaffirms the principle that agency action can be enjoined as *ultra vires* when it is "in excess of its delegated powers and contrary to a *specific prohibition* in a statute." 145 S. Ct. 1762, 1776 (2025) (citing *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958)). The Fourth Circuit thus instructs that an "action is *ultra vires* if the agency or other government entity 'is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden.'" *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012). Section 922(o)(1) contains prohibitory language: "it shall be unlawful for any person to transfer or possess a machinegun." It expressly forbids the private possession of machineguns that ATF will now directly facilitate. Plus, it forbids the transfer of machineguns, and as detailed above, is not saved by Subsection 922(o)(2)(A). And ATF's refusal to dispute the meaning of "machinegun" removes doubt that these FRTs are, for this

motion, machineguns. This policy of imminent redistributions oversteps the outer limits of ATF's authority, and Plaintiff States are likely to prevail in showing that it is unlawful.

ATF's complaint that Section 922(o) does not provide a cause of action, *see* Opp. 22-23, is erroneous. *Ultra vires* claims provide an independent right to equitable relief specifically "when no statutory review [is] available." *NRC*, 145 S. Ct. at 1775 (citation omitted). That 922(o) does not contain a cause of action is irrelevant, because any *ultra vires* cause of action exists in such absence.[7] What matters about 922(o) for the *ultra vires* claim in this case is its prohibitory effect on ATF. Indeed, ATF's own reliance on *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979), reinforces that distinction's importance. There, the Court agreed 18 U.S.C. §1905 did not give petitioner Chrysler a cause of action against the Defense Logistics Agency. *Id.* at 316. But it held that Chrysler could assert an APA claim based on allegations that the DLA had caused *its* officials to violate §1905. *Id.* at 317. *Chrysler* thus underscores a line between reliance on a criminal statute as a cause of action itself (unavailable) and reliance on a criminal statute as a constraint on agency action (appropriate). Section 922(o) serves as the latter. It establishes ATF's chosen policy as both outside the bounds of its authority, and contrary to law under Section 706 of the APA.

## III.    THE EQUITIES COMPEL PRELIMINARY RELIEF.

The States will suffer irreparable harm from redistribution of FRTs to third-party resellers who sell FRTs into the States in violation of their state laws. *See supra* at 2-7; Br. 25-28. Threats to public health and safety—including from the influx of dangerous weapons—can constitute irreparable harm. *See Duncan v. Bonta*, 83 F.4th 803, 806 (9th Cir. 2023); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, ___ F. Supp. 3d ___, 2025 WL 1017775, at *4-5 (D.R.I. Apr. 5, 2025).

---

[7] Both circuit cases on which ATF relies involved plaintiffs who tried to use federal criminal statutes as bases for retrospective monetary relief. *See Dourlain v. Comm'r of Tax'n & Fin.*, 133 F. App'x 765, 767 (2d Cir. 2005); *Marx v. Centran Corp.*, 747 F.2d 1536, 1548 (6th Cir. 1984). Neither is apposite here.

ATF itself has warned of the "potent public safety threat" posed by FRTs. Ex. 2 at ¶11; *see also id.* at ¶¶32-43 (documenting risk of FRTs to public safety); Br. 4-6. Indeed, its response here confirms that FRTs have been used in conjunction with criminal conduct. Varisco Decl. at ¶8 (stating FRTs were seized pursuant to "criminal investigations in which FRT-15s and WOTs were used in the commission of criminal activity"); *see also* Ex. 2 at ¶¶32-38 (documenting association of FRTs with crime). And although FRTs themselves are relatively new, ATF has consistently acknowledged that FRTs are a form of MCD and pose the same threat as that broader category. *See* Ex. 2 at ¶¶10-11; Ex. 6 at ¶¶5-10, 13-15. There is significant evidence—including from ATF— that these devices are used to commit violent crime and pose a particularly acute public safety threat due to their rapid fire and the ease with which someone can obtain and conceal these devices. *See* Ex. 4 at ¶¶20-23 (ATF's finding that FRTs "pose a significant public safety risk" and pointing to their high rate of fire, recoveries of FRTs in connection with serious criminal conduct, low cost, and other reasons); *see also* Ex. 1 at ¶12, ECF 5-4 (ATF reported a "dramatic increase in the use of [MCDs] in violent crimes" from 2018 to 2023); Ex. 2 at ¶¶33-35 (reporting ATF investigations that reveal MCDs to be involved in narcotics trafficking, drive-by shootings targeting homes and law enforcement, gang investigations, and other criminal activity); *id.* at ¶¶32-33 (FRTs create a rate of fire similar to that of a "commercially manufactured machinegun," and do so all "without visible modification to the firearm"). *See generally* Br. 3-5. It is not speculative to conclude that FRTs—a subset of MCDs that share these characteristics—are a public safety threat.

None of the harms that the States will experience are self-inflicted; they are instead caused by the United States's imminent redistribution of FRTs. If there is a violation of state law— including one the Federal Defendants aided and abetted—it is not a self-inflicted injury for the State to enforce its own laws. That States rarely had to enforce their FRT bans in the past because

of active federal enforcement does not mean their own projected enforcement is "manufacture[d],"
Opp. 25; it just means that the imminent redistribution of FRTs that will end up harming Plaintiff
States (against the backdrop of the Federal Defendants' entirely new policy) will cause increased
threats to public safety that will require a new state law enforcement response.

Contrary to Defendants' assertions, the equities and public interest also weigh strongly in
Plaintiff States' favor. While there may be benefits to settlements as a general matter, *see* Opp. 26,
there is no equitable nor public interest in cloaking unlawful actions under the guise of a settlement
agreement. Any discretion to settle a case "does not include license to agree to settlement terms
that would violate" the law. *Exec. Bus. Media*, 3 F.3d at 762. Indeed, even decisions "committed
to absolute agency discretion by law" are reviewable when "an agency exceeded its legal authority,
acted unconstitutionally, or failed to follow its own regulations." *Id. See* Br. 16-17 n.5. Thus, there
is no separation-of-powers concern when this Court reviews agreements that "transgress[]" the
"legal authority conferred [to the agency] by Congress." *Med. Imaging & Tech. All. v. Libr. of
Congress*, 103 F.4th 830, 838 (D.C. Cir. 2024)*.* Nor would an injunction here "undermine the
[federal] Government's ability to settle litigation," Opp. 26, as it is well-established that unlawful
settlement agreements are reviewable, see *supra* at 14-15, and that the Federal Government would
retain discretion to enter into agreements that do not violate the law or exceed the authority set by
Congress. And third-party resellers—the only entities whose redistribution would be impacted by
the narrow relief the States seek—are not even parties to the Settlement Agreement, and so impacts
on any incidental benefits they receive would not affect the *parties*' willingness to settle.

Nor is ATF correct that the public interest would somehow be served by redistributions to
sellers because ATF lacks authority to retain such devices. Opp. 27. To the contrary, the sellers
have no "property interest" in FRTs at all such that they have a right to their return for one simple

reason: they are illegal. *See supra* at 7-8 (explaining that the federal government need not return confiscated items when they are contraband). Indeed, an individual "cannot have a property right in that which is not subject to legal possession." *Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003) (citation omitted), and ATF has not contested here that possession of FRTs is illegal under the NFA (and the States established that much in their opening brief). There is thus no equitable or public interest in ATF's redistribution of FRTs to such resellers, especially absent safeguards to ensure that those resellers will not sell into Plaintiff States contrary to state law.

## IV. THE COURT NEED NOT ADDRESS THE NON-FEDERAL ENTITIES' PERSONAL JURISDICTION AND VENUE ARGUMENTS BECAUSE THE STATES SEEK NO INJUNCTIVE RELIEF AGAINST THEM.

The Non-Federal Entities spill much ink on personal jurisdiction and venue, but their arguments rest on a misunderstanding: the States do not ask this Court to award any injunctive relief against them. Instead, Plaintiff States seek relief *only* as to the Federal Defendants. *See* Proposed Order at ¶2 ("Government Defendants are ENJOINED") & ¶5 (listing only Government Defendants). So while a district court must have jurisdiction over a party in order to subject that party to injunctive relief, *see Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019), this Court does: it has undisputed personal jurisdiction over the Federal Defendants. Indeed, the States' requested relief would enjoin *government* agencies from redistributing the illegal FRTs; it would not order private parties to do or refrain from doing anything with those FRTs. The States named these private entities to avoid any threshold disputes about whether they should be joined based on their interests in the underlying Settlement Agreement. But the States are not seeking to enjoin the private entities themselves, such that the court must have jurisdiction over them to grant

Plaintiffs' request. And the private entities cite no case where a party against whom *no* relief was sought was able to defeat a preliminary injunction based on lack of jurisdiction as to them.[8]

Because this Court is not asked to enter relief against the Non-Federal Entities, the Court need not even address their arguments prior to making a decision on preliminary relief against the Federal Defendants. *See Evapco, Inc. v. Mech. Prods. Sw., LLC*, No. 22-3375, 2023 WL 361131, at \*3 (D. Md. Jan. 23, 2023) (proceeding with temporary restraining order analysis as to defendant properly before the court and reserving analysis as to other defendant until the matter could be fully heard). These arguments are better left for a later date, when an actual motion to dismiss can be fully briefed and presented to the Court and not when the States are constrained to a reply in their own motion. The Non-Federal Entities acknowledge as much. *See* NAGR Opp. 1, ECF 65 ("Non-Federal Defendants reserve their rights to raise ... this Court's lack of personal jurisdiction over them, and improper venue at the motion to dismiss stage and expect to more fully brief those issues then."). Instead, this Court should resolve the preliminary application before it, and enjoin the *Federal* Defendants from redistributing FRTs, except as required by a prior judicial order, to any distributor or seller that sells, resells, or distributes into Plaintiff States, directly or indirectly. That will remedy the States' imminent irreparable harm and protect the status quo.

## <u>CONCLUSION</u>

This Court should enjoin Federal Defendants from returning FRTs to third-party entities who sell, resell, or otherwise distribute them into Plaintiff States, either directly or indirectly.

---

[8] Instead, in their cited cases, the party raising the jurisdiction issue is the party against whom relief was entered. *See R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 951-52 (4th Cir. 1999) (nonparty appealing court's injunction preventing them from taking pictures of Titanic wreck site); *In re Rationis Enters., Inc. of Panama*, 261 F.3d 264, 266-67, 270 (2d Cir. 2001) (third-party defendant appealing from injunction preventing it from seeking relief in a Korean court); *In re Aflibercept Pat. Litig.*, No. 1:23-CV-97, 2024 WL 3423047, at \*1-3 (N.D. W. Va. July 9, 2024) (defendants filed motion to dismiss and opposed a preliminary injunction seeking to prevent defendants from infringing patent); *Catalog Mktg. Servs., Ltd. v. Savitch*, No. 88-3538, 1989 WL 42488, at \*1-2 (4th Cir. Apr. 24, 1989) (defendant appealed injunction that prevented them from using information obtained in its prior business relationship with plaintiff).

Dated: July 3, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy (D. Md. Bar No. 28391)
  *Deputy Solicitor General*
Jeremy M. Feigenbaum
  *Solicitor General*
Nathaniel Rubin
  *Special Assistant to the Solicitor General*
Christopher Ioannou
Max Lesser
Marie Cepeda Mekosh
Amanda McElfresh
  *Deputy Attorneys General*
Office of the Attorney General
25 Market Street, 8th Floor
Trenton, NJ 08625
(609) 376-3377
Shankar.Duraiswamy@njoag.gov

*Counsel for the State of New Jersey*


**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar. No. 31472)
Keith M. Jamieson (D. Md. Bar. No. 31543)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, MD  21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*


**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

/s/ *Ian R. Liston*
Ian R. Liston
  *Director of Impact Litigation*
Kate Aaronson*
  *Deputy Attorney General*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

*/s/ Shannon Stevenson*
Shannon Stevenson*
  *Solicitor General*
Peter J. Baumann*
  *Senior Assistant Attorney General*
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Shannon.Stevenson@coag.gov
Peter.Baumann@coag.gov

*Counsel for the State of Colorado*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

/s/ Eliza H. Simon
Eliza H. Simon (D.Md Bar No. 19648)
  *Senior Counsel to the Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street NW
Washington, D.C., 20001
(202) 741-5221
Eliza.Simon@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

*/s/ Michael M. Tresnowski*
Michael M. Tresnowski*
  *Assistant Attorney General*
Cara Hendrickson*
  *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(312) 814-3000
Michael.Tresnowski@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Katherine Dirks
Katherine Dirks
  *Chief State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
Katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

/s/ Vivian A. Mikhail
Vivian A. Mikhail
  *Deputy Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333
Tel.:  207-626-8800
Fax:  207-287-3120
vivian.mikhail@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

*/s/ Adam R. de Bear*
Adam R. de Bear*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI  48933
(517) 335-7573
debeara@michigan.gov

*Counsel for the People of the State of Michigan*

22

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

*/s/ Lindsey E. Middlecamp*
Lindsey E. Middlecamp*
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: (971) 673-1880
Fax: (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

*/s/ Jonathan T. Rose*
Jonathan T. Rose
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

*\* Pro hac vice application pending or forthcoming*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

*/s/ Heidi Parry Stern*
Heidi Parry Stern
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

*/s/ Stephen N. Provazza*
Stephen N. Provazza*
  *Unit Chief, Consumer & Economic Justice Unit*
150 South Main St.
Providence, RI 02903
(401) 274-4400
SProvazza@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

*/s/ Andrew R. W. Hughes*
Andrew R.W. Hughes
William McGinty*
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Andrew.Hughes@atg.wa.gov
William.McGinty@atg.wa.gov

*Counsel for the State of Washington*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 3, 2025, I served a copy of the foregoing Reply in Support of Plaintiffs' Motion for a Preliminary Injunction on counsel for Defendants via CM/ECF.

For Plaintiffs whose counsel's motions for admission for pro hac vice are forthcoming, I served the foregoing document via email to those counsel.


Respectfully submitted,

*/s/ Virginia A. Williamson*
Virginia A. Williamson (D. Md. Bar. No. 31472)
 *Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6584
vwilliamson@oag.state.md.us